## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **USI INSURANCE SERVICES, LLC, and USI INSURANCE SERVICES NATIONAL, INC. f/k/a WELLS FARGO INSURANCE SERVICES USA, INC.,**<br><br>　　　　**Plaintiffs,**<br><br>　　vs.<br><br>**LOCKTON COMPANIES, LLC**<br>　　**444 West 47th Street, Suite 900**<br>　　**Kansas City, Missouri 64112, and**<br><br>**CHAD ELGAS**<br>　　**15224 Iron Horse Circle**<br>　　**Leawood, Kansas 66224,**<br><br>　　　　**Defendants.** | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

---

### COMPLAINT FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES

---

Plaintiffs USI Insurance Services, LLC ("USI"), and USI Insurance Services National, Inc. (formerly known as Wells Fargo Insurance Services USA, Inc., and referred to herein as "Wells Fargo" or the "Company"), for their Complaint state and allege as follows:

### Parties, Jurisdiction, and Venue

1.　　Plaintiff Wells Fargo is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business in Valhalla, New York.

2.　　Plaintiff USI is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Valhalla, New York. USI's sole member is USI Holdings Corporation, which is a Delaware corporation with its principal place of business in the State of New York.

1

***EXHIBIT "A"***

3.     Effective on or about December 1, 2017, USI acquired all the stock of Wells Fargo pursuant to a stock purchase agreement.  Wells Fargo continues to exist as a separate entity.  Through their relationship, Plaintiffs have a common interest in the outcome of this litigation.

4.     Defendant Chad Elgas ("Elgas") is a citizen and resident of the State of Kansas and resides in Leawood, Kansas.  Elgas was an employee of Wells Fargo until he resigned on or about November 28, 2017.

5.     Defendant Lockton Companies, LLC ("Lockton"), is a limited liability company organized and existing under the laws of the State of Missouri, with its principal place of business at 444 West 47th Street, Suite 900, Kansas City, Missouri 64112.  Lockton is registered to do business in the State of Kansas as a foreign limited liability company.  Lockton's registered agent in Kansas is Corporate Creations Network Inc., with a registered office at 4601 E. Douglas Avenue #700, Wichita, Kansas 67218.

6.     On information and belief, no member of Lockton is a citizen of the State of Delaware, New York, or North Carolina.

7.     Immediately upon Elgas's resignation from Wells Fargo he became an employee of one of the Lockton family of companies, which on information and belief is Defendant Lockton.  Elgas engages in significant business activity on Lockton's behalf in the State of Kansas, including but not limited to the activity alleged in this Complaint.

8.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, because this action includes claims arising under the laws of the United States.

2

9. The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. §1367 over state law claims.

10. Subject matter jurisdiction also exists by virtue of diversity of citizenship, 28 U.S.C. §1332. The matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, and there is complete diversity of citizenship. Injunctive relief is also sought.

11. Venue in this Court is appropriate under 28 U.S.C. §1391, because Defendant Elgas is a resident of the State in which this District is located, and because, on information and belief, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## Allegations Common to All Counts

**I.      The Parties' Relationships.**

12. Wells Fargo is a nationwide insurance broker licensed in all 50 States and is engaged in the business of selling and providing insurance services and products to its clients/customers and prospective clients/customers (the terms "clients" and "customers" are used interchangeably in this Complaint).

13. USI is an insurance brokerage and consulting firm that delivers property and casualty, employee benefits, personal risk, program and retirement solutions to large risk management clients, middle market companies, smaller firms, and individuals.

14. Lockton is an insurance broker and part of the Lockton family of companies, which describes itself on its website as "the world's largest privately held, independent insurance broker" (http://www.lockton.com/the-lockton-story, last visited Dec. 12, 2017).

3

15.    Lockton is a direct competitor of Plaintiffs.

16.    As noted, on information and belief, Lockton is also the current employer of Defendant Elgas.

17.    Until on or about November 28, 2017, Defendant Elgas was a Wells Fargo employee employed as a Senior Private Risk Advisor in the Company's Private Risk Management ("PRM") group.

18.    As a condition of Elgas's employment with Wells Fargo, and in consideration for becoming employed and compensated by Wells Fargo, Elgas entered into an agreement with the Company that provided that for two years after his resignation or other termination from employment with Wells Fargo, Elgas was (1) not to solicit, recruit, or promote the solicitation or recruitment of any employee of Wells Fargo for the purpose of encouraging that employee to leave employment with Wells Fargo; and (2) not to solicit, participate in, or promote the solicitation of any Wells Fargo client, customer, or prospective customer with whom Elgas had material contact or regarding whom he received confidential information, for the purpose of providing competitive products or services.

19.    In addition, the agreement prohibited Elgas, both during his employment with Wells Fargo and at any time thereafter, from using or disclosing any trade secrets or confidential information of Wells Fargo or information about the customers of Wells Fargo. The agreement also required Elgas, upon his resignation, to immediately return to Wells Fargo all of its records and confidential information, including but not limited to information stored on computers and other electronic devices.

20.     On or about November 28, 2017, Elgas and seven other members of the PRM group resigned from Wells Fargo and became employees of Lockton or an affiliated business entity.

21.     The resignation letters of the resigning PRM employees were virtually identical and show the concerted nature of their conduct.

