## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **USI INSURANCE SERVICES, LLC, and WELLS FARGO INSURANCE SERVICES USA, INC.,**<br><br>     **Plaintiffs,**<br><br>  **vs.**<br><br>**LOCKTON-DUNNING SERIES OF LOCKTON COMPANIES, LLC; and DESIRE ALBION,**<br><br>     **Defendants.** | Case No.<br><br>**JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT

Plaintiffs USI Insurance Services, LLC ("USI"), and Wells Fargo Insurance Services USA, Inc. ("Wells Fargo" or the "Company"), in their Complaint against Defendants Desire Albion ("Albion") and Lockton-Dunning Series of Lockton Companies, LLC ("Lockton"; collectively, "Defendants"), state and allege as follows:

### PARTIES

1.    Plaintiff Wells Fargo is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business in Charlotte, North Carolina.

2.    Plaintiff USI is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Valhalla, New York. USI's sole member is USI, Inc., which is a Delaware corporation with its principal place of business in New York.

3.    Effective on or about December 1, 2017, USI acquired all of the stock of Wells Fargo pursuant to a stock purchase agreement. Wells Fargo continues to exist as a separate entity. Through this relationship, Plaintiffs have a common interest in the outcome of this litigation. ████████████████████████████████████████

*EXHIBIT "B"*

4.      Lockton is a limited liability company organized and existing under the law of the State of Missouri, with its principal place of business in Dallas Texas.

5.      On information and belief, the sole member of Lockton is Lockton Insurance Agency, LLC, a limited liability company organized and existing under the law of the State of Missouri, with its principal office in Kansas City, Missouri.

6.      On information and belief, the sole member of Lockton Insurance Agency, LLC, is its organizer, William W. Humphrey III, an individual who on information and belief is a citizen of the State of Missouri.

7.      Defendant Albion is a citizen of the State of Texas, and on information and belief is a resident of McKinney, Texas.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 as the parties are diverse and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

9.      The Court also has jurisdiction over this action under 28 U.S.C. §1331, because this action includes claims asserted under 18 U.S.C. §1030 and 18 U.S.C. §1831 et seq. Jurisdiction in that case arises over the state law claims pursuant to 28 U.S.C. §1367.

10.     Venue is proper in this District because, on information and belief, Albion lives and works in this District, and most or all of the conduct alleged in this Complaint occurred in this District.

## FACTS COMMON TO ALL COUNTS

### I.      The Parties' Relationships.

11.     Wells Fargo is a nationwide insurance broker licensed in the State of Texas and is engaged in the business of selling and providing insurance services and products to its clients/customers and prospective clients/customers (the terms "clients" and "customers" are used interchangeably in this Complaint).

12.     USI is an insurance brokerage and consulting firm that delivers property and casualty, employee benefits, personal risk, program and retirement solutions to large risk management clients, middle market companies, smaller firms, and individuals.

13.     Lockton is an insurance broker and part of the Lockton family of companies, which describes itself on its website as "the world's largest privately held, independent insurance broker" (http://www.lockton.com/the-lockton-story, last visited Dec. 12, 2017).

14.     Lockton is a direct competitor of Plaintiffs.

15.     On information and belief, Lockton is also the current employer of Defendant Albion.

16.     Until on or about November 28, 2017, Defendant Albion was a Wells Fargo employee employed in the Company's Dallas, Texas, office as a Senior Private Risk Advisor-Vice President in the Company's Private Risk Management group, selling insurance products and services.

17.     In consideration of her continued employment by Wells Fargo and of her ability to participate in a new compensation plan containing new and additional benefits that included but were not limited to a guaranteed draw and increased commission percentage, Albion entered into an agreement with the Company that provided that for two years after the termination of her employment with Wells Fargo for any reason, Albion was (1) not to solicit, recruit, or promote the solicitation or recruitment of any employee of Wells Fargo for the purpose of encouraging that employee to leave employment with Wells Fargo; and (2) not to solicit, participate in, or promote the solicitation of any Wells Fargo client, customer, or prospective customer with whom Albion had material contact or regarding whom she received confidential information, for the purpose of providing competitive products or services.

18.     In addition, the agreement prohibited Albion, both during her employment with Wells Fargo and at any time thereafter, from using or disclosing any trade secrets or confidential information of Wells Fargo or information about the customers of Wells Fargo.  The agreement also required Albion, upon her resignation, to immediately return to Wells Fargo all of its

records and confidential information, including but not limited to information stored on computers and other electronic devices.

19.     On or about November 28, 2017, Albion and other members of the Private Risk Management group resigned from Wells Fargo and immediately became employees of various entities of the Lockton family of companies, which are direct competitors of Plaintiffs.

20.     The resignation letters of the resigning Private Risk Management employees were virtually identical and showed the concerted nature of their conduct.

21.     The commissions the resigning Private Risk Management group employees generated for Wells Fargo totaled approximately $25 million per year.

22.     Albion is currently employed as Vice President-Private Risk Management at Lockton.

23.     Since resigning from Wells Fargo and beginning employment with Lockton, Albion has been directly soliciting Wells Fargo customers, using Wells Fargo's trade secrets and confidential and proprietary information.

II.     **Wells Fargo's Business and Operations.**

24.     A key and principal part of Wells Fargo's business is providing insurance products and services that are unique to the particular needs and specifications of its clients and customers.  Information concerning Wells Fargo's customers and the details of their insurance needs and policies, including but not limited to non-public internal procedures, programs, and forms, non-public lists of prospective and insured customers, non-public information compiled on behalf of Wells Fargo regarding such facts as habits and insurance needs of customers and prospective customers, locations and descriptions of insured properties or properties proposed to be insured, expiration dates of insurance policies, and insurance daily reports (hereinafter "Confidential Information," which is further defined below), is considered and treated as highly confidential within Wells Fargo and is not shared with anyone outside of the Company.

25.     Wells Fargo has developed and maintained its Confidential Information through considerable expenditure of time, effort, and expense.

26.     In addition to the time, effort, and money spent to develop this Confidential Information, Wells Fargo has also expended significant time, effort, and money to develop relationships with its customers; to learn the particular insurance needs, specifications, and requirements of its customers; to develop substantial contacts and goodwill with its customers; and to market and sell its insurance products and services to those customers.

27.     Wells Fargo considers and treats all of its Confidential Information as having substantial competitive value to Wells Fargo.

28.     Wells Fargo's Confidential Information is neither generally known nor readily ascertainable by proper means from publicly available sources; is related directly to and used by Wells Fargo's business; and provides Wells Fargo with a competitive advantage over those who do not know this information.  The possession of Wells Fargo's Confidential Information would give competitors, particularly those like Lockton that compete directly with Wells Fargo by providing similar insurance brokerage services in the same area as Wells Fargo, an unfair economic advantage in developing, marketing, brokering, and selling competitive insurance services and products.

29.     Wells Fargo therefore has consistently used, and continues to use, reasonable and diligent efforts to protect and keep secret its Confidential Information.  These efforts include, but are not limited to, prohibiting access to the information by the general public; requiring employees to sign confidentiality agreements; limiting general employee access to the information; instructing employees not to share the information with competitors; and restricting access to the information to Wells Fargo employees who agree to maintain its confidentiality and to use the Confidential Information only for the benefit of Wells Fargo.

