## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **USI INSURANCE SERVICES, LLC, and USI INSURANCE SERVICES NATIONAL, INC. (formerly known as WELLS FARGO INSURANCE SERVICES USA, INC.),**<br><br>        **Plaintiffs,**<br><br>   **vs.**<br><br>**LOCKTON COMPANIES, LLC, d/b/a LOCKTON COMPANIES-NEW YORK**<br>    **444 West 47th Street, Suite 900**<br>    **Kansas City, Missouri 64112, and**<br><br>**JILL ARNOLD BULL**<br>    **2513 Adams Place**<br>    **Union City, New Jersey 07087,**<br><br>     **Defendants.** | Case No. 1:17-cv-09946<br><br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs USI Insurance Services, LLC ("USI"), and USI Insurance Services National, Inc. (formerly known as Wells Fargo Insurance Services USA, Inc., and referred to herein as "Wells Fargo" or the "Company") (collectively, "Plaintiffs"), for their Complaint against Defendants Lockton Companies, LLC ("Lockton"), and Jill Arnold Bull ("Bull") (referred to collectively as "Defendants"), state and allege the following:

### PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Wells Fargo is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business in Valhalla, New York.

2.    Plaintiff USI is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Valhalla, New York. USI's sole member is USI Holdings Corporation, which is a corporation organized and existing under the State of Delaware with its principal place of business in the State of New York.

*EXHIBIT "D"*

3.      Effective on or about December 1, 2017, USI acquired all the stock of Wells Fargo pursuant to a stock purchase agreement.  Wells Fargo continues to exist as a separate entity. Through their relationship, Plaintiffs have a common interest in the outcome of this litigation.

4.      Defendant Lockton Companies, LLC ("Lockton"), is a limited liability company organized and existing under the laws of the State of Missouri, with its principal place of business at 444 West 47th Street, Suite 900, Kansas City, Missouri 64112.  On information and belief, Lockton does business in the State of New York as "Lockton Companies-New York," which has a business address of 1185 Avenue of the Americas, Suite 2010, New York, New York 10036. Lockton is registered to do business in the State of New York and the name and address of Lockton's registered agent in this State is Corporate Creations Network, Inc., 15 North Mill Street, Nyack, New York 10960.

5.      On information and belief, no member of Lockton is a citizen of the States of Delaware, North Carolina, or New York.

6.      Defendant Bull is a resident of Union City, New Jersey, and a citizen of the State of New Jersey.  Bull was an employee of Wells Fargo in its New York City office until she resigned on or about November 28, 2017.

7.      Immediately upon her resignation from Wells Fargo, Bull became an employee of one of the Lockton family of companies, which on information and belief is Defendant Lockton doing business as Lockton Companies-New York.

8.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, because this action includes claims arising under the laws of the United States.

9.      The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. §1367 over state law claims.

FPDOCS 33555752.1

10.     The Court also has diversity jurisdiction under 28 U.S.C. §1332, because there is complete diversity of citizenship and the matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.  Injunctive relief is also sought.

11.     Venue in this Court is appropriate under 28 U.S.C. §1391, because Defendant Lockton is a resident of this District, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

**I.      The Parties' Relationships.**

12.     Wells Fargo is a nationwide insurance broker licensed in all 50 States and is engaged in the business of selling and providing insurance services and products to its clients/customers and prospective clients/customers (the terms "clients" and "customers" are used interchangeably in this Complaint).

13.     USI is an insurance brokerage and consulting firm that delivers property and casualty, employee benefits, personal risk, program and retirement solutions to large risk management clients, middle market companies, smaller firms, and individuals.

14.     Lockton is an insurance broker and part of the Lockton family of companies, which describes itself on its website as "the world's largest privately held, independent insurance broker" (http://www.lockton.com/the-lockton-story, last visited Dec. 19, 2017).

15.     Lockton is a direct competitor of Plaintiffs.

16.     As noted, on information and belief, Lockton is also the Lockton company that currently employs Defendant Bull.

3

17.     Until on or about November 28, 2017, Defendant Bull was a Wells Fargo employee. Bull was employed as Private Risk Advisor/Sales Manager in the Company's Private Risk Management ("PRM") group and worked in the Company's New York City office.

18.     In consideration for her becoming employed and compensated by Wells Fargo, Bull entered into an agreement with the Company that provided that for two years after her resignation or other termination from employment with Wells Fargo, Bull was (1) not to solicit, recruit, or promote the solicitation or recruitment of any employee of Wells Fargo for the purpose of encouraging that employee to leave employment with Wells Fargo; and (2) not to solicit, participate in, or promote the solicitation of any Wells Fargo client, customer, or prospective customer with whom Bull had material contact or regarding whom she received confidential information, for the purpose of providing competitive products or services.

19.     In addition, the Agreement prohibited Bull, both during her employment with the Company and at any time thereafter, from using or disclosing any trade secrets or confidential information of Wells Fargo, including information about the customers of Wells Fargo.  The agreement also required Bull, upon her resignation, to immediately return to Wells Fargo all of its records and confidential information, including but not limited to information stored on computers and other electronic devices.

20.     On or about November 28, 2017, Bull and seven other members of the PRM group resigned from Wells Fargo and immediately became employees of Lockton or an affiliated business entity.

21.     The resignation letters of the resigning PRM group employees were virtually identical and show the concerted nature of their conduct.