22.     The commissions the resigning PRM group employees generated for Wells Fargo totaled approximately $25 million per year.

23.     Elgas is currently employed as Vice President, Private Risk Management, at Lockton.

24.     Since resigning from Wells Fargo and beginning employment with Lockton, Elgas has been directly soliciting Wells Fargo customers.  Elgas has also forwarded his Wells Fargo office telephone line to his personal cell phone.

II.     **Wells Fargo's Business and Operations.**

25.     A key and principal part of Wells Fargo's business is providing insurance products and services that are unique to the particular needs and specifications of its clients and customers.  Information concerning Wells Fargo's customers and the details of their insurance needs and policies, including but not limited to non-public internal procedures, programs, and forms, non-public lists of prospective and insured customers, non-public information compiled on behalf of Wells Fargo regarding such facts as habits and insurance needs of customers and prospective customers, locations and descriptions of insured properties or properties proposed to be insured, expiration dates of insurance policies, and insurance daily reports (hereinafter

5

"Confidential Information," which is further defined below), is considered and treated as highly confidential within Wells Fargo and is not shared with anyone outside of the Company.

26.     Wells Fargo has developed and maintained its Confidential Information through considerable expenditure of time, effort, and expense.

27.     In addition to the time, effort, and money spent to develop this Confidential Information, Wells Fargo has also expended significant time, effort, and money to develop relationships with its customers; to learn the particular insurance needs, specifications, and requirements of its customers; to develop substantial contacts and goodwill with its customers; and to market and sell its insurance products and services to those customers.

28.     Wells Fargo considers and treats all of its Confidential Information as having substantial competitive value to Wells Fargo.

29.     Wells Fargo's Confidential Information is neither generally known nor readily ascertainable by proper means from publicly available sources; is related directly to and used by Wells Fargo's business; and provides Wells Fargo with a competitive advantage over those who do not know this information.  The possession of Wells Fargo's Confidential Information would give competitors, particularly those like Lockton that compete directly with Wells Fargo by providing similar insurance brokerage services in the same area as Wells Fargo, an unfair economic advantage in developing, marketing, brokering, and selling competitive insurance services and products.

30.     Wells Fargo therefore has consistently used, and continues to use, reasonable and diligent efforts to protect and keep secret its Confidential Information.  These efforts include, but are not limited to, prohibiting access to the information by the general public; requiring

6

employees to sign confidentiality agreements; limiting general employee access to the information; instructing employees not to share the information with competitors; and restricting access to its Confidential Information to Wells Fargo employees who agree to maintain its confidentiality and to use the Confidential Information only for the benefit of Wells Fargo.

**III.     Broker of Record.**

31.     At all relevant times there was and still is a general custom and usage in the insurance brokerage industry that a broker of record is the entity authorized by the customer to negotiate insurance policy terms on the customer's behalf.

32.     At all relevant times, there was and still is a general custom and usage in the insurance brokerage business that the broker of record, for services performed, is entitled to commissions based upon a percentage of the insurance premiums payable with respect to the insurance policies purchased by the customer.  In the ordinary situation, the customer pays the premium to the insurance company (which includes a charge for the commission to be paid to the broker of record), and the broker becomes entitled to receive commissions from the insurance company as those premiums are received by the insurance company from the customer.

33.     Thus, an insurance broker like Wells Fargo is entitled to receive a commission from the insurance company for every insurance policy on which Wells Fargo is listed as the broker of record.

34.     When a change in the broker of record occurs, the "new" broker of record is entitled to receive commissions from the insurance company for every policy on which it is listed as the broker of record, and the "old" broker of record is no longer entitled to receive such commissions.

**IV.    Elgas's Agreement with Wells Fargo.**

35.    On July 14, 2014, as a condition of his employment with Wells Fargo, and in consideration of becoming employed and being compensated by Wells Fargo, Elgas entered into a Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, and Assignment of Inventions ("Agreement," a true and correct copy of which is attached hereto as **Exhibit A**).

36.    Section III of the Agreement is entitled "Non-Solicitation Of The Company's Customers and Employees" and provides:

> I agree that for a period of two (2) years immediately following termination or resignation of my employment for any reason, I will not do any of the following, directly or indirectly or through associates, agents, or employees:
>
> a.  solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services;
>
> b.  solicit, participate in or promote the solicitation of any of the Company's clients, customers, or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship; or
>
> c.  Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company:
>
>     i.   with whom I had Material Contact, and/or
>
>     ii.  were clients or customers of the Company within six (6) months prior to my termination of employment.

8

This two (2) year limitation is not intended to limit the Company's right to prevent misappropriation of its Confidential Information beyond the two (2) year period.

37.     Section II of the Agreement is headed "Trade Secrets And Confidential

Information" and provides:

> During the course of my employment I will acquire knowledge of the Company's Trade Secrets and other proprietary information relating to its business, business methods, personnel, and customers (collectively referenced as "Confidential Information"). "Trade Secrets" are defined as information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Company's Trade Secrets include, but are not limited to, the following:

> • the names, address, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies and objectives;

> • any information concerning the Company's operations, including without limitation, information related to its methods, services, pricing, costs, margins and mark ups, finances, practices, strategies, business plans, agreements, decision-making, systems, technology, policies, procedures, marketing, sales, techniques, agent information, and processes;

> • any other proprietary and/or confidential information relating to the Company's customers, employees, products, services, sales, technologies, or business affairs.