**III.     Broker of Record.**

30.     At all relevant times there was and still is a general custom and usage in the insurance brokerage industry that a broker of record is the entity authorized by the customer to negotiate insurance policy terms on the customer's behalf.

31.     At all relevant times, there was and still is a general custom and usage in the insurance brokerage business that the broker of record, for services performed, is entitled to commissions based upon a percentage of the insurance premiums payable with respect to the insurance policies purchased by the customer.  In the ordinary situation, the customer pays the premium to the insurance company (which includes a charge for the commission to be paid to the broker of record), and the broker becomes entitled to receive commissions from the insurance company as those premiums are received by the insurance company from the customer.

32.     Thus, an insurance broker like Wells Fargo is entitled to receive a commission from the insurance company for every insurance policy on which Wells Fargo is listed as the broker of record.

33.     When a change in the broker of record occurs, the "new" broker of record is entitled to receive commissions from the insurance company for every policy on which it is listed as the broker of record, and the "old" broker of record is no longer entitled to receive such commissions.

## IV.     Albion's Agreement with Wells Fargo.

34.     On December 29, 2009, in consideration of her continued employment at Wells Fargo, and of the ability to participate in a new compensation plan containing new and additional benefits, including but not limited to a guaranteed draw and increased commission percentage, Albion entered into a Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, and Assignment of Inventions ("Agreement," copy attached hereto as **Exhibit A**).

35.     Section III of the Agreement is entitled "Non-Solicitation Of The Company's Customers And Employees" and provides:

> I agree that for a period of two (2) years immediately following termination of my employment for any reason, I will not do any of the following, directly or indirectly or through associates, agents, or employees:
>
>> a. solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging

that employee or consultant to leave the Company's employ or sever an agreement for services;

b. solicit, participate in or promote the solicitation of any of the Company's clients, customers, or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in Competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship; or

c. Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company:

   i. with whom I had Material Contact, and/or

   ii. were clients or customers of the Company within six (6) months prior to my termination of employment.

This two-year limitation is not intended to limit the Company's right to prevent misappropriation of its Confidential Information beyond the two-year period.

36.      Section II of the Agreement is headed "Trade Secrets And Confidential Information" and provides:

During the course of my employment I will acquire knowledge of the Company's Trade Secrets and other proprietary information relating to its business, business methods, personnel, and customers (collectively referenced as "Confidential Information"). "Trade Secrets" are defined as information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Company's Trade Secrets include, but are not limited to, the following:

• the names, address, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies and objectives;

• any information concerning the Company's operations, including without limitation, information related to its methods, services, pricing, costs, margins and mark ups, finances, practices, strategies, business plans, agreements, decisionmaking, systems, technology, policies, procedures, marketing, sales, techniques, agent information, and processes;

• any other proprietary and/or confidential information relating to the Company's customers, employees, products, services, sales, technologies, or business affairs.

I understand that Records of the Company also constitute Confidential Information and that my obligation to maintain the confidentiality thereof continues at all times during and after my employment. "Records" include, but are not limited to, original, duplicated, computerized, memorized, handwritten or any other form of information, whether contained in materials provided to me by the Company, or by any institution acquired by the Company, or compiled by me in any form or manner including information in documents or electronic devices, such as software, flowcharts, graphs, spreadsheets, resource manuals, videotapes, calendars, day timers, planners, rolodexes, or telephone directories maintained in personal computers, laptop computers, personal digital assistants or any other device. These records do not become any less confidential or proprietary to the Company because I may commit some of them to memory or because I may otherwise maintain them outside of the Company's offices.

I agree that any Confidential Information of the Company is to be used by me solely and exclusively for the purpose of conducting business on behalf of the Company. I am expected to keep such Confidential Information confidential and not to divulge, use or disclose this information except for that purpose. If I resign or am terminated from my employment for any reason, I agree to immediately return to the Company all Records and Confidential Information, including information maintained by me in my office, personal electronic devices, and/or at home.

## V.   Code of Ethics & Business Conduct.

37.     Wells Fargo takes numerous steps to protect its Confidential Information in addition to requiring employees to sign agreements like the Agreement quoted above.  Such steps include, among other things, the policies set forth in Wells Fargo's Code of Ethics & Business Conduct ("Code"), which employees must agree to as a condition of their employment with Wells Fargo.  The "Confidential Information" section of the Code provides, in pertinent part, as follows:

Your role in privacy protection is critical. As a team member, you will have access to confidential information about Wells Fargo, its customers, team members, and vendors that you are obligated to protect from unauthorized disclosure. Such information is intended solely for use within Wells Fargo and is limited to those with a business need to know. Confidential information acquired by a team member through his or her employment must be held in the strictest confidence and, except for a business reason, must never be discussed with anyone – not even family members. Such information is to be used solely for corporate purposes and never for personal gain and may not be used to compete with Wells Fargo.

You may not access confidential information without a business purpose. You must not disclose confidential information that you have obtained in the course of your employment to any other team member unless the other team member has a business need to know the information for the performance of his or her duties on behalf of Wells Fargo.

Wells Fargo protects the private, personal, and proprietary information of customers, vendors, and team members. Confidential customer information may not be disclosed to persons outside Wells Fargo except when its disclosure is required by law or in accordance with Wells Fargo's privacy policies and customer agreements. In addition, Wells Fargo may have entered into a confidentiality or nondisclosure agreement to protect a third party's confidential information and to prevent unauthorized disclosure or use of that information. You must be careful to honor those agreements.

\*    \*    \*

Improper release of or unauthorized access to confidential information damages our customers' trust in Wells Fargo and can result in loss of business and even legal action. It also reflects on your ability to do your job and is a violation of company policy and this Code.

38.    The "Proprietary Information" section of the Code provides that "[p]roprietary information is information that is the property of Wells Fargo." It prohibits employees, among other things, from:

- Reveal[ing] any proprietary information about the company or its team members, customers, or vendors to anyone except properly designated team members.

\*    \*    \*

- Disclos[ing] or us[ing] any proprietary information in a manner that is harmful to Wells Fargo, useful to competitors, or for your own or another's gain.

- Keep[ing] any originals or copies (in electronic or other form) of manuals, notebooks, drawings, notes, reports, proposals, other documents, materials, tools, or equipment or property belonging to Wells Fargo.

39.     Proprietary Information under the Code includes but is not limited to information regarding:

- Wells Fargo's business.

- The Company's financial performance, if it has not been publicly announced.

- Customers.

- Team members.

- Products, services, and pricing.

- Patents and other intellectual property Wells Fargo has not disclosed to the public, including inventions related to any of Wells Fargo's businesses.

- Systems plans and information.

- Data centers or other property information.

- Passwords and computer programs.

- Business plans.

- Marketing plans, strategies, and costs.

- Potential acquisitions and divestitures.

- Any nonpublic information that would be harmful to Wells Fargo if disclosed.