22.     The commissions the resigning PRM group employees generated for Wells Fargo totaled approximately $25 million per year.

23.     On information and belief, Bull is currently employed as an insurance broker at Lockton's 1185 Avenue of the Americas, New York, New York 10036 address.

24.     On information and belief, since resigning from Wells Fargo and beginning employment, Bull has been soliciting Wells Fargo customers to terminate their relationships with Wells Fargo and become Lockton customers.

**II.     Wells Fargo's Business and Operations.**

25.     A key and principal part of Wells Fargo's business is providing insurance products and services that are unique to the particular needs and specifications of its clients and customers. Information concerning Wells Fargo's customers and the details of their insurance needs and policies, including but not limited to non-public internal procedures, programs, and forms, non-public lists of prospective and insured customers, non-public information compiled on behalf of Wells Fargo regarding such facts as habits and insurance needs of customers and prospective customers, locations and descriptions of insured properties or properties proposed to be insured, expiration dates of insurance policies, and insurance daily reports (hereinafter "Confidential Information," which is further defined below), is considered and treated as highly confidential within Wells Fargo and is not shared with anyone outside of the Company.

26.     Wells Fargo's Confidential Information also includes, but is not limited to, such information as relates to its methods, services, pricing, costs, margins and mark ups, finances, practices, strategies, business plans, agreements, decision-making, systems, technology, policies, procedures, marketing, sales, techniques, and processes.  This information, too, like all of Wells

FPDOCS 33555752.1

Fargo's Confidential Information, is considered and treated as highly confidential within Wells Fargo and is not shared with anyone outside the Company.

27.    Wells Fargo has developed and maintained its Confidential Information through considerable expenditure of time, effort, and expense.

28.    In addition to the time, effort, and money spent to develop this Confidential Information, Wells Fargo has also expended significant time, effort, and money to develop relationships with its customers; to learn the particular insurance needs, specifications, and requirements of its customers; to develop substantial contacts and goodwill with its customers; and to market and sell its insurance products and services to those customers.

29.    Wells Fargo considers and treats all of its Confidential Information as having substantial competitive value to Wells Fargo.

30.    Wells Fargo's Confidential Information is neither generally known nor readily ascertainable by proper means from publicly available sources; is related directly to and used by Wells Fargo's business; and provides Wells Fargo with a competitive advantage over those who do not know this information.  The possession of Wells Fargo's Confidential Information would give competitors, particularly those like Lockton that compete directly with Wells Fargo by providing similar insurance brokerage services in the same area as Wells Fargo, an unfair economic advantage in developing, marketing, brokering, and selling competitive insurance services and products.

31.    Wells Fargo therefore has consistently used, and continues to use, reasonable and diligent efforts to protect and keep secret its Confidential Information.  These efforts include, but are not limited to, prohibiting access to the information by the general public; requiring employees to sign confidentiality agreements; limiting general employee access to the information; instructing

FPDOCS 33555752.1

employees not to share the information with competitors; and restricting access to the information to Wells Fargo employees who agree to maintain its confidentiality and to use the information only for the benefit of Wells Fargo.

### III.   Broker of Record.

32.     At all relevant times there was and still is a general custom and usage in the insurance brokerage industry that a broker of record is the entity authorized by the customer to negotiate insurance policy terms on the customer's behalf.

33.     At all relevant times, there was and still is a general custom and usage in the insurance brokerage business that the broker of record, for services performed, is entitled to commissions based upon a percentage of the insurance premiums payable with respect to the insurance policies purchased by the customer.  In the ordinary situation, the customer pays the premium to the insurance company (which includes a charge for the commission to be paid to the broker of record), and the broker becomes entitled to receive commissions from the insurance company as those premiums are received by the insurance company from the customer.

34.     Thus, an insurance broker like Wells Fargo is entitled to receive a commission from the insurance company for every insurance policy on which Wells Fargo is listed as the broker of record.

35.     When a change in the broker of record occurs, the "new" broker of record is entitled to receive commissions from the insurance company for every policy on which it is listed as the broker of record, and the "old" broker of record is no longer entitled to receive such commissions.

### IV.   Bull's Agreement with Wells Fargo.

36.     On November 2, 2015, as a condition of her employment with Wells Fargo, and in consideration of her becoming employed and being compensated by Wells Fargo, Bull entered

into a Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, and Assignment of Inventions ("Agreement," a true and correct copy of which is attached hereto as **Exhibit A**.)

37.     Section III of the Agreement is entitled "Non-Solicitation Of The Company's Customers and Employees" and provides:

> I agree that for a period of two (2) years immediately following termination or resignation of my employment for any reason, I will not do any of the following, directly or indirectly or through associates, agents, or employees:
>
> a. solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services;
>
> b. solicit, participate in or promote the solicitation of any of the Company's clients, customers, or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship; or
>
> c. Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company:
>
>> i. with whom I had Material Contact, and/or
>>
>> ii. were clients or customers of the Company within six (6) months prior to my termination of employment.
>
> This two (2) year limitation is not intended to limit the Company's right to prevent misappropriation of its Confidential Information beyond the two (2) year period.