> I understand that Records of the Company also constitute Confidential Information and that my obligation to maintain the confidentiality thereof continues at all times during and after my employment. "Records" include, but are not limited to, original, duplicated, computerized, memorized, handwritten or any other form of information, whether contained in materials provided to me by the Company, or by any institution acquired by the Company, or compiled by me in any form or manner including information in documents or electronic devices, such as software, flowcharts, graphs, spreadsheets, resource manuals, videotapes,

9

calendars, day timers, planners, rolodexes, or telephone directories maintained in personal computers, laptop computers, personal digital assistants or any other device. These records do not become any less confidential or proprietary to the Company because I may commit some of them to memory or because I may otherwise maintain them outside of the Company's offices.

I agree that any Confidential Information of the Company is to be used by me solely and exclusively for the purpose of conducting business on behalf of the Company. I am expected to keep such Confidential Information confidential and not to divulge, use or disclose this information except for that purpose. If I resign or am terminated from my employment for any reason, I agree to immediately return to the Company all Records and Confidential Information, including information maintained by me in my office, personal electronic devices, and/or at home.

## V.   Code of Ethics & Business Conduct.

38.     Wells Fargo takes numerous steps to protect its Confidential Information in addition to requiring employees to sign agreements like the Agreement quoted above.  Such steps include, among other things, the policies set forth in Wells Fargo's Code of Ethics & Business Conduct ("Code"), which employees must agree to as a condition of their employment with Wells Fargo.  The "Confidential Information" section of the Code provides, in pertinent part, as follows:

> Your role in privacy protection is critical. As a team member, you will have access to confidential information about Wells Fargo, its customers, team members, and vendors that you are obligated to protect from unauthorized disclosure. Such information is intended solely for use within Wells Fargo and is limited to those with a business need to know. Confidential information acquired by a team member through his or her employment must be held in the strictest confidence and, except for a business reason, must never be discussed with anyone – not even family members. Such information is to be used solely for corporate purposes and never for personal gain and may not be used to compete with Wells Fargo.

> You may not access confidential information without a business purpose. You must not disclose confidential information that you have obtained in the course of your employment to any other team member unless the other team member has a

10

business need to know the information for the performance of his or her duties on behalf of Wells Fargo.

Wells Fargo protects the private, personal, and proprietary information of customers, vendors, and team members. Confidential customer information may not be disclosed to persons outside Wells Fargo except when its disclosure is required by law or in accordance with Wells Fargo's privacy policies and customer agreements. In addition, Wells Fargo may have entered into a confidentiality or nondisclosure agreement to protect a third party's confidential information and to prevent unauthorized disclosure or use of that information. You must be careful to honor those agreements.

\*    \*    \*

Improper release of or unauthorized access to confidential information damages our customers' trust in Wells Fargo and can result in loss of business and even legal action. It also reflects on your ability to do your job and is a violation of company policy and this Code.

39.    The "Proprietary Information" section of the Code provides that "[p]roprietary information is information that is the property of Wells Fargo." It prohibits employees, among other things, from:

- Reveal[ing] any proprietary information about the company or its team members, customers, or vendors to anyone except properly designated team members.

       \*    \*    \*

- Disclos[ing] or us[ing] any proprietary information in a manner that is harmful to Wells Fargo, useful to competitors, or for your own or another's gain.

- Keep[ing] any originals or copies (in electronic or other form) of manuals, notebooks, drawings, notes, reports, proposals, other documents, materials, tools, or equipment or property belonging to Wells Fargo.

40.    Proprietary Information under the Code includes but is not limited to information regarding:

- Wells Fargo's business.

- The Company's financial performance, if it has not been publicly announced.

- Customers.

- Team members.

- Products, services, and pricing.

- Patents and other intellectual property Wells Fargo has not disclosed to the public, including inventions related to any of Wells Fargo's businesses.

- Systems plans and information.

- Data centers or other property information.

- Passwords and computer programs.

- Business plans.

- Marketing plans, strategies, and costs.

- Potential acquisitions and divestitures.

- Any nonpublic information that would be harmful to Wells Fargo if disclosed.

## VI.   Elgas Breaches His Legal and Contractual Obligations.

41.     Unfortunately, Elgas has breached and is continuing to breach his legal and contractual obligations to Wells Fargo, with the active encouragement of his new employer, Lockton, which on information and belief has actual knowledge of Elgas's Agreement with Wells Fargo.

42.     Elgas has been soliciting Wells Fargo's customers in direct violation of his Agreement, and improperly using the Company's Confidential and Proprietary Information in the process, in order to persuade those customers to terminate their relationships with Wells Fargo and transfer their business to Lockton.

43.     For example, on or about December 8, 2017, little more than a week after Elgas's sudden resignation from Wells Fargo, Elgas – together with Michelle Shaner ("Shaner"), also a former Wells Fargo employee who resigned November 28, 2017, and immediately became

12

employed by a Lockton Company – successfully solicited Wells Fargo customers Thomas Davis and Jessica Feshbach Davis to terminate their business relationship with the Company and transfer their business to Lockton.