**VI.     Albion Breaches Her Legal and Contractual Obligations, with the Active Involvement of Lockton.**

40.     Unfortunately, Albion has breached and is continuing to breach her legal and contractual obligations to Wells Fargo, with the active encouragement and assistance of her new employer, Lockton, who on information and belief knows of Albion's Agreement with Wells Fargo.

41.     On information and belief, Albion has been soliciting Wells Fargo's customers, using the Company's Confidential Information, in direct violation of the Agreement.

42.     For example, on or about December 5, 2017, just one week after Albion's sudden resignation from Wells Fargo, the Company received copies of two broker of record letters, prepared by a Lockton employee for the signature of two Wells Fargo customers who had been serviced by Albion during her Wells Fargo employment.   The two broker of record letters informed two respective insurers that Lockton would be the customers' new broker of record.  A copy of the two broker of record letters is attached hereto as **Exhibit B**.

## COUNT I

## BREACH OF CONTRACT

**(Against Albion)**

43.     The allegations of Paragraphs 1 through 42 are incorporated by reference herein with the same force and effect as if set forth in full below.

44.     Albion's Agreement is a valid contract supported by adequate consideration.

45.     By engaging in the conduct described above, including but not limited to soliciting Wells Fargo customers and using Wells Fargo's Confidential Information and other trade secrets to compete with Wells Fargo, Albion has breached and is continuing to breach the Agreement.

46.     Albion's breach of the Agreement has caused Plaintiffs irreparable injury for which monetary damages alone are an insufficient remedy.

## COUNT II

## VIOLATION OF TEXAS UNIFORM TRADE SECRETS ACT

**(Against Both Defendants)**

47.     The allegations of Paragraphs 1 through 46 are incorporated by reference herein with the same force and effect as if set forth in full below.

48.     Wells Fargo reposed its trust and confidence in Albion by disclosing to her and giving her access to the Company's Confidential and Proprietary Information, as defined above, which constitutes trade secrets under the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §134A.001 et seq.

49.     As described above, Wells Fargo has taken reasonable measures to keep its Confidential and Proprietary Information secret, including but not limited to requiring employees to enter into agreements like the Agreement Albion entered into, and by adopting policies, like the Code of Business Conduct & Ethics, that require employees to maintain the confidentiality of Wells Fargo's Confidential and Proprietary Information and use it only for the benefit of the Company.

50.     As described above, Wells Fargo's Confidential and Proprietary Information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure and use of that information.

51.     On information and belief, Albion has misappropriated, and continues to misappropriate, Wells Fargo's Confidential and Proprietary Information, by using it to compete with Wells Fargo and solicit Wells Fargo customers, and by revealing it to Lockton.

52.     On information and belief, Lockton has misappropriated, and continues to misappropriate, Wells Fargo's Confidential and Proprietary Information by having acquired it from Albion, who had a contractual and legal duty not to reveal it outside of Wells Fargo and not to use it for the benefit of any individual or entity except for Wells Fargo.

53.     Lockton has also misappropriated, and continues misappropriate, Wells Fargo's Confidential and Proprietary Information by using it to unfairly compete against Wells Fargo.

54.     As a result, Plaintiffs have suffered damages as well as irreparable injury for which monetary damages alone are an insufficient remedy.

55.     Defendants' misappropriation is willful and malicious, as a result of which Plaintiffs are entitled to exemplary damages of twice the amount of other damages awarded, and to an award of reasonable attorney's fees.

## COUNT III

## VIOLATION OF TEXAS THEFT LIABILITY ACT

### (Against Both Defendants)

56.     The allegations of Paragraphs 1 through 55 are incorporated by reference herein with the same force and effect as if set forth in full below.

57.     By unlawfully appropriating Wells Fargo's Confidential and Proprietary Information, which rightfully belongs to Wells Fargo, without the Company's consent and with the intent to deprive Wells Fargo of its property, Defendants are liable under the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code §134.001 et seq.

58.     In addition to actual damages, Plaintiffs seek an award of additional damages in the maximum amount allowed by law, as provided by Tex. Civ. Prac. & Rem. Code §134.005(a)(1).

## COUNT IV

## TORTIOUS INTERFERENCE WITH CONTRACTS
## AND BUSINESS RELATIONSHIPS

### (Against Both Defendants)

59.     The allegations of Paragraphs 1 through 58 are incorporated by reference herein with the same force and effect as if set forth in full below.

60.     Wells Fargo had and continues to have business and/or contractual relationships with its customers.

61.     Wells Fargo has also expended and continues to expend significant efforts and resources to identify prospective customers.

62.     Defendants have used and continue to use Wells Fargo's Confidential and Proprietary Information to divert and procure the Company's customers and prospective customers.

63.     Defendants have intentionally and tortiously interfered with the relationships Wells Fargo has with its current and prospective customers by using improper and unlawful

means, including but not limited to the use of Wells Fargo's Confidential and Proprietary Information, to solicit and encourage the Company's current and prospective customers to sever their relationships with Wells Fargo and give their business to Lockton.

64.     Defendants are in a position to continue such unlawful conduct, which will result in immediate and irreparable harm to Wells Fargo's business and contractual relationships with its customers.   Defendants' unlawful conduct will continue unless restrained immediately by order of the Court.

65.     Defendants' tortious interference with Wells Fargo's current and prospective relationships with its customers has proximately caused, and continues to cause, damage to the Plaintiffs.   Plaintiffs have incurred, and continue to incur, damages, lost profits, and economic injury as a result of Defendants' tortious interference.   Defendants' conduct was and is also malicious and, as a result, Plaintiffs are entitled to exemplary damages.

66.     By Defendants' actual and threatened unlawful conduct, Plaintiffs have also suffered and will continue to suffer immediate and irreparable harm, including but not limited to loss of good will that cannot be compensated adequately by an award of damages in that Wells Fargo's current and prospective contractual and business relationships will be permanently damaged.   The injunctive relief prayed for herein is reasonably suited to abate such conduct and will do no more than restore the parties to their status as it existed prior to Defendants' unlawful interference.   Any harm done by issuing injunctive relief prayed for herein does not outweigh the substantial loss to be caused by Defendants' actual and threatened unlawful actions. Accordingly, Plaintiff are entitled to injunctive relief due to Defendants' past and ongoing unlawful conduct.

## COUNT V

## TORTIOUS INTERFERENCE WITH CONTRACT

### (Against Lockton)

67.     The allegations of Paragraphs 1 through 66 are incorporated by reference herein with the same force and effect as if set forth in full below.

68.     Wells Fargo has a valid and enforceable contract with Albion prohibiting her from misappropriating, misusing, and failing to return the Company's Confidential and Proprietary Information, and from soliciting Wells Fargo customers.

69.     On information and belief, Lockton, without lawful right or privilege, has intentionally interfered and continues to interfere with those contractual provisions, thus interfering with Wells Fargo's contractual rights and expectations by encouraging, facilitating, and allowing Albion to violate her contractual obligations to Wells Fargo for the benefit of Lockton.