38.     Section II of the Agreement is entitled "Trade Secrets And Confidential Information" and provides:

> During the course of my employment I will acquire knowledge of the Company's Trade Secrets and other proprietary information relating to its business, business

8

methods, personnel, and customers (collectively referenced as "Confidential Information"). "Trade Secrets" are defined as information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Company's Trade Secrets include, but are not limited to, the following:

- the names, address, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies and objectives;

- any information concerning the Company's operations, including without limitation, information related to its methods, services, pricing, costs, margins and mark ups, finances, practices, strategies, business plans, agreements, decision-making, systems, technology, policies, procedures, marketing, sales, techniques, agent information, and processes;

- any other proprietary and/or confidential information relating to the Company's customers, employees, products, services, sales, technologies, or business affairs.

I understand that Records of the Company also constitute Confidential Information and that my obligation to maintain the confidentiality thereof continues at all times during and after my employment. "Records" include, but are not limited to, original, duplicated, computerized, memorized, handwritten or any other form of information, whether contained in materials provided to me by the Company, or by any institution acquired by the Company, or compiled by me in any form or manner including information in documents or electronic devices, such as software, flowcharts, graphs, spreadsheets, resource manuals, videotapes, calendars, day timers, planners, rolodexes, or telephone directories maintained in personal computers, laptop computers, personal digital assistants or any other device. These records do not become any less confidential or proprietary to the Company because I may commit some of them to memory or because I may otherwise maintain them outside of the Company's offices.

I agree that any Confidential Information of the Company is to be used by me solely and exclusively for the purpose of conducting business on behalf of the Company. I am expected to keep such Confidential Information confidential and not to divulge, use or disclose this information except for that purpose. If I resign or am terminated from my employment for any reason, I agree to immediately return to

the Company all Records and Confidential Information, including information maintained by me in my office, personal electronic devices, and/or at home.

**V.      Code of Ethics & Business Conduct.**

39.      Wells Fargo takes numerous steps to protect its Confidential Information in addition to requiring employees to sign agreements like the Agreement quoted above. Such steps include, among other things, the policies set forth in Wells Fargo's Code of Ethics & Business Conduct ("Code"), which employees must agree to as a condition of their employment with Wells Fargo. The "Confidential Information" section of the Code provides, in pertinent part, as follows:

> Your role in privacy protection is critical. As a team member, you will have access to confidential information about Wells Fargo, its customers, team members, and vendors that you are obligated to protect from unauthorized disclosure. Such information is intended solely for use within Wells Fargo and is limited to those with a business need to know. Confidential information acquired by a team member through his or her employment must be held in the strictest confidence and, except for a business reason, must never be discussed with anyone – not even family members. Such information is to be used solely for corporate purposes and never for personal gain and may not be used to compete with Wells Fargo.

> You may not access confidential information without a business purpose. You must not disclose confidential information that you have obtained in the course of your employment to any other team member unless the other team member has a business need to know the information for the performance of his or her duties on behalf of Wells Fargo.

> Wells Fargo protects the private, personal, and proprietary information of customers, vendors, and team members. Confidential customer information may not be disclosed to persons outside Wells Fargo except when its disclosure is required by law or in accordance with Wells Fargo's privacy policies and customer agreements. In addition, Wells Fargo may have entered into a confidentiality or nondisclosure agreement to protect a third party's confidential information and to prevent unauthorized disclosure or use of that information. You must be careful to honor those agreements.

> *      *      *

> Improper release of or unauthorized access to confidential information damages our customers' trust in Wells Fargo and can result in loss of business and even legal action. It also reflects on your ability to do your job and is a violation of company policy and this Code.

10

40.     The "Proprietary Information" section of the Code provides that "[p]roprietary information is information that is the property of Wells Fargo."  It prohibits employees, among other things, from:

- Reveal[ing] any proprietary information about the company or its team members, customers, or vendors to anyone except properly designated team members.

\*     \*     \*

- Disclos[ing] or us[ing] any proprietary information in a manner that is harmful to Wells Fargo, useful to competitors, or for your own or another's gain.

- Keep[ing] any originals or copies (in electronic or other form) of manuals, notebooks, drawings, notes, reports, proposals, other documents, materials, tools, or equipment or property belonging to Wells Fargo.

41.     Proprietary Information under the Code includes but is not limited to information regarding:

- Wells Fargo's business.

- The Company's financial performance, if it has not been publicly announced.

- Customers.

- Team members.

- Products, services, and pricing.

- Patents and other intellectual property Wells Fargo has not disclosed to the public, including inventions related to any of Wells Fargo's businesses.

- Systems plans and information.

- Data centers or other property information.

- Passwords and computer programs.

- Business plans.

- Marketing plans, strategies, and costs.

- Potential acquisitions and divestitures.

11

- Any nonpublic information that would be harmful to Wells Fargo if disclosed.

## VI.   Defendants' Violations of Their Legal Obligations.

42.     Unfortunately, Bull has breached and is continuing to breach her legal and contractual obligations to Wells Fargo, on information and belief with the active encouragement of her new employer, Lockton, which has knowledge of Bull's Agreement with Wells Fargo.

43.     For example, on December 7, 2017, little more than a week after Bull's sudden resignation from Wells Fargo, one of the Wells Fargo customers she serviced while working at the Company announced he was transferring his account to Lockton.  On information and belief, this was a result of Bull's solicitation of the customer.  The customer's account included multiple insurance policies and so multiple commission streams.

44.     On December 15, 2017, Wells Fargo received communications that four customers were changing their broker of record from Wells Fargo to Lockton on a total of 14 insurance policies.  On information and belief, this change of broker of record was a result of the solicitation of the customers by Bull, who did not explain to the customers the significance of signing the letters changing the broker of record.