44.     Also on or about December 8, 2017, Elgas and Shaner successfully solicited Wells Fargo customers Jack and Jeri Veach to terminate their business relationship with the Company and transfer their business to Lockton.  Attached hereto as **Exhibit B** is a true and correct copy of a December 8, 2017, letter from Chubb Personal Risk Services to Wells Fargo, informing Wells Fargo that it would no longer be producer of record on the Veaches' Chubb policies.

**COUNT I**
**Violation of the Computer Fraud and Abuse Act (18 U.S.C. §1030)**
**(Against Elgas)**

45.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 44.

46.     During his employment with Wells Fargo, Elgas had access to Wells Fargo's computer system.

47.     The Wells Fargo computer system to which Elgas had access constitutes a "protected computer" within the meaning of 18 U.S.C. §1030(e) because the computer system is used in interstate or foreign commerce or communication.

48.     Plaintiffs are informed and believe that Elgas intentionally accessed Wells Fargo's computer systems.  The accessing of Wells Fargo's computer systems was without authorization or exceeded Elgas's authorized access in an effort to download and/or print files containing customer information, proprietary information, trade secrets, and other confidential information.

49.     As a result, Elgas furthered his intended fraud upon Wells Fargo and caused Plaintiffs to lose in excess of $5,000.

50.     Plaintiffs have suffered and will continue to suffer irreparable harm and loss, and have sustained damages, including but not limited to loss of capital, loss of valuable business, loss of profits and future profits, and loss of goodwill, in an amount to be determined at trial, which damages are ongoing and continue unabated at the time of the filing of this Complaint.

### COUNT II
### Violation of the Defend Trade Secrets Act (18 U.S.C. §1831 et seq.)
### (Against Both Defendants)

51.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 50.

52.     The information Elgas took from Wells Fargo with the knowledge and assistance of Lockton constitutes trade secrets of Wells Fargo subject to protection under the Defend Trade Secrets Act, 18 U.S.C. §1831 et seq.

53.     This information is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use; it is not readily available to the public or to Wells Fargo's competitors. Wells Fargo spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

54.     Wells Fargo has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including requiring computer access passwords to be used to access Company computer systems and records, and having policies that expressly prohibit the use, removal, and disclosure of such information outside of Wells Fargo.

14

55.     On information and belief, Lockton aided, abetted, and facilitated Elgas's theft and misappropriation of Wells Fargo's trade secrets. Additionally, Defendants are currently in possession of Wells Fargo's trade secrets and acquired that information by improper means.

56.     The foregoing conduct constitutes an actual and threatened misappropriation and misuse of Wells Fargo's trade secret information in violation of the Defend Trade Secrets Act, 18 U.S.C. §1831 et seq.

57.     Elgas's misappropriation of Wells Fargo's trade secrets, and Lockton's material assistance and facilitation of the same, have caused Plaintiffs irreparable injury for which monetary damages alone are an inadequate remedy.

58.     Defendants willfully and maliciously misappropriated Wells Fargo's trade secrets, and Plaintiffs are therefore entitled to recover two times their damages and the reasonable attorney fees they incur in this action, appropriate royalties for the trade secrets that Defendants misappropriated, as well as any amount by which Defendants were unjustly enriched by their misappropriation.

**COUNT III**
**Breach of Contract**
**(Against Elgas)**

59.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 58.

60.     The Agreement is an enforceable contract between Wells Fargo and Elgas.

61.     Elgas has breached the Agreement in that he has used the confidential, proprietary, and trade secret information of Wells Fargo to solicit, switch, and/or convert Wells Fargo's customers to other providers of insurance products and services, and/or has participated or assisted others in soliciting, switching, and/or converting Wells Fargo customers to other

15

providers of insurance products and services by providing such others with access to Wells Fargo's confidential, proprietary, and trade secret information.

62.     Elgas has breached the Agreement in that following his resignation on or about November 28, 2017, he has directly or indirectly solicited, accepted, or serviced Wells Fargo customers who were customers of the Company as of November 28, 2017.

63.     Elgas's breach of the Agreement has caused Plaintiffs irreparable injury for which monetary damages alone are an inadequate remedy.

**COUNT IV**
**Breach of Fiduciary Duty**
**(Against Elgas)**

64.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 63.

65.     By virtue of his prior status as a Senior Private Risk Advisor in Wells Fargo's PRM group, Elgas operated as a fiduciary with respect to Wells Fargo's business, owed the Company the fiduciary duties of loyalty and care, and was required to keep the confidential and proprietary information, trade secrets, and business secrets of Wells Fargo inviolate.

66.     Elgas has breached his fiduciary duties by engaging in misconduct that served his own self-interests and the interests of others rather than the interests of Wells Fargo and has acted in a manner inconsistent with the best interests of Wells Fargo – to wit, relying on his knowledge and information obtained through his employment with Wells Fargo, including the Company's confidential, proprietary, and trade secret information, to improperly solicit, accept, service, switch, and/or convert Wells Fargo's customers to other providers of insurance products and services in order to unfairly compete against Wells Fargo.

16

67.     Elgas's breach of his fiduciary duties and the Agreement has caused Plaintiffs irreparable injury for which monetary damages alone are an inadequate remedy.

68.     Elgas's actions were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Wells Fargo, entitling Plaintiffs to an award of punitive damages.