70.     On information and belief, Lockton's interference was accomplished by improper means, including but not limited to Lockton's willful and malicious misappropriation of Wells Fargo's Confidential and Proprietary Information; the solicitation of Wells Fargo's customers based on information that Lockton knew or should have known was unlawfully obtained through breaches of Albion's Agreement with Wells Fargo.  Lockton continues to encourage, facilitate, and allow Albion to violate her contract with Wells Fargo.

71.     Lockton is in a position to continue such unlawful conduct, which will result in irreparable harm to Wells Fargo's business and contractual relationships with its customers. Lockton's unlawful conduct will continue unless restrained by order of the Court.

72.     Lockton's tortious interference with Wells Fargo's Agreement with Albion has proximately caused, and continues to cause, damage to the Plaintiffs.  Plaintiffs have incurred, and continue to incur, damages, lost profits, and economic injury as a result of Lockton's tortious interference.  Lockton's conduct was and is also malicious and, as a result, Plaintiffs are entitled to exemplary damages.

73.     By Lockton's actual and threatened unlawful conduct, Plaintiffs have also suffered and will continue to suffer irreparable harm, including but not limited to loss of good will that cannot be compensated adequately by an award of damages in that Wells Fargo's current and prospective contractual and business relationships will be permanently damaged. The injunctive relief prayed for herein is reasonably suited to abate such conduct and will do no

more than restore the parties to their status as it existed prior to Lockton's unlawful interference. Any harm done by issuing injunctive relief prayed for herein does not outweigh the substantial loss to be caused by Lockton's actual and threatened unlawful actions. Accordingly, Plaintiff are entitled to injunctive relief due to Lockton's past and ongoing unlawful conduct.

**COUNT VI**

**BREACH OF THE DUTY OF LOYALTY**

**(Against Albion)**

74.      The allegations of Paragraphs 1 through 73 are incorporated by reference herein with the same force and effect as if set forth in full below.

75.      As an employee of Wells Fargo, Albion owed a duty of loyalty to the Company. In particular, she was obligated to maintain the confidentiality of Wells Fargo's Confidential and Proprietary Information and not to use it to compete with Wells Fargo or for the benefit of any party but Wells Fargo.

76.      By using Wells Fargo's Confidential and Proprietary Information to compete against the Company, Albion has breached and continues to breach her duty of loyalty to the Company.

77.      Albion's conduct has been willful and malicious.

78.      Albion's breach of her duty of loyalty has caused Plaintiffs damages and irreparable injury for which monetary damages alone are an insufficient remedy.

**COUNT VII**

**AIDING AND ABETTING BREACH OF THE DUTY OF LOYALTY**

**(Against Lockton)**

79.      The allegations of Paragraphs 1 through 78 are incorporated by reference herein with the same force and effect as if set forth in full below.

80.      Lockton has assisted, aided, and abetted Albion in the conduct constituting breach of her duty of loyalty to Wells Fargo, and continues to do so.

81.     Lockton has been and is aware of its role in assisting, aiding, and abetting Albion in breaching her duty of loyalty to Wells Fargo.

82.     Lockton has knowingly and substantially assisted Albion in the conduct constituting breach of her duty of loyalty to Wells Fargo, and continues to do so.

83.     Lockton's conduct was willful and malicious.

84.     Lockton's conduct has caused Plaintiffs damages and irreparable injury for which monetary damages alone are an insufficient remedy.

## COUNT VIII

## UNFAIR COMPETITION

### (Against Both Defendants)

85.     The allegations of Paragraphs 1 through 81 are incorporated by reference herein with the same force and effect as if set forth in full below.

86.     As an employee of Wells Fargo, Albion had continual access to and was given Wells Fargo's Confidential and Proprietary Information.  Albion consequently owed fiduciary obligations to Wells Fargo, both during and after her employment.

87.     Wells Fargo also invested substantial resources into assisting Albion to develop goodwill for Wells Fargo.

88.     Defendants are unlawfully competing against Wells Fargo, in part by misappropriating Wells Fargo's Confidential and Proprietary Information that Albion obtained from the Company and improperly revealed and used for the benefit of Lockton, with Lockton's encouragement and facilitation.

89.     Defendants' conduct demonstrates their intent to destroy and injure Wells Fargo's business and to promote their own business at Wells Fargo's expense.

90.     Wells Fargo has a unique and pecuniary interest in the Confidential and Proprietary Information that was unlawfully disclosed and is being used by Defendants.

91.     Wells Fargo created this information through expenditure of labor, skill, and money.

92.     Accordingly, Plaintiffs are entitled to recover for damages suffered as a result of Defendants' misappropriation and unfair use of Wells Fargo's Confidential and Proprietary Information.

93.     Moreover, Defendants' use of Wells Fargo's Confidential and Proprietary Information constitutes unfair competition that will result in irreparable harm to the Company's business and contractual relationships with its customers.

94.     Defendants' unlawful conduct will continue unless restrained by order of the Court.

95.     The injunctive relief prayed for herein is reasonably suited to abate such conduct and will do no more than restore the parties to their status as it existed prior to Defendants' unlawful conduct.

96.     Any harm done by issuing injunctive relief prayed for herein does not outweigh the substantial loss to be caused by the actual and threatened unlawful actions by Defendants. Accordingly, Plaintiffs are entitled to injunctive relief due to Defendants' current and ongoing unlawful conduct.

## COUNT IX

## CONVERSION

### (Against Both Defendants)

97.     The allegations of Paragraphs 1 through 93 are incorporated by reference herein with the same force and effect as if set forth in full below.

98.     Wells Fargo is and all times relevant to this case was the owner of the Confidential and Proprietary Information described herein.

99.     On information and belief, beginning on or before Albion's resignation from her employment with Wells Fargo on or about November 28, 2017, and continuing to the present, Defendants have unlawfully and without Wells Fargo's authorization exercised dominion and control over Wells Fargo's Confidential and Proprietary Information, which is inconsistent with Wells Fargo's prior exclusive ownership and control of the information.

100.     Accordingly, Plaintiffs are entitled to recover for damages suffered as a result of Defendants' conversion of Wells Fargo's Confidential and Proprietary Information, including exemplary damages inasmuch as Defendants' conduct was and is willful and malicious.

101.     Moreover, Defendants' use of Wells Fargo's Confidential and Proprietary Information constitutes a conversion thereof and is causing irreparable injury to Plaintiffs for which there is no adequate remedy at law.

102.     The injunctive relief prayed for herein is reasonably suited to abate such conduct and will do no more than restore the parties to their status as it existed prior to Defendants' unlawful conduct.

103.     Any harm done by issuing injunctive relief prayed for herein does not outweigh the substantial loss to be caused by the actual and threatened unlawful actions by Defendants.

104.     Accordingly, Plaintiffs are entitled to injunctive relief due to Defendants' current and ongoing unlawful conduct.

<u>**COUNT X**</u>

**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT,
<u>18 U.S.C. §1030</u>**

**(Against Albion)**

105.     The allegations of Paragraphs 1 through 101 are incorporated by reference herein with the same force and effect as if set forth in full below.

106.     During her employment with Wells Fargo, Albion had access to Wells Fargo's computer system.

107.     The Wells Fargo computer system to which Albion had access constitutes a "protected computer" within the meaning of 18 U.S.C. §1030(e) because the computer system is used in interstate or foreign commerce or communication.