45.     On or before December 6, 2017, approximately a week after Bull's sudden resignation from Wells Fargo, she solicited another customer to terminate his relationship with the Company and transfer his business to Lockton.  This solicitation was unsuccessful.

46.     By engaging in the conduct described above, Bull is breaching her contractual and other legal obligations to Wells Fargo.

47.     On information and belief, Lockton has actual knowledge of Bull's Agreement with Wells Fargo and is encouraging and assisting Bull's breach of that Agreement, as well as of her other legal obligations to Wells Fargo.

## COUNT ONE
### Violation of the Defend Trade Secrets Act, 18 U.S.C. §1831 et seq.
### (Against Both Defendants)

48.     Plaintiffs repeat the allegations set forth in Paragraphs 1 through 47 as if the same were fully set forth at length herein.

49.     Bull's solicitation of Wells Fargo customers to transfer their business from the Company to Lockton necessarily involved her use, on behalf of Lockton, of such information as the names, addresses, contact information, and insurance information and needs of Wells Fargo's customers, and of the Company's methods, services, pricing, practices, techniques, sales, and marketing, in breach of her contractual and legal duty to maintain the secrecy of such information and to return such information to Wells Fargo upon her resignation from the Company.

50.     Bull's use of such Wells Fargo information on behalf of Lockton was known to Lockton and encouraged and assisted by Lockton.

51.     The information Bull took from Wells Fargo and used to compete with Wells Fargo on Lockton's behalf, with the encouragement and assistance of Lockton, constitutes trade secrets of Wells Fargo subject to protection under the Defend Trade Secrets Act, 18 U.S.C. §1831 et seq.

52.     This information is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use, and it is not readily available to the public or to Wells Fargo's competitors. Wells Fargo spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

53.     Wells Fargo has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including requiring computer access passwords to be used

to access Company computer systems and records, and having policies that expressly prohibit the use, removal, and disclosure of such information outside of Wells Fargo.

54.     Lockton aided, abetted, and facilitated Bull's theft and misappropriation of Wells Fargo's trade secrets.  Additionally, Defendants are currently in possession of Wells Fargo's trade secrets and acquired them by improper means.

55.     The foregoing conduct constitutes a misappropriation and misuse of Wells Fargo's trade secret information in violation of the Defend Trade Secrets Act, 18 U.S.C. §1831 et seq.

56.     Bull's misappropriation of Wells Fargo's trade secrets, and Lockton's material assistance and facilitation of the same, have caused Plaintiffs irreparable injury for which monetary damages alone are an inadequate remedy.

57.     Defendants willfully and maliciously misappropriated Wells Fargo's trade secrets, and Plaintiffs are therefore entitled to recover, in addition to the damages provided in the Defendant Trade Secrets Act, two times their damages and the reasonable attorney fees they incur in this action, appropriate royalties for the trade secrets that Defendants misappropriated, as well as any amount by which Defendants were unjustly enriched by their misappropriation.

**COUNT TWO**
**Breach of Contract**
**(Against Bull)**

58.     Plaintiffs repeat the allegations set forth in Paragraphs 1 through 57 as if the same were fully set forth at length herein.

59.     In her Agreement with Wells Fargo, Bull agreed to the nondisclosure of Wells Fargo's Confidential Information to anyone outside Wells Fargo.

60.     In her Agreement with Wells Fargo, Bull agreed not to use Wells Fargo's Confidential Information for any purpose other than to conduct business on behalf of Wells Fargo.

61.     In her Agreement with Wells Fargo, Bull agreed that upon her resignation from Wells Fargo, she would immediately return all Confidential Information to Wells Fargo.

62.     In her Agreement with Wells Fargo, Bull agreed that for two years after her resignation from Wells Fargo, she would not solicit, participate in, or promote the solicitation of Wells Fargo customers with whom she had Material Contact or regarding whom she received Confidential Information.

63.     By the conduct described above, Bull breached these provisions of her Agreement with Wells Fargo.

64.     As a result, Plaintiffs have suffered and continue to suffer irreparable injury for which monetary damages alone are an inadequate remedy.

**COUNT THREE**
**Breach of Contract – Implied Covenant of Good Faith and Fair Dealing**
**(Against Bull)**

65.     Plaintiffs repeat the allegations set forth in Paragraphs 1 through 64 as if the same were fully set forth at length herein.

66.     By the actions and omissions described herein, Bull breached the covenant of good faith and fair dealing implied by law in her Agreement with Wells Fargo.

67.     As a result, Plaintiffs have suffered and continue to suffer irreparable injury for which monetary damages alone are an inadequate remedy.

**COUNT FOUR**
**Tortious Interference with Bull's Agreement with Wells Fargo**
**(Against Lockton)**

68.     Plaintiffs repeat the allegations set forth in Paragraphs 1 through 67 as if the same were fully set forth at length herein.

15

69.     Lockton knew or should have known of the Agreement between Bull and Wells Fargo and the provisions therein.

70.     Lockton intentionally, maliciously, and without justification interfered with, and continues to interfere with, the contractual relationship between Wells Fargo and Bull, and has induced, encouraged, assisted, and permitted Bull to breach her Agreement with Wells Fargo.

71.     As a result, Plaintiffs have suffered and continue to suffer irreparable injury for which monetary damages alone are an inadequate remedy.