69.     Elgas will continue to breach his fiduciary duties to Wells Fargo unless restrained by this Court.

### COUNT V
### Breach of Duty of Loyalty
### (Against Elgas)

70.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 69.

71.     Elgas had and has a duty of loyalty to Wells Fargo by virtue of his duty to act for the benefit of the Company in matters connected with his contractual relationship with the Company, and by the special confidence reposed in him by Wells Fargo in connection with his exposure and access to Wells Fargo's confidential, proprietary, and trade secret information, including but not limited to customer information.

72.     Elgas breached his duty of loyalty owed to Wells Fargo by his conduct in communicating with Wells Fargo customers on behalf of himself and/or others for the purpose of soliciting and/or servicing those customers and otherwise competing with Wells Fargo.

73.     Elgas's breach of his duty of loyalty has caused Plaintiffs irreparable injury for which monetary damages alone are an inadequate remedy.

17

74.     Elgas's actions were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Wells Fargo, entitling Plaintiffs to an award of punitive damages.

75.     But for an exercise of the equitable powers of this Court, Plaintiffs will be irreparably injured and harmed by Elgas's continuing breaches of his duty of loyalty to Farmers.

### COUNT VI
### Aiding and Abetting Breaches of Fiduciary Duty and Duty of Loyalty
### (Against Lockton)

76.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 75.

77.     Lockton has assisted, aided, and abetted Elgas in the conduct constituting breach of his fiduciary duty and duty of loyalty to Wells Fargo, and continues to do so.

78.     Lockton has been and is aware of its role in assisting, aiding, and abetting Elgas in breaching his fiduciary duty and duty of loyalty to Wells Fargo.

79.     Lockton has knowingly and substantially assisted Elgas in the conduct constituting breach of his fiduciary duty and duty of loyalty to Wells Fargo, and continues to do so.

80.     Lockton's actions were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Wells Fargo, entitling Plaintiffs to an award of punitive damages.

81.     Lockton's conduct has caused Plaintiffs damages and irreparable injury for which monetary damages alone are an insufficient remedy.

### COUNT VII
### Tortious Interference with Business Expectancy

82.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 81.

18

83.     Wells Fargo has a valid business expectancy and contractual relations in connection with each of its customers whom Elgas has solicited on behalf of Lockton, with Lockton's assistance and encouragement, for the purpose of taking their business from Wells Fargo and transferring it to Lockton.

84.     On information and belief, Elgas, with the assistance and encouragement of Lockton, intentionally interfered with Wells Fargo's business expectancy with respect to Company customers by contacting them individually to solicit their business away from Wells Fargo and to Lockton.

85.     Defendants have no justification for their intentional interference.

86.     Defendants' intentional interference has caused Plaintiffs irreparable injury for which monetary damages alone are an inadequate remedy.

87.     Defendants' actions were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Wells Fargo, entitling Plaintiffs to an award of punitive damages.

88.     But for an exercise of the equitable powers of this Court, Plaintiffs will be irreparably injured and harmed by Defendants' tortious interference with business expectancy.

89.     Defendants will continue to tortiously interfere with Plaintiffs' business expectancies unless restrained by this Court.

### COUNT VIII
### Tortious Interference with Contract
### (Against Lockton)

90.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 89.

91.     Elgas and Wells Fargo were parties to the Agreement, which was a valid and enforceable contract prohibiting Elgas from misappropriating, misusing, and failing to return the Company's Confidential and Proprietary Information, and from soliciting Wells Fargo customers.

92.     On information and belief, Lockton had actual knowledge of the Agreement and Elgas's commitments thereunder.

93.     On information and belief Lockton intentionally interfered with the Agreement by assisting and encouraging Elgas to breach his commitments thereunder.

94.     Lockton has no justification for their intentional interference.

95.     Lockton's intentional interference has caused Plaintiffs irreparable injury for which monetary damages alone are an inadequate remedy.

96.     Lockton's actions were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Wells Fargo, entitling Plaintiffs to an award of punitive damages.

97.     But for an exercise of the equitable powers of this Court, Plaintiffs will be irreparably injured and harmed by Lockton's tortious interference with the Agreement.

98.     Lockton will continue to tortiously interfere with the Agreement unless restrained by this Court.

## COUNT IX
### Unjust Enrichment
### (Against Both Defendants)

99.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 98.

20

100.     As a result of Defendants' misconduct as set forth in this Complaint, Defendants have been unjustly enriched.

101.     The retention of the benefits Defendants thereby wrongfully obtained is inequitable and they should therefore be required to disgorge their wrongful gains.

102.     Defendants' actions were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Wells Fargo, entitling Plaintiffs to an award of punitive damages.

**COUNT X**
**Misappropriation of Trade Secrets (K.S.A. §60-3320 et seq.)**
**(Against Elgas)**

103.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 102.

104.     Elgas had access to trade secrets that consisted of Wells Fargo's Confidential and Proprietary Information.

105.     Elgas misappropriated Wells Fargo's trade secrets by using them to solicit Wells Fargo customers even though Elgas knew he had a duty to Wells Fargo to maintain the secrecy and confidentiality of the trade secrets.

106.     As a result of Elgas's misappropriation of Wells Fargo's trade secrets, Plaintiffs have suffered damages.

107.     Elgas's misappropriation was willful and malicious, as a result of which Plaintiffs are entitled to exemplary damages and reasonable attorney's fees.