108.     Plaintiffs are informed and believe that Albion intentionally accessed Wells Fargo's computer systems.   The accessing of Wells Fargo's computer systems was without

authorization or exceeded Albion's authorized access in an effort to download and/or print files containing Wells Fargo's Confidential and Proprietary Information.

109.    As a result, Albion furthered her intended fraud upon Wells Fargo and caused Plaintiffs to lose in excess of $5,000.

110.    Plaintiffs have suffered and will continue to suffer irreparable harm and loss, and have sustained damages, including but not limited to loss of capital, loss of valuable business, loss of profits and future profits, and loss of goodwill, in an amount to be determined at trial, which damages are ongoing and continue unabated at the time of the filing of this Complaint.

## COUNT XI

### VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §1831 et seq.

**(Against Both Defendants)**

111.    The allegations of Paragraphs 1 through 107 are incorporated by reference herein with the same force and effect as if set forth in full below.

112.    The information Albion took from Wells Fargo with the knowledge and assistance of Lockton constitutes trade secrets of Wells Fargo subject to protection under the Defend Trade Secrets Act, 18 U.S.C. §1831 et seq.

113.    This information is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use; it is not readily available to the public or to Wells Fargo's competitors. Wells Fargo spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

114.    Wells Fargo has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including requiring computer access passwords to be used to access Company computer systems and records, and having contracts and policies that expressly prohibit the use, removal, and disclosure of such information outside of Wells Fargo.

115.    On information and belief, Lockton, aided, abetted, and facilitated Albion's theft and misappropriation of Wells Fargo's trade secrets.  Additionally, Defendants are currently in possession of Wells Fargo's trade secrets and acquired that information by improper means.

116.    The foregoing conduct constitutes an actual and threatened misappropriation and misuse of Wells Fargo's trade secret information in violation of the Defend Trade Secrets Act, 18 U.S.C. §1831 et seq.

117.    Albion's misappropriation of Wells Fargo's trade secrets, and Lockton's material assistance and facilitation of the same, has caused Plaintiffs irreparable injury for which monetary damages alone are an inadequate remedy.

118.    Defendants willfully and maliciously misappropriated Wells Fargo's trade secrets, and Plaintiffs are therefore entitled to recover two times their damages and the reasonable attorney fees they incur in this action, appropriate royalties for the trade secrets that Defendants misappropriated, as well as any amount by which Defendants were unjustly enriched by their misappropriation.

## COUNT XII

## UNJUST ENRICHMENT

119.    The allegations of Paragraphs 1 through 115 are incorporated by reference herein with the same force and effect as if set forth in full below.

120.    Under the circumstances set forth herein, Wells Fargo conferred benefits on Defendants.

121.    Defendants knew or should have known these benefits were conferred by Wells Fargo.

122.    The acceptance and/or retention of these benefits by Defendants under the circumstances set forth herein renders it inequitable for them to retain the benefits without paying and/or compensating Wells Fargo for their value.

123.    As a consequence of the foregoing misconduct, Plaintiffs have suffered and will continue to suffer damages and loss.  Plaintiffs have sustained damages including but not limited

to the loss of revenue; loss of employees and a stable workforce; loss of valuable business and business opportunities; loss of profits and future profits; the loss of trade secrets and confidential information; and other damages, all in an amount to be determined at trial, and all of which damages are ongoing and continue unabated at the time of the filing of this Complaint.

## COUNT XIII

## PERMANENT INJUNCTION ████████████████

### (Against Both Defendants)

124.    The allegations of Paragraphs 1 through 120 are incorporated by reference herein with the same force and effect as if set forth in full below.

125.    Plaintiffs request that this Court issue an injunction: (a) ordering Defendants to return to Wells Fargo the confidential, proprietary, and trade secret information of Wells Fargo still within their possession, custody, or control; (b) prohibiting Defendants from using any confidential, proprietary, and trade secret information of Wells Fargo, including but not limited to information regarding Wells Fargo customers, to solicit, service, switch and/or convert Wells Fargo's customers to other providers of insurance products and services; and (c) prohibiting Defendants, either directly or indirectly, from soliciting, accepting the business of, or servicing any Wells Fargo customer that was a customer of the Company as of the date of Albion's resignation from the Company, November 28, 2017.

126.    By reason of the conduct set forth above, Plaintiffs have suffered great and irreparable injury.  Unless Albion is enjoined from further breach of the Agreement, and Lockton is enjoined from facilitating, encouraging, and/or allowing the same, Plaintiffs will suffer additional irreparable injury by the continuing loss of Wells Fargo customers and the further disclosure of confidential, proprietary, and trade secret information, and will incur future economic loss which is incalculable.

127.    No damage to Defendants will result from injunctive relief.  Both Defendants can continue to sell insurance products and services, but cannot use the confidential, proprietary, and

trade secret information of Wells Fargo, and Albion cannot, directly or indirectly, solicit, accept, or service Wells Fargo customers either on her own behalf or on behalf of another individual or entity.

128.     Plaintiffs have no adequate remedy at law, as the damages in terms of money for the future loss of customers and confidential, proprietary, and trade secret information arising from Defendants' conduct cannot be measured or calculated.

129.     The threatened harm to Plaintiffs is greater should injunctive relief not be ordered in that Albion is in violation of the terms of the Agreement, Lockton is facilitating, encouraging, and/or permitting her to do so, and Defendants are in possession of Wells Fargo's confidential, proprietary, and trade secret information.

130.     The public has an interest in seeing that contractual provisions, including provisions regarding the use and disclosure of confidential, proprietary, and trade secret information and non-solicitation, are enforced.

131.     Accordingly, Plaintiffs request that this Court issue permanent injunctive relief as follows:

a.     Issue an order requiring Defendants to return to Wells Fargo all confidential, proprietary, and trade secret information belonging to Wells Fargo (including but not limited to the Company's Confidential and Proprietary Information) that is in their possession, including but not limited to all such information in electronic form;

b.     Issue an order instructing Albion to delete no matter from her personal computer(s), cell phones, and all other electronic devices, and to turn such devices over to Plaintiffs' counsel for review by investigators chosen by Plaintiffs;

c.     Issue an order enjoining and restraining Albion for two years from the date of the order from:

i.     directly or indirectly soliciting, accepting, and/or servicing any Wells Fargo customer who was a Wells Fargo customer as of November 28, 2017;

      ii.     directly or indirectly switching and/or converting Wells Fargo customers to other providers of insurance products or services, including but not limited to Lockton;

d.     Issue an order permanently enjoining and restraining Albion from:

      i.     directly or indirectly making use of confidential, proprietary, and trade secret information belonging to Wells Fargo (including but not limited to the Company's Confidential and Proprietary Information); and

      ii.     otherwise breaching the terms of the Agreement.

e.     Issue an order permanently enjoining and restraining Lockton from using any confidential, proprietary, or trade secret information of Wells Fargo to solicit Wells Fargo's customers to switch their business to Lockton;

f.     Award judgment in Plaintiffs' favor and against Defendants; award Plaintiffs damages, including but not limited to punitive and exemplary damages; award Plaintiffs their costs expended herein, including reasonable attorneys' fees; and award Plaintiffs such other and further relief as may be just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment in their favor and against Defendants for: permanent injunctive relief as set forth in Count XI; for damages as are fair and reasonable, including actual damages, punitive damages, exemplary damages, equitable relief, pre-judgment and post-judgment interest, costs, and attorneys' fees; and for such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all causes of action and claims.