**COUNT FIVE**
**Tortious Interference with Contractual Relationships and**
**Prospective Economic Advantage**
**(Against Both Defendants)**

72.     Plaintiffs repeat the allegations set forth in Paragraphs 1 through 71 as if the same were fully set forth at length herein.

73.     Wells Fargo has developed and maintained contractual and profitable business relationships with its customers.

74.     Defendants knew or reasonably should have known about these contracts and business relationships.

75.     Defendants intentionally, maliciously, and improperly interfered with, and continue to interfere with, Wells Fargo's contracts and relationships with its customers by among other things, directly or indirectly attempting to induce Wells Fargo's customers to sever their contractual and other relationships with Wells Fargo in favor of Defendants, and by using Wells Fargo's Confidential Information to do so.

76.     As a result, Plaintiffs have suffered and continue to suffer irreparable injury for which monetary damages alone are an inadequate remedy.

16

## COUNT SIX
## Misappropriation of Trade Secrets
### (Against Both Defendants)

77.     Plaintiffs repeat the allegations set forth in Paragraphs 1 through 76 as if the same were fully set forth at length herein.

78.     The books, files, electronic data, and all other records of Wells Fargo, and the Confidential Information contained in them, including but not limited to customer-related information, such as names, addresses, contact information, and insurance information and needs, and the Company's methods, services, pricing, practices, techniques, sales, and marketing, are all trade secrets of Wells Fargo subject to protection under New York law.

79.     This information derives independent economic value by not being accessible, through proper means, to competitors such as Lockton, which can profit from its use or disclosure. This information is not readily available to the public or to Wells Fargo's competitors.  Wells Fargo has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

80.     Wells Fargo has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including assigning computer access passwords to be used to access Wells Fargo computer systems and records, restricting access to its business premises, and having employees, including Bull, sign agreements which expressly prohibit the use and disclosure of such information outside of Wells Fargo.

81.     The foregoing conduct of Bull, with the assistance and encouragement of Lockton, constitutes a misappropriation and misuse of Wells Fargo's trade secrets violation of New York law because Bull and Lockton have used and/or disclosed Wells Fargo's Confidential Information without Wells Fargo's consent and despite the fact that Bull acquired knowledge of this

17

information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Bull owed Wells Fargo as its agent, employee, and representative.

82.     As a result, Plaintiffs have suffered and continue to suffer irreparable injury for which monetary damages alone are an inadequate remedy.

83.     Defendants' conduct constitutes a willful and malicious misappropriation of Wells Fargo's trade secrets, entitling Plaintiffs to an award of punitive damages.

### COUNT SEVEN
### Unfair Competition
### (Against Both Defendants)

84.     Plaintiffs repeat the allegations set forth in Paragraphs 1 through 83 as if the same were fully set forth at length herein.

85.     Defendants' conduct as described herein constitutes an unfair method of competition.

86.     As a result, Plaintiffs have suffered and continue to suffer irreparable injury for which monetary damages alone are an inadequate remedy.

87.     Defendants' conduct is willful and malicious, entitling Plaintiffs to an award of punitive damages.

### COUNT EIGHT
### Breach of the Duty of Loyalty
### (Against Bull)

88.     Plaintiffs repeat the allegations set forth in Paragraphs 1 through 87 as if the same were fully set forth at length herein.

89.     Bull had, and continues to have, a common law duty of loyalty arising from her relationship as an employee, agent, and/or representative of Wells Fargo.

90.     Bull had a confidential relationship with Wells Fargo.

91.     Bull is now using for her own benefit and the benefit of her new employer, Defendant Lockton, the Confidential Information obtained as a result of her employment with Wells Fargo, including but not limited to customer-related information, such as names, addresses, contact information, and insurance information and needs; and the Company's methods, services, pricing, practices, techniques, sales, and marketing, in order to solicit Wells Fargo customers to end their business relationships with the Company and to transfer their business to Lockton, and to unfairly compete with Wells Fargo.

92.     The foregoing constitutes a breach of Bull's duty of loyalty to Wells Fargo.

93.     As a result, Plaintiffs have suffered and continue to suffer irreparable injury for which monetary damages alone are an inadequate remedy.

94.     Bull's conduct is willful and malicious, entitling Plaintiffs to an award of punitive damages.

### COUNT NINE
### Aiding and Abetting Breach of the Duty of Loyalty
### (Against Lockton)

95.     Plaintiffs repeat the allegations set forth in Paragraphs 1 through 94 as if the same were fully set forth at length herein.

96.     Lockton knows that Bull is breaching her duty of loyalty to Wells Fargo by using the Company's Confidential Information, including but not limited to customer-related information, such as names, addresses, contact information, and insurance information and needs, and the Company's methods, services, pricing, practices, techniques, sales, and marketing, in order to solicit Wells Fargo customers to end their business relationships with the Company and to transfer their business to Lockton, and to unfairly compete with Wells Fargo.

19

97.     Lockton is substantially assisting Bull's breach of her duty of loyalty to Wells Fargo by providing her with resources to use, and by itself using, Wells Fargo's Confidential Information in order to solicit Wells Fargo customers to end their business relationships with the Company and to transfer their business to Lockton, and to unfairly compete with Wells Fargo.

98.     As a result, Plaintiffs have suffered and continue to suffer irreparable injury for which monetary damages alone are an inadequate remedy.