**COUNT XI**
**Civil Conspiracy**
**(Against Both Defendants)**

108.     Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 107.

21

109.    Defendants had a meeting of the minds with the object of accomplishing the conduct stated in this Complaint.

110.    Defendants did perform one or more unlawful overt acts in furtherance of accomplishing their objective, as set forth above.

111.    Plaintiffs have suffered damages as a result of this conspiracy.

112.    The actions of Defendants as set forth above were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of Plaintiffs, entitling Plaintiffs to an award of punitive damages.

## COUNT XII
### Permanent Injunction
### (Against Both Defendants)

113.    Plaintiffs reallege and incorporate by reference herein paragraphs 1 through 112.

114.    Plaintiffs request that this Court issue an injunction: (a) ordering Defendants to return to Wells Fargo the confidential, proprietary, and trade secret information of Wells Fargo still within their possession, custody, or control; (b) prohibiting Defendants from using any confidential, proprietary, and trade secret information of Wells Fargo, including but not limited to information regarding Wells Fargo customers, to solicit, service, switch and/or convert Wells Fargo's customers to other providers of insurance products and services; and (c) prohibiting Defendants, either directly or indirectly, from soliciting, accepting the business of, or servicing any Wells Fargo customer that was a customer of the Company as of the date of Elgas's resignation from the Company, November 28, 2017.

115.    By reason of the conduct set forth above, Plaintiffs have suffered great and irreparable injury. Unless Elgas is enjoined from further breach of the Agreement, and Lockton

is enjoined from facilitating, encouraging, and/or allowing the same, Plaintiffs will suffer additional irreparable injury by the continuing loss of Wells Fargo customers and the further disclosure of confidential, proprietary, and trade secret information, and will incur future economic loss which is incalculable.

116.    No damage to Defendants will result from injunctive relief.  Both Defendants can continue to sell insurance products and services, but cannot use the confidential, proprietary, and trade secret information of Wells Fargo, and Elgas cannot, directly or indirectly, solicit, accept, or service Wells Fargo customers either on her own behalf or on behalf of another individual or entity.

117.    Plaintiffs have no adequate remedy at law, as the damages in terms of money for the future loss of customers and confidential, proprietary, and trade secret information arising from Defendants' conduct cannot be measured or calculated.

118.    The threatened harm to Plaintiffs is greater should injunctive relief not be ordered in that Elgas is in violation of the terms of the Agreement, Lockton is facilitating, encouraging, and/or permitting him to do so, and Defendants are in possession of Wells Fargo's confidential, proprietary, and trade secret information.

119.    The public has an interest in seeing that contractual provisions, including provisions regarding the use and disclosure of confidential, proprietary, and trade secret information and non-solicitation, are enforced.

120.    Accordingly, Plaintiffs request that this Court issue permanent injunctive relief as follows:

      a.    Issue an order requiring Defendants to return to Wells Fargo all confidential, proprietary, and trade secret information belonging to Wells Fargo (including but

23

not limited to the Company's Confidential and Proprietary Information) that is in their possession, including but not limited to all such information in electronic form;

b.   Issue an order instructing Elgas to delete no matter from his personal computer(s), cell phones, and all other electronic devices, and to turn such devices over to Plaintiffs' counsel for review by investigators chosen by Plaintiffs;

c.   Issue an order enjoining and restraining Elgas for two years from the date of the order from:

   i.   directly or indirectly soliciting, accepting, and/or servicing any Wells Fargo customer who was a Wells Fargo customer as of November 28, 2017;

   ii.   directly or indirectly switching and/or converting Wells Fargo customers to other providers of insurance products or services, including but not limited to Lockton;

d.   Issue an order permanently enjoining and restraining Elgas from:

   i.   directly or indirectly making use of confidential, proprietary, and trade secret information belonging to Wells Fargo (including but not limited to the Company's Confidential and Proprietary Information); and

   ii.   otherwise breaching the terms of the Agreement.

e.   Issue an order permanently enjoining and restraining Lockton from using any confidential, proprietary, or trade secret information of Wells Fargo to solicit Wells Fargo's customers to switch their business to Lockton;

f.   Award judgment in Plaintiffs' favor and against Defendants; award Plaintiffs damages, including but not limited to punitive and exemplary damages; award Plaintiffs their costs expended herein, including reasonable attorneys' fees; and award Plaintiffs such other and further relief as may be just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment in their favor and against Defendants for: permanent injunctive relief as set forth in Count XII; for damages as are fair and reasonable, including actual damages, punitive damages, exemplary damages, equitable relief, pre-judgment

and post-judgment interest, costs, and attorneys' fees; and for such other and further relief as the Court may deem just and proper.

## Demand for Jury Trial

Plaintiffs hereby demand a jury trial on all causes of action and claims.

## Designation of Place of Trial

Plaintiffs hereby designate the place of trial as the United States District Court for the District of Kansas in Kansas City, Kansas.