Dated: December 13, 2017

Respectfully submitted,

*/s/ Arthur V. Lambert*
Arthur V. Lambert
Texas Bar No. 11841250
Fisher & Phillips LLP
500 North Akard, Suite 3550
Dallas, Texas 75201
Telephone: (214) 220-9100
Facsimile: (214) 220-9122
*alambert@fisherphillips.com*

**ATTORNEY FOR PLAINTIFFS**

# EXHIBIT A

*FMP ID: 491998*
*Albion*

# Wells Fargo Agreement Regarding
# Trade Secrets, Confidential Information,
# Non-Solicitation, And Assignment Of Inventions

### I. Introduction

In consideration for my continued employment by a Wells Fargo company and/or any of its past, present, and future parent companies, subsidiaries, predecessors, successors, affiliates, and acquisitions (collectively "the Company"), the ability to participate in a new compensation plan containing new and additional benefits which include, but are not limited to, a guaranteed draw and an increased commission percentage for new revenue and net new revenue generated in 2010, I agree as follows:

I acknowledge that the nature of my employment with the Company permits me to have access to certain of its trade secrets and/or confidential and proprietary information. Nevertheless, such information is, and shall always remain, the sole and exclusive property of the Company. Any unauthorized acquisition, disclosure or use of this information would be wrongful and would cause the Company irreparable harm. I also acknowledge that if in the course of my employment I develop Inventions (as defined herein), I agree to assign these Inventions to the Company.

### II. Trade Secrets And Confidential Information

During the course of my employment I will acquire knowledge of the Company's Trade Secrets and other proprietary information relating to its business, business methods, personnel, and customers (collectively referenced as "Confidential Information"). "Trade Secrets" are defined as information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Company's Trade Secrets include, but are not limited to, the following:

• the names, address, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies and objectives;

• any information concerning the Company's operations, including without limitation, information related to its methods, services, pricing, costs, margins and mark ups, finances, practices, strategies, business plans, agreements, decision-making, systems, technology, policies, procedures, marketing, sales, techniques, agent information, and processes;

• any other proprietary and/or confidential information relating to the Company's customers, employees, products, services, sales, technologies, or business affairs.

I understand that Records of the Company also constitute Confidential Information and that my obligation to maintain the confidentiality thereof continues at all times during and after my employment. "Records" include, but are not limited to, original, duplicated, computerized, memorized, handwritten or any other form of information, whether contained in materials provided to me by the Company, or by any institution acquired by the Company, or compiled by me in any form or manner including information in documents or electronic devices, such as software, flowcharts, graphs, spreadsheets, resource manuals, videotapes, calendars, day timers, planners, rolodexes, or telephone directories maintained in personal computers, laptop computers, personal digital assistants or any other device. These records do not become any less confidential or proprietary to the Company because I may commit some of them to memory or because I may otherwise maintain them outside of the Company's offices.

I agree that any Confidential Information of the Company is to be used by me solely and exclusively for the purpose of conducting business on behalf of the Company. I am expected to keep such Confidential Information confidential and not to divulge, use or disclose this information except for that purpose. If I resign or am terminated from my employment for any reason, I agree to immediately return to the Company all Records and Confidential Information, including information maintained by me in my office, personal electronic devices, and/or at home.

WFIS09-03c


*ND014012*

1



POOR QUALITY
COPY RECEIVED

### III. Non-Solicitation Of The Company's Customers And Employees

I agree that for a period of two (2) years immediately following termination of my employment for any reason, I will not do any of the following, directly or indirectly or through associates, agents, or employees:

    a.    solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services;

    b.    solicit, participate in or promote the solicitation of any of the Company's clients, customers, or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship; or

    c.    Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company:

        i.    with whom I had Material Contact, and/or
        ii.    were clients or customers of the Company within six (6) months prior to my termination of employment.

This two-year limitation is not intended to limit the Company's right to prevent misappropriation of its Confidential Information beyond the two-year period.

### IV. Compliance With Other Agreements

It is understood that I have complied and will continue to comply with any other policies covering trade secrets, inventions, confidential information or solicitation from any former employer. I certify that, to the best of my information and belief, I am not a party to any other agreement that will interfere with my full compliance with this Agreement, including any agreement relating to the non-disclosure of information of any other individual or entity, or that prior to my employment I disclosed any such agreements to Wells Fargo for proper legal review. I also certify that I will not disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to any previous employer or others. I agree not to enter into any agreement either written or oral that conflicts with any provision of this Agreement.

### V. Assignment Of Inventions

I agree to disclose to the Company promptly in writing complete information regarding all Inventions that I make, conceive or first reduce to practice (alone or in conjunction with others) during my employment with the Company. For the purposes of this Assignment, the term "Invention" means any invention, discovery, design, formula, modification, improvement, new idea, business method, process, algorithm, software program, know how or trade secret, or other work or concept, whether recorded in a written document, electronically or not recorded at all and whether or not copyrightable or patentable. The categories of Inventions that are subject to this assignment are: (1) all Inventions that relate at the time of conception or reduction to practice of the Invention to the Company's business, or actual or demonstrably anticipated research or development of the Company whether or not I made, conceived or first reduced the Inventions to practice during normal working hours; and (2) all Inventions involving the use of any time, material, information, or facility of the Company. I acknowledge and agree that all Inventions and all worldwide intellectual property rights therein are owned by the Company. All intellectual property rights in the Inventions shall vest in the Company on the date such Inventions are created, conceived, reduced to practice, actually or constructively, or reduced to a tangible medium of expression, whichever occurs first. Without limiting the foregoing, I agree that if any Inventions are copyrightable and fall within the definition of a "work made for hire" as defined in 17 U.S.C. §101 and §201(b), such Inventions will be considered "works made for hire" and all copyrights and copyright registrations related to such copyrightable Inventions will be the sole and exclusive property of the Company. If, and to the extent that, all intellectual property rights in any Inventions do not vest in the Company, I hereby irrevocably grant and assign to the Company without reservation, all of my worldwide ownership rights, title and interest in and to all Inventions and all present and future intellectual property rights in such Inventions, and irrevocably waive all moral rights in, and other intellectual property rights to, all Inventions.

2


POOR QUALITY
COPY RECEIVED

By entering into this Assignment, I understand that I am not conveying any rights in Inventions I may have made, conceived or first reduced to practice before my employment with the Company ("Prior Inventions"). If I claim ownership in any Prior Inventions, I have identified and provided a non-confidential description of each such Prior Invention in the space provided below (and on additional pages as necessary):

Notwithstanding the foregoing, this assignment of Inventions as set forth above does not apply to an Invention that I developed entirely on my own time without using the Company's equipment, supplies, facilities, or trade secret information except for those Inventions that either: (i) relate at the time of conception or reduction to practice of the Invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or (ii) result from any work performed by me for the Company.