99.     Lockton's conduct is willful and malicious, entitling Plaintiffs to an award of punitive damages.

### COUNT TEN
### Civil Conspiracy
### (Against Both Defendants)

100.    Plaintiffs repeat the allegations set forth in Paragraphs 1 through 99 as if the same were fully set forth at length herein.

101.    Defendants conspired and agreed to engage in the unlawful and tortious conduct described above.

102.    Defendants deliberately engaged in such conduct in furtherance of their unlawful plan and scheme to solicit Wells Fargo customers to end their business relationships with Wells Fargo and transfer their business to Lockton, in violation of the Agreement.

103.    Defendants used and continue to use Wells Fargo's Confidential Information to solicit Wells Fargo's customers to end their business relationships with Wells Fargo and transfer their business to Lockton and to unfairly compete with Wells Fargo.

104.    Each Defendant acted on behalf of the other Defendant at all relevant times.

105.    Each Defendant has knowingly participated in, profited from, and/or ratified the conduct of the other Defendant and other conspirators.

20

106.     Each Defendant is therefore liable for the conduct of the other Defendant and all other participants in the conspiracy.

107.     As a result, Plaintiffs have suffered and continue to suffer irreparable injury for which monetary damages alone are an inadequate remedy.

108.     Defendants' conduct is willful and malicious, entitling Plaintiffs to an award of punitive damages.

**COUNT ELEVEN**
**Unjust Enrichment**
**(Against Both Defendants)**

109.     Plaintiffs repeat the allegations set forth in Paragraphs 1 through 108 as if the same were fully set forth at length herein.

110.     Defendants' conduct as described herein constitutes circumstances wherein it would be manifestly unjust, grossly unfair, and unconscionable to allow Defendants to retain Wells Fargo's Confidential Information, or to retain any benefit or profit generated from their misappropriation of such information, or from the breach of or interference with the Agreement, or from the breach of Bull's duty of loyalty to Wells Fargo, or from any other unlawful or inequitable conduct.

111.     As a result of Defendants' conduct, Plaintiffs have suffered and continue to suffer irreparable injury for which monetary damages alone are an inadequate remedy.

**COUNT TWELVE**
**Permanent Injunction**
**(Against Both Defendants)**

112.     Plaintiffs repeat the allegations set forth in Paragraphs 1 through 111 as if the same were fully set forth at length herein.

FPDOCS 33555752.1

113.    Plaintiffs request that this Court issue an injunction: (a) ordering Defendants to return to Wells Fargo the confidential, proprietary, and trade secret information of Wells Fargo still within their possession, custody, or control; (b) prohibiting Defendants from using any confidential, proprietary, and trade secret information of Wells Fargo, including but not limited to customer-related information, such as names, addresses, contact information, and insurance information and needs, and the Company's methods, services, pricing, practices, techniques, sales, and marketing, in order to solicit, service, switch and/or convert Wells Fargo's customers to other providers of insurance products and services; and (c) prohibiting Defendants, either directly or indirectly, from soliciting, accepting the business of, or servicing any Wells Fargo customer that was a customer of the Company as of the date of Bull's resignation from the Company, November 28, 2017.

114.    By reason of the conduct set forth above, Plaintiffs have suffered great and irreparable injury.  Unless Bull is enjoined from further breach of the Agreement, and Lockton is enjoined from facilitating, encouraging, and/or allowing the same, Plaintiffs will suffer additional irreparable injury by the loss of Wells Fargo customers and the further disclosure of confidential, proprietary, and trade secret information, and will incur future economic loss which is incalculable.

115.    No damage to Defendants will result from injunctive relief.  Both Defendants can continue to sell insurance products and services, but cannot use the confidential, proprietary, and trade secret information of Wells Fargo, and Bull cannot, directly or indirectly, solicit, accept, or service Wells Fargo customers either on her own behalf or on behalf of another individual or entity.

116.    Plaintiffs have no adequate remedy at law, as the damages in terms of money for the future loss of customers and confidential, proprietary, and trade secret information arising from Defendants' conduct cannot be measured or calculated.

117.     The threatened harm to Plaintiffs is greater should injunctive relief not be ordered in that Bull is in breach of the terms of the Agreement, Lockton is facilitating, encouraging, and/or permitting her to continue her breaches, and Defendants are in possession of Wells Fargo's confidential, proprietary, and trade secret information.

118.     The public has an interest in seeing that contractual provisions, including provisions regarding the use and disclosure of confidential, proprietary, and trade secret information and non-solicitation, are enforced.

119.     Accordingly, Plaintiffs request that this Court issue permanent injunctive relief as follows:

a.     Issue an order requiring Defendants to return to Wells Fargo all confidential, proprietary, and trade secret information belonging to Wells Fargo (including but not limited to the Company's Confidential Information) that is in their possession, including but not limited to all such information in electronic form;

b.     Issue an order instructing Bull to delete no matter from her personal computer(s), cell phones, and all other electronic devices, and to turn such devices over to Plaintiffs' counsel for review by investigators chosen by Plaintiffs;

c.     Issue an order enjoining and restraining Bull for two years from the date of the order from:

i.     directly or indirectly soliciting, accepting, and/or servicing any Wells Fargo customer who was a Wells Fargo customer as of November 28, 2017; and

ii.     directly or indirectly switching and/or converting Wells Fargo customers to other providers of insurance products or services, including but not limited to Lockton;

d.     Issue an order permanently enjoining and restraining Bull from:

i.     directly or indirectly making use of confidential, proprietary, and trade secret information belonging to Wells Fargo (including but not limited to the Company's Confidential Information); and

ii.     otherwise breaching the terms of the Agreement;

e.      Issue an order permanently enjoining and restraining Lockton from using any confidential, proprietary, or trade secret information of Wells Fargo to solicit Wells Fargo's customers to switch their business to Lockton or to otherwise compete with Wells Fargo; and

f.      Award judgment in Plaintiffs' favor and against Defendants; award Plaintiffs damages, including but not limited to punitive and exemplary damages; award Plaintiffs their costs expended herein, including reasonable attorneys' fees; and award Plaintiffs such other and further relief as may be just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants for:

A.      Permanent injunctive relief as set forth in Count Twelve;

B.      For damages that are fair and reasonable, including actual damages, punitive damages, exemplary damages, and all damages as allowed under applicable statutes;

C.      For equitable relief, pre-judgment and post-judgment interest, costs, and attorneys' fees; and

D.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues.

FPDOCS 33555752.1

Dated:  December 20, 2017                    Respectfully submitted,

                                            s/David E. Strand
                                            DAVID E. STRAND, ESQ.
                                            Fisher & Phillips LLP
                                            620 Eighth Avenue, 36th Floor
                                            New York, NY 10018
                                            Tel.: 212-899-9960
                                            Fax: 212-956-1971
                                            E-Mail: dstrand@fisherphillips.com

                                            Fisher & Phillips LLP
                                            430 Mountain Avenue, Suite 303
                                            Murray Hill, NJ 07974
                                            Tel.: 908-516-1050
                                            Fax: 908-516-1051

                                            *Attorneys for Plaintiffs USI Insurance
                                            Services, LLC, and USI Insurance Services
                                            National, Inc.*

FPDOCS 33555752.1

# Exhibit A

# Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, And Assignment Of Inventions



### I. Introduction

In consideration for my becoming employed and compensated by a Wells Fargo company and/or any of its past, present, and future parent companies, subsidiaries, predecessors, successors, affiliates, and acquisitions (collectively "the Company"), I agree as follows:

I acknowledge that the nature of my employment with the Company permits me to have access to certain of its trade secrets and/or confidential and proprietary information. Nevertheless, such information is, and shall always remain, the sole and exclusive property of the Company. Any unauthorized acquisition, disclosure or use of this information would be wrongful and would cause the Company irreparable harm. I also acknowledge that if in the course of my employment I develop Inventions (as defined herein), I agree to assign these inventions to the Company.

### II. Trade Secrets And Confidential Information

During the course of my employment I will acquire knowledge of the Company's Trade Secrets and other proprietary information relating to its business, business methods, personnel, and customers (collectively referenced as "Confidential Information"). "Trade Secrets" are defined as information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The Company's Trade Secrets include, but are not limited to, the following:

• the names, address, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies and objectives;

• any information concerning the Company's operations, including without limitation, information related to its methods, services, pricing, costs, margins and mark ups, finances, practices, strategies, business plans, agreements, decision-making, systems, technology, policies, procedures, marketing, sales, techniques, agent information, and processes;

• any other proprietary and/or confidential information relating to the Company's customers, employees, products, services, sales, technologies, or business affairs.

I understand that Records of the Company also constitute Confidential Information and that my obligation to maintain the confidentiality thereof continues at all times during and after my employment. "Records" include, but are not limited to, original, duplicated, computerized, memorized, handwritten or any other form of information, whether contained in materials provided to me by the Company, or by any institution acquired by the Company, or compiled by me in any form or manner including information in documents or electronic devices, such as software, flowcharts, graphs, spreadsheets, resource manuals, videotapes, calendars, day timers, planners, rolodexes, or telephone directories maintained in personal computers, laptop computers, personal digital assistants or any other device. These records do not become any less confidential or proprietary to the Company because I may commit some of them to memory or because I may otherwise maintain them outside of the Company's offices.

I agree that any Confidential Information of the Company is to be used by me solely and exclusively for the purpose of conducting business on behalf of the Company. I am expected to keep such Confidential Information confidential and not to divulge, use or disclose this information except for that purpose. If I resign or am terminated from my employment for any reason, I agree to immediately return to the Company all Records and Confidential Information, including information maintained by me in my office, personal electronic devices, and/or at home.

### III. Non-Solicitation Of The Company's Customers And Employees

I agree that for a period of two (2) years immediately following termination or resignation of my employment for any reason, I will not do any of the following, directly or indirectly or through associates, agents, or employees:

   a. solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services;

   b. solicit, participate in or promote the solicitation of any of the Company's clients, customers, or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship; or



ND014012

    c. Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company:

        i.  with whom I had Material Contact, and/or

        ii.  were clients or customers of the Company within six (6) months prior to my termination of employment.

This two (2) year limitation is not intended to limit the Company's right to prevent misappropriation of its Confidential Information beyond the two (2) year period.

## IV. Compliance With Other Agreements

It is understood that I have complied and will continue to comply with any other policies covering trade secrets, inventions, confidential information or solicitation from any former employer. I certify that, to the best of my information and belief, I am not a party to any other agreement that will interfere with my full compliance with this Agreement, including any agreement relating to the non-disclosure of information of any other individual or entity, or that prior to my employment I disclosed any such agreements to Wells Fargo for proper legal review. I also certify that I will not disclose to the Company, or induce the Company to use, any confidential or proprietary information or material belonging to any previous employer or others. I agree not to enter into any agreement either written or oral that conflicts with any provision of this Agreement.