Respectfully submitted,

/s/ Melody L. Rayl
Melody L. Rayl, Esq., KS Bar No. 23730
FISHER & PHILLIPS, LLP
4900 Main Street, Suite 650
Kansas City, Missouri 64112
TEL: (816) 842-8770
FAX: (816) 842-8767
E-Mail: mrayl@fisherphillips.com

ATTORNEY FOR PLAINTIFFS

# Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, And Assignment Of Inventions



**Exhibit A**

## I. Introduction

In consideration for my becoming employed and compensated by a Wells Fargo company and/or any of its past, present, and future parent companies, subsidiaries, predecessors, successors, affiliates, and acquisitions (collectively "the Company"), I agree as follows:

I acknowledge that the nature of my employment with the Company permits me to have access to certain of its trade secrets and/or confidential and proprietary information. Nevertheless, such information is, and shall always remain, the sole and exclusive property of the Company. Any unauthorized acquisition, disclosure or use of this information would be wrongful and would cause the Company irreparable harm. I also acknowledge that if in the course of my employment I develop Inventions (as defined herein), I agree to assign these inventions to the Company.

## II. Trade Secrets And Confidential Information

During the course of my employment I will acquire knowledge of the Company's Trade Secrets and other proprietary information relating to its business, business methods, personnel, and customers (collectively referenced as "Confidential Information"). "Trade Secrets" are defined as information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Company's Trade Secrets include, but are not limited to, the following:

• the names, address, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies and objectives;

• any information concerning the Company's operations, including without limitation, information related to its methods, services, pricing, costs, margins and mark ups, finances, practices, strategies, business plans, agreements, decision-making, systems, technology, policies, procedures, marketing, sales, techniques, agent information, and processes;

• any other proprietary and/or confidential information relating to the Company's customers, employees, products, services, sales, technologies, or business affairs.

I understand that Records of the Company also constitute Confidential Information and that my obligation to maintain the confidentiality thereof continues at all times during and after my employment. "Records" include, but are not limited to, original, duplicated, computerized, memorized, handwritten or any other form of information, whether contained in materials provided to me by the Company, or by any institution acquired by the Company, or compiled by me in any form or manner including information in documents or electronic devices, such as software, flowcharts, graphs, spreadsheets, resource manuals, videotapes, calendars, day timers, planners, rolodexes, or telephone directories maintained in personal computers, laptop computers, personal digital assistants or any other device. These records do not become any less confidential or proprietary to the Company because I may commit some of them to memory or because I may otherwise maintain them outside of the Company's offices.

I agree that any Confidential Information of the Company is to be used by me solely and exclusively for the purpose of conducting business on behalf of the Company. I am expected to keep such Confidential Information confidential and not to divulge, use or disclose this information except for that purpose. If I resign or am terminated from my employment for any reason, I agree to immediately return to the Company all Records and Confidential Information, including information maintained by me in my office, personal electronic devices, and/or at home.

## III. Non-Solicitation Of The Company's Customers And Employees

I agree that for a period of two (2) years immediately following termination or resignation of my employment for any reason, I will not do any of the following, directly or indirectly or through associates, agents, or employees:

a. solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services;

b. solicit, participate in or promote the solicitation of any of the Company's clients, customers, or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship; or

POOR QUALITY
COPY RECEIVED




c. Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company:

   i. with whom I had Material Contact, and/or

   ii. were clients or customers of the Company within six (6) months prior to my termination of employment.

This two (2) year limitation is not intended to limit the Company's right to prevent misappropriation of its Confidential Information beyond the two (2) year period.

## IV. Compliance With Other Agreements

It is understood that I have complied and will continue to comply with any other policies covering trade secrets, inventions, confidential information or solicitation from any former employer. I certify that, to the best of my information and belief, I am not a party to any other agreement that will interfere with my full compliance with this Agreement, including any agreement relating to the non-disclosure of information of any other individual or entity, or that prior to my employment I disclosed any such agreements to Wells Fargo for proper legal review. I also certify that I will not disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to any previous employer or others. I agree not to enter into any agreement either written or oral that conflicts with any provision of this Agreement.

## V. Assignment Of Inventions

I agree to disclose to the Company promptly in writing complete information regarding all Inventions that I make, conceive or first reduce to practice (alone or in conjunction with others) during my employment with the Company. For the purposes of this Assignment, the term "Invention" means any invention, discovery, design, formula, modification, improvement, new idea, business method, process, algorithm, software program, know how or trade secret, or other work or concept, whether recorded in a written document, electronically or not recorded at all and whether or not copyrightable or patentable. The categories of Inventions that are subject to this assignment are: (1) all Inventions that relate at the time of conception or reduction to practice of the Invention to the Company's business, or actual or demonstrably anticipated research or development of the Company whether or not I made, conceived or first reduced the Inventions to practice during normal working hours; and (2) all Inventions involving the use of any time, material, information, or facility of the Company. I acknowledge and agree that all Inventions and all worldwide intellectual property rights therein are owned by the Company. All intellectual property rights in the Inventions shall vest in the Company on the date such Inventions are created, conceived, reduced to practice, actually or constructively, or reduced to a tangible medium of expression, whichever occurs first. Without limiting the foregoing, I agree that if any Inventions are copyrightable and fall within the definition of a "work made for hire" as defined in 17 U.S.C. §101 and §201(b), such Inventions will be considered "works made for hire" and all copyrights and copyright registrations related to such copyrightable Inventions will be the sole and exclusive property of the Company. If, and to the extent that, all intellectual property rights in any Inventions do not vest in the Company, I hereby irrevocably grant and assign to the Company without reservation, all of my worldwide ownership rights, title and interest in and to all Inventions and all present and future intellectual property rights in such Inventions, and irrevocably waive all moral rights in, and other intellectual property rights to, all Inventions.