I further agree, without charge and at the Company's expense, to give the Company all assistance it reasonably requires to evidence, establish, maintain, perfect, protect, and use the rights to the Inventions I have assigned to it. In particular, but without limitation, I agree to sign all documents, supply all information, and provide all written or oral testimony that the Company may deem necessary or desirable to: (i) transfer or record the transfer of my entire right, title, and interest in the assigned Inventions; (ii) enable the Company to obtain patent protection for such Inventions anywhere in the world; and (iii) protect and enforce Company's rights in the Inventions and the intellectual property rights therein. Notwithstanding the foregoing, I hereby irrevocably appoint Wells Fargo as attorney in fact (coupled with an interest) to execute any such documents.

## VI. Employment At Will
I understand that my employment with the Company is "at will" and nothing in this document changes, alters or modifies my "at will" status or my obligation to comply with all policies, procedures and rules of the Company, as they may be adopted or amended from time to time. My employment at will status may not be changed except in writing, signed by me and an executive officer of the Company.

## VII. Injunctive Relief & Damages
Recognizing the irreparable nature of the injury that could be done by my violation of this Agreement and that money damages would be inadequate compensation to the Company, it is agreed that any violation of this Agreement by me should be the proper subject for immediate injunctive relief, specific performance and other equitable relief to the Company. I further agree to communicate the contents of this section and the non-solicitation and non-disclosure sections of this Agreement to any prospective employer.

## VIII. Severability And Judicial Modification
If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions shall remain in full force and effect and the invalid or unenforceable provision shall be modified only to the extent necessary to render that provision valid and enforceable to the fullest extent permitted by law. If the invalid or unenforceable provision cannot be modified, that provision shall be severed from the Agreement and all other provisions shall remain valid and enforceable.

## IX. Choice Of Law/Integration/Survival
This Agreement and any dispute, controversy or claim which arises under or relates in any way to it shall be governed by the law of state where the incident(s) giving rise to the dispute or claim arose. This Agreement supersedes any prior written or verbal agreements pertaining to the subject matter herein, and is intended to be a final expression of our Agreement with respect only to the terms contained herein; provided, however, that the employee and customer non-solicitation provisions herein are in addition to, and not in lieu of, any such provisions contained in any prior agreements between the Company and me. There may be no modification of this Agreement except in writing signed by me and an executive officer of the Company. This Agreement shall survive my employment by the Company, inure to the benefit of successors and assigns of the Company, and is binding upon my heirs and legal representatives.

## Acknowledgment
I acknowledge that I have read, understand, and received a copy of this Agreement and will abide by its terms.

| | |
|---|---|
| _Desire Jo Albion_ (signature) | 12-29-2009 |
| Team Member's Signature | Date |
| Desire' Jo Albion | 491998 |
| Print Name | Employee ID |

3

POOR QUALITY
COPY RECEIVED

# Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, And Assignment Of Inventions



## I. Introduction

In consideration for my becoming employed and compensated by a Wells Fargo company and/or any of its past, present, and future parent companies, subsidiaries, predecessors, successors, affiliates, and acquisitions (collectively "the Company"), I agree as follows:

I acknowledge that the nature of my employment with the Company permits me to have access to certain of its trade secrets and/or confidential and proprietary information. Nevertheless, such information is, and shall always remain, the sole and exclusive property of the Company. Any unauthorized acquisition, disclosure or use of this information would be wrongful and would cause the Company irreparable harm. I also acknowledge that if in the course of my employment I develop Inventions (as defined herein), I agree to assign these inventions to the Company.

## II. Trade Secrets And Confidential Information

During the course of my employment I will acquire knowledge of the Company's Trade Secrets and other proprietary information relating to its business, business methods, personnel, and customers (collectively referenced as "Confidential Information"). "Trade Secrets" are defined as information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Company's Trade Secrets include, but are not limited to, the following:

- the names, address, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies and objectives;

- any information concerning the Company's operations, including without limitation, information related to its methods, services, pricing, costs, margins and mark ups, finances, practices, strategies, business plans, agreements, decision-making, systems, technology, policies, procedures, marketing, sales, techniques, agent information and processes;

- any other proprietary and/or confidential information relating to the Company's customers, employees, products, services, sales, technologies, or business affairs.

I understand that Records of the Company also constitute Confidential Information and that my obligation to maintain the confidentiality thereof continues at all times during and after my employment. "Records" include, but are not limited to, original, duplicated, computerized, memorized, handwritten or any other form of information, whether contained in materials provided to me by the Company, or by any institution acquired by the Company, or compiled by me in any form or manner including information in documents or electronic devices, such as software, flowcharts, graphs, spreadsheets, resource manuals, videotapes, calendars, day timers, planners, rolodexes, or telephone directories maintained in personal computers, laptop computers, personal digital assistants or any other device. These records do not become any less confidential or proprietary to the Company because I may commit some of them to memory or because I may otherwise maintain them outside of the Company's offices.

I agree that any Confidential Information of the Company is to be used by me solely and exclusively for the purpose of conducting business on behalf of the Company. I am expected to keep such Confidential Information confidential and not to divulge, use or disclose this information except for that purpose. If I resign or am terminated from my employment for any reason, I agree to immediately return to the Company all Records and Confidential Information, including information maintained by me in my office, personal electronic devices, and/or at home.

## III. Non-Solicitation Of The Company's Customers And Employees

I agree that for a period of two (2) years immediately following termination or resignation of my employment for any reason, I will not do any of the following either directly or indirectly or through associates, agents, or employees:

a. solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services; or

b. solicit, participate in or promote the solicitation of any of the Company's clients, customers, or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship.

This two (2) year limitation is not intended to limit the Company's right to prevent misappropriation of its Confidential Information beyond the two (2) year period.



*ND014012*

## IV. Compliance With Other Agreements

It is understood that I have complied and will continue to comply with any other policies covering trade secrets, inventions, confidential information or solicitation from any former employer. I certify that, to the best of my information and belief, I am not a party to any other agreement that will interfere with my full compliance with this Agreement, including any agreement relating to the non-disclosure of information of any other individual or entity, or that prior to my employment I disclosed any such agreements to Wells Fargo for proper legal review. I also certify that I will not disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to any previous employer or others. I agree not to enter into any agreement either written or oral that conflicts with any provision of this Agreement.