## V. Assignment Of Inventions

I agree to disclose to the Company promptly in writing complete information regarding all Inventions that I make, conceive or first reduce to practice (alone or in conjunction with others) during my employment with the Company. For the purposes of this Assignment, the term "Invention" means any invention, discovery, design, formula, modification, improvement, new idea, business method, process, algorithm, software program, know how or trade secret, or other work or concept, whether recorded in a written document, electronically or not recorded at all and whether or not copyrightable or patentable. The categories of Inventions that are subject to this assignment are: (1) all Inventions that relate at the time of conception or reduction to practice of the Invention to the Company's business, or actual or demonstrably anticipated research or development of the Company whether or not I made, conceived or first reduced the Inventions to practice during normal working hours; and (2) all Inventions involving the use of any time, material, information, or facility of the Company. I acknowledge and agree that all Inventions and all worldwide intellectual property rights therein are owned by the Company. All intellectual property rights in the Inventions shall vest in the Company on the date such Inventions are created, conceived, reduced to practice, actually or constructively, or reduced to a tangible medium of expression, whichever occurs first. Without limiting the foregoing, I agree that if any Inventions are copyrightable and fall within the definition of a "work made for hire" as defined in 17 U.S.C. §101 and §201(b), such Inventions will be considered "works made for hire" and all copyrights and copyright registrations related to such copyrightable Inventions will be the sole and exclusive property of the Company. If, and to the extent that, all intellectual property rights in any Inventions do not vest in the Company, I hereby irrevocably grant and assign to the Company without reservation, all of my worldwide ownership rights, title and interest in and to all Inventions and all present and future intellectual property rights in such Inventions, and irrevocably waive all moral rights in, and other intellectual property rights to, all Inventions.

By entering into this Assignment, I understand that I am not conveying any rights in Inventions I may have made, conceived or first reduced to practice before my employment with the Company ("Prior Inventions"). If I claim ownership in any Prior Inventions, I have identified and provided a non-confidential description of each such Prior Invention in the space provided below (and on additional pages as necessary):

_____

_____

_____

Notwithstanding the foregoing, this assignment of Inventions as set forth above does not apply to an Invention that I developed entirely on my own time without using the Company's equipment, supplies, facilities, or trade secret information except for those Inventions that either: (i) relate at the time of conception or reduction to practice of the Invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or (ii) result from any work performed by me for the Company.

I further agree, without charge and at the Company's expense, to give the Company all assistance it reasonably requires to evidence, establish, maintain, perfect, protect, and use the rights to the Inventions I have assigned to it. In particular, but without limitation, I agree to sign all documents, supply all information, and provide all written or oral testimony that the Company may deem necessary or desirable to: (i) transfer or record the transfer of my entire right, title, and interest in the assigned Inventions; (ii) enable the Company to obtain patent protection for such Inventions anywhere in the world; and (iii) protect and enforce Company's rights in the Inventions and the intellectual property rights therein. Notwithstanding the foregoing, I hereby irrevocably appoint Wells Fargo as attorney in fact (coupled with an interest) to execute any such documents.

## VI. Employment At Will

I understand that my employment with the Company is "at will" and nothing in this document changes, alters or modifies my "at will" status or my obligation to comply with all policies, procedures and rules of the Company, as they may be adopted or amended from time to time. My employment at will status may not be changed except in writing, signed by me and an officer of the Company at the level of executive vice president or higher, authorized by the senior Human Resource Manager for my business group.

## VII. Injunctive Relief & Damages

Recognizing the irreparable nature of the injury that could be done by my violation of this Agreement and that money damages would be inadequate compensation to the Company, it is agreed that any violation of this Agreement by me should be the proper subject for immediate injunctive relief, specific performance and other equitable relief to the Company. I further agree to communicate the contents of this section and the non-solicitation and non-disclosure sections of this Agreement to any prospective employer.

## VIII. Severability And Judicial Modification

If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions shall remain in full force and effect and the invalid or unenforceable provision shall be modified only to the extent necessary to render that provision valid and enforceable to the fullest extent permitted by law. If the invalid or unenforceable provision cannot be modified, that provision shall be severed from the Agreement and all other provisions shall remain valid and enforceable.

## IX. Choice Of Law/Integration/Survival

This Agreement and any dispute, controversy or claim which arises under or relates in any way to it shall be governed by the law of state where the incident(s) giving rise to the dispute or claim arose. This Agreement supersedes any prior written or verbal agreements pertaining to the subject matter herein, and is intended to be a final expression of our Agreement with respect only to the terms contained herein; provided, however, that the employee and customer non-solicitation provisions herein are in addition to, and not in lieu of, any such provisions contained in any prior agreements. There may be no modification of this Agreement except in writing signed by me and an officer of the Company at a level of executive vice president or higher. This Agreement shall survive my employment by the Company, inure to the benefit of successors and assigns of the Company, and is binding upon my heirs and legal representatives.

## ACKNOWLEDGMENT

I acknowledge that I have read, understand, and received a copy of this Agreement and will abide by its terms.

_____     11/2/2015
Team Member's Signature                       Date

_____     1592249
Print Name    Jill Arnold                     Employee ID