By entering into this Assignment, I understand that I am not conveying any rights in Inventions I may have made, conceived or first reduced to practice before my employment with the Company ("Prior Inventions"). If I claim ownership in any Prior Inventions, I have identified and provided a non-confidential description of each such Prior Invention in the space provided below (and on additional pages as necessary):

POOR QUALITY COPY RECEIVED

_____

_____

_____

Notwithstanding the foregoing, this assignment of Inventions as set forth above does not apply to an Invention that I developed entirely on my own time without using the Company's equipment, supplies, facilities, or trade secret information except for those Inventions that either: (i) relate at the time of conception or reduction to practice of the Invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or (ii) result from any work performed by me for the Company.

I further agree, without charge and at the Company's expense, to give the Company all assistance it reasonably requires to evidence, establish, maintain, perfect, protect, and use the rights to the Inventions I have assigned to it. In particular, but without limitation, I agree to sign all documents, supply all information, and provide all written or oral testimony that the Company may deem necessary or desirable to: (i) transfer or record the transfer of my entire right, title, and interest in the assigned Inventions; (ii) enable the Company to obtain patent protection for such Inventions anywhere in the world; and (iii) protect and enforce Company's rights in the Inventions and the intellectual property rights therein. Notwithstanding the foregoing, I hereby irrevocably appoint Wells Fargo as attorney in fact (coupled with an interest) to execute any such documents.

HR56095NonA (4-19 128221)                               Page 2 of 3

**VI. Employment At Will**

I understand that my employment with the Company is "at will" and nothing in this document changes, alters or modifies my "at will" status or my obligation to comply with all policies, procedures and rules of the Company, as they may be adopted or amended from time to time. My employment at will status may not be changed except in writing, signed by me and an officer of the Company at the level of executive vice president or higher, authorized by the senior Human Resource Manager for my business group.

**VII. Injunctive Relief & Damages**

Recognizing the irreparable nature of the injury that could be done by my violation of this Agreement and that money damages would be inadequate compensation to the Company, it is agreed that any violation of this Agreement by me should be the proper subject for immediate injunctive relief, specific performance and other equitable relief to the Company. I further agree to communicate the contents of this section and the non-solicitation and non-disclosure sections of this Agreement to any prospective employer.

**VIII. Severability And Judicial Modification**

If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions shall remain in full force and effect and the invalid or unenforceable provision shall be modified only to the extent necessary to render that provision valid and enforceable to the fullest extent permitted by law. If the invalid or unenforceable provision cannot be modified, that provision shall be severed from the Agreement and all other provisions shall remain valid and enforceable.

**IX. Choice Of Law/Integration/Survival**

This Agreement and any dispute, controversy or claim which arises under or relates in any way to it shall be governed by the law of state where the incident(s) giving rise to the dispute or claim arose. This Agreement supersedes any prior written or verbal agreements pertaining to the subject matter herein, and is intended to be a final expression of our Agreement with respect only to the terms contained herein; provided, however, that the employee and customer non-solicitation provisions herein are in addition to, and not in lieu of, any such provisions contained in any prior agreements. There may be no modification of this Agreement except in writing signed by me and an officer of the Company at a level of executive vice president or higher. This Agreement shall survive my employment by the Company, inure to the benefit of successors and assigns of the Company, and is binding upon my heirs and legal representatives.

**ACKNOWLEDGMENT**

I acknowledge that I have read, understand, and received a copy of this Agreement and will abide by its terms.

| | |
|---|---|
| _Chad_ (signature) | 7/14/14 |
| Team Member's Signature | Date |
| Chad Elgas | 1484958 |
| Print Name | Employee ID |

POOR QUALITY
COPY RECEIVED

**Exhibit B**

Chubb Personal Risk Services
202 Hall's Mill Rd.
Whitehouse Stn, NJ 08889

O: 908-572-3804
F: 888-684-2200
E: Cpi-Brokerofrecord@chubb.com

14 December 2017

WELLS FARGO INSURANCE SERVICES USA, INC. (IL)
10 S WACKER DR, 17TH FL
CHICAGO, IL 60606

CHUBB®

RE: JACK & JERI VEACH

Policy: 1387402404, 1387402405, 1387402406, 1387402407

Dear Agent,

This letter is to advise you that the insured listed above has requested that the noted policy(s) be handled by another producer effective 12/29/2017.

In order to accommodate this change, we will:

☐ **Cancel** the inforce policy.
☒ **Endorse** the inforce policy.

Chubb's producer of record procedures applies to all premiums, commissions and losses on this account. Specifically:

- Original premiums and installments (including commissions), prior to the effective date of the transfer are your responsibility.
- Installments, endorsements and cancellations after the effective date of the transfer, are the responsibility of the new producer.
- Losses that occur prior to the effective date of the transfer will be booked to you; losses that occur after the effective date of the transfer will be booked to the new producer.

If you have any questions, please call me at 908-572-3526.

Sincerely,

Ryan Smith
BOR Customer Service Representative