## V. Assignment Of Inventions

I agree to disclose to the Company promptly in writing complete information regarding all Inventions that I make, conceive or first reduce to practice (alone or in conjunction with others) during my employment with the Company. For the purposes of this Assignment, the term "Invention" means any invention, discovery, design, formula, modification, improvement, new idea, business method, process, algorithm, software program, know how or trade secret, or other work or concept, whether recorded in a written document, electronically or not recorded at all and whether or not copyrightable or patentable. The categories of Inventions that are subject to this assignment are: (1) all Inventions that relate at the time of conception or reduction to practice of the Invention to the Company's business, or actual or demonstrably anticipated research or development of the Company whether or not I made, conceived or first reduced the Inventions to practice during normal working hours; and (2) all Inventions involving the use of any time, material, information, or facility of the Company. I acknowledge and agree that all Inventions and all worldwide intellectual property rights therein are owned by the Company. All intellectual property rights in the Inventions shall vest in the Company on the date such Inventions are created, conceived, reduced to practice, actually or constructively, or reduced to a tangible medium of expression, whichever occurs first. Without limiting the foregoing, I agree that if any Inventions are copyrightable and fall within the definition of a "work made for hire" as defined in 17 U.S.C. §101 and §201(b), such Inventions will be considered "works made for hire" and all copyrights and copyright registrations related to such copyrightable Inventions will be the sole and exclusive property of the Company. If, and to the extent that, all intellectual property rights in any Inventions do not vest in the Company, I hereby irrevocably grant and assign to the Company without reservation, all of my worldwide ownership rights, title and interest in and to all Inventions and all present and future intellectual property rights in such Inventions, and irrevocably waive all moral rights in, and other intellectual property rights to, all Inventions.

By entering into this Assignment, I understand that I am not conveying any rights in Inventions I may have made, conceived or first reduced to practice before my employment with the Company ("Prior Inventions"). If I claim ownership in any Prior Inventions, I have identified and provided a non-confidential description of each such Prior Invention in the space provided below (and on additional pages as necessary):

_____

_____

_____

_____

Notwithstanding the foregoing, this assignment of Inventions as set forth above does not apply to an Invention that I developed entirely on my own time without using the Company's equipment, supplies, facilities, or trade secret information except for those Inventions that either: (i) relate at the time of conception or reduction to practice of the Invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or (ii) result from any work performed by me for the Company.

I further agree, without charge and at the Company's expense, to give the Company all assistance it reasonably requires to evidence, establish, maintain, perfect, protect, and use the rights to the Inventions I have assigned to it. In particular, but without limitation, I agree to sign all documents, supply all information, and provide all written or oral testimony that the Company may deem necessary or desirable to: (i) transfer of record the transfer of my entire right, title, and interest in the assigned Inventions; (ii) enable the Company to obtain patent protection for such Inventions anywhere in the world; and (iii) protect and enforce Company's rights in the Inventions and the intellectual property rights therein. Notwithstanding the foregoing, I hereby irrevocably appoint Wells Fargo as attorney in fact (coupled with an interest) to execute any such documents.

## VI. Employment At Will

I understand that my employment with the Company is "at will" and nothing in this document changes, alters or modifies my "at will" status or my obligation to comply with all policies, procedures and rules of the Company, as they may be adopted or amended from time to time. My employment at will status may not be changed except in writing, signed by me and an officer of the Company at the level of executive vice president or higher, authorized by the senior Human Resource Manager for my business group.

### VII. Injunctive Relief & Damages

Recognizing the irreparable nature of the injury that could be done by my violation of this Agreement and that money damages would be inadequate compensation to the Company, it is agreed that any violation of this Agreement by me should be the proper subject for immediate injunctive relief, specific performance and other equitable relief to the Company. I further agree to communicate the contents of this section and the non-solicitation and non-disclosure sections of this Agreement to any prospective employer.

### VIII. Severability And Judicial Modification

If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions shall remain in full force and effect and the invalid or unenforceable provision shall be modified only to the extent necessary to render that provision valid and enforceable to the fullest extent permitted by law. If the invalid or unenforceable provision cannot be modified, that provision shall be severed from the Agreement and all other provisions shall remain valid and enforceable.

### IX. Choice Of Law/Integration/Survival

This Agreement and any dispute, controversy or claim which arises under or relates in any way to it shall be governed by the law of state where the incident(s) giving rise to the dispute or claim arose. This Agreement supersedes any prior written or verbal agreements pertaining to the subject matter herein, and is intended to be a final expression of our Agreement with respect only to the terms contained herein; provided, however, that the employee and customer non-solicitation provisions herein are in addition to, and not in lieu of, any such provisions contained in any prior agreements. There may be no modification of this Agreement except in writing signed by me and an officer of the Company at the level of executive vice president or higher. This Agreement shall survive my employment by the Company, inure to the benefit of successors and assigns of the Company, and is binding upon my heirs and legal representatives.

### ACKNOWLEDGMENT

I acknowledge that I have read, understand, and received a copy of this Agreement and will abide by its terms.

| | |
|---|---|
| Print Name | Employee ID |

491998

Desire Albion

NOT FOR SIGNATURE

# EXHIBIT B

December 5, 2017

**Chubb Insurance Company**

**Re:**   Douglas and Virginia Ware
          Personal Insurance Program

Effective Date of Broker Change:  Immediately
Lockton Agent Code: 15192

To Whom It May Concern:

Effective immediately, we hereby appoint Lockton Companies as our exclusive insurance broker for all insurance policies with Chubb Insurance Company.

The employment of Lockton Companies rescinds all previous appointments, and the authority contained herein shall remain in full force until canceled in writing. Further, this letter constitutes our desire to waive any subsequent option for a period of potential rescission of this authority.  No rescission shall be granted.

Lockton Companies is hereby authorized to negotiate directly with any interested company, including incumbents, as respects the implementation of any and all personal insurance policies written through Chubb provided for and on behalf of Douglas and Virginia Ware.

This letter also constitutes your authority to furnish Lockton Companies representatives with all information that they may request as it pertains to our insurance policies/contracts, rates, rating schedules, appraisals, reserves, retentions, and all other financial data that they may wish to obtain to complete their analysis of our present and future requirements in connection with this insurance program.

Lockton Companies shall not be responsible for any transaction, including but not limited to, unearned commissions and/or errors and omissions arising out of the placement of the above captioned insurance program that preceded this letter of authority.

Yours truly,


_____
**Douglas Ware**

_____
**Date**


_____
**Virginia Ware**

_____
**Date**

December 5, 2017

**Wright National Flood Insurance Company**

Re:    Douglas and Virginia Ware
       Flood Coverage

Effective Date of Broker Change:  Immediately

To Whom It May Concern:

Effective immediately, we hereby appoint Lockton Companies as our exclusive insurance broker for all insurance policies with Wright National Flood Insurance Company.

The employment of Lockton Companies rescinds all previous appointments, and the authority contained herein shall remain in full force until canceled in writing. Further, this letter constitutes our desire to waive any subsequent option for a period of potential rescission of this authority. No rescission shall be granted.

Lockton Companies is hereby authorized to negotiate directly with any interested company, including incumbents, as respects the implementation of any and all Flood policies through Wright National Flood Insurance Company provided for and on behalf of Douglas and Virginia Ware.

This letter also constitutes your authority to furnish Lockton Companies representatives with all information that they may request as it pertains to our insurance policies/contracts, rates, rating schedules, appraisals, reserves, retentions, and all other financial data that they may wish to obtain to complete their analysis of our present and future requirements in connection with this insurance program.

Lockton Companies shall not be responsible for any transaction, including but not limited to, unearned commissions and/or errors & omissions arising out of the placement of the above captioned policy that preceded this letter of authority.

Yours truly,

_____           _____
**Douglas Ware**                                 **Date**

_____           _____
**Virginia Ware**                                 **Date**