UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 05-80112-CIV-RYSKAMP/VITUNAC

NEUBERGER BERMAN, LLC, a
Delaware limited liability company,

Plaintiff,

FILED UNDER SEAL

v.

SCOTT STROCHAK and
ALISA JAFFE,

Defendants.

_____/

FILED by _____ D.C.

MAR 1 1 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

THIS CAUSE comes before the Court pursuant to Plaintiff Neuberger Berman, LLC's

("NB") Motion for Preliminary Injunction, filed February 8, 2005 [DE 2]. Defendants Scott

Strochak and Alisa Jaffe ("Strochak" and "Jaffe" individually, "Defendants" collectively)

responded on February 16, 2005. NB replied on February 17, 2005. The Court held a hearing on

the Motion for Preliminary Injunction on February 22, 2005. This motion is ripe for

adjudication.

## I. BACKGROUND

NB is a Delaware limited liability company with its principal place of business in New

York City, New York. It conducts business throughout the United States, including substantial

business in Palm Beach County, Florida. NB is a broker-dealer providing investment advisory

services and money management services for a full range of institutional and individual clients.

(Compl. ¶ 1.)

*EXHIBIT "M"*

Defendants began employment with NB on January 20, 2001. Jaffe, a Vice President and portfolio manager, was responsible for serving existing NB clients, managing client assets, recommending asset allocations and working with NB money managers. (Compl. ¶ 6.) Strochak, a Regional Vice President and client consultant, was responsible for serving existing NB clients an obtaining new NB clients. (Compl. ¶ 4.) Defendants executed employment agreements that included the following non-compete and confidential information clause:

> For twelve months following the date your employment is terminated (whether by you or NB), you will not, directly or indirectly, as an individual, a sole proprietor or a member of a partnership, as a stockholder, investor, officer, employee or director of a corporation, or as an executive, agent, associate or consultant of any person, firm or corporation other than NB or a successor corporation or one of its parents, subsidiaries or affiliates, solicit the business of or provide services to any client or prospective client to whom you provided services while employed by NB or as to whom you learned confidential information while at NB. You also agree not to assist any person or entity in competition with NB to solicit or service any such client to reduce its business with NB. Excluded from this prohibition are clients who are members of your immediate family and clients that you were directly involved in bring to your previous lam before you joined NB.

Defendants used NB's name, goodwill, reputation and financial resources to procure and service new accounts on behalf of NB. (Compl. ¶ 10.) Defendants had access to many NB accounts and referral sources. Defendants also had access to client names and addresses, asset allocation of clients, specific money managers and asset managers working on behalf of various clients, the services offered to and used by a particular client, the types of securities held by clients, names and addresses of prospective clients, marketing plans, business plans, client fee schedules and

commission schedules as applicable. (Compl. ¶ 11.)

Defendants were out of the West Palm Beach office from December 29, 2004 through January 12, 2005. (Compl. ¶¶ 15-16.) When Strochak returned to the office on January 12, 2005, his supervisor, NB Managing Director Robert Firth ("Firth"), observed Strochak returning numerous files to the office. (Compl. ¶ 16.) Firth terminated Defendants that day. (Compl. ¶ 15.) Defendants began employment at the Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") West Palm Beach office the same day, January 12, 2005. (Compl. ¶ 17.)

NB claims that Defendants took confidential trade secrets (in the form of client lists and other confidential client information) to Merrill Lynch and solicited NB clients to transfer their accounts to Merrill Lynch in derogation of the terms of their employment agreements. (Compl. ¶ 20.) NB moves for a preliminary injunction to prevent Defendants from engaging in the alleged solicitation activities.

## II. LEGAL STANDARD

This Court may issue preliminary injunctions only in limited circumstances:

> A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004) (quoting Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam)). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the

'burden of persuasion' as to all four elements." Horton v. City of St. Augustine, FL, 272 F.3d 1318, 1326 (11th Cir. 2001) (quoting Siegel, 234 F.3d at 1176). "The grant or denial of a preliminary injunction is a decision within the sound discretion of the district court." Siegel, 234 F.3d at 1179 (quoting Sierra Club v. Georgia Power Co., 180 F.3d 1309, 1310 (11th Cir. 1999)). Factual findings are reviewed for clear error, whereas conclusions of law are reviewed *de novo*. Id. (citing SEC v. Unique Financial Concepts, Inc., 196 F.3d 1195, 1198 (11th Cir. 1999)).

## III. DISCUSSION

NB has submitted four sworn affidavits in support of its preliminary injunction motion. These documents include affidavits from Firth, NB Managing Director Stephanie Stiefel ("Stiefel"), NB Internal Wholesaler Allison Newman ("Newman") and Defendants' replacement in the West Palm Beach office, NB Client Consultant Louis Vilardo ("Vilardo"). Several of the affiants state that they spoke with NB clients Defendants had solicited to transfer their accounts to Merrill Lynch, and one affiant states that at least six clients had already transferred their accounts. (Firth Aff. ¶¶ 23, 25; Stiefel Aff. ¶ 3; Vilardo Aff. ¶¶ 6-9.) Another NB employee avers that she received a telephone call from Jaffe's Merrill Lynch assistant in which the assistant stated that Jaffe had already transferred five accounts to Merrill Lynch and that she was seeking to transfer many more. (Newman Aff. ¶¶ 3, 5.) NB also submits Strochak's deposition, in which Strochak states that he discussed Merrill Lynch's fee structure and the resources Merrill Lynch made available to him as a financial planner, but only in response to customer inquiries. (Strochak Depo., 44-48.)

In response, Defendants have submitted affidavits in which they deny soliciting NB

clients. Defendants explain that after they left NB, they created a list of customer names from

memory and used publicly available sources to obtain the customers' addresses and telephone

numbers for the purpose of informing the customers that they were no longer with NB. If a client

inquired as to the identity of their new employer, Defendants would provide the customer with

the Merrill Lynch name. Defendants would assist with account transfers, but only at the behest

of the customer, and only if the customer made the initial request. (Strochak Aff. ¶¶ 5-7; Jaffe

Aff. ¶¶ 5-7.)

Although submitted on behalf of NB, Strochak's deposition actually demonstrates that

Strochak did not engage in solicitation. Strochak contacted several clients by telephone to

inform them that he was no longer with NB. (Strochak Depo., 40.) Strochak only disclosed the

identity of his new employer if the customer inquired, however. Id. at 40, 44-45. If a customer

asked why Strochak went to Merrill Lynch, Strochak would respond that "Merrill Lynch had

superior money management, systems and service and I thought it was a win-win for myself and

my clients" prior to asking whether the customer desired more information. Id. at 41. Strochak

never said that Merrill Lynch was a superior financial management firm to NB, but simply

described the resources that Merrill Lynch made available to him. Id. at 48. Although Strochak

disclosed Merrill Lynch's fee structure to a number of his former NB clients, he did not disclose

the information for purposes of comparison with NB's fee structure. Id. at 39. Strochak denies

telling customers that Merrill Lynch would manage their accounts for less. Id.

Based on this record and the arguments of counsel, NB has not demonstrated a substantial

likelihood of success on the merits. The only evidence of solicitation is circumstantial and based

upon hearsay statements, which are inadmissible to support a motion for preliminary injunction.

See Ocean Bio-Chem v. Turner Network Television, 741 F.Supp. 1546, 1559 (S.D. Fla. 1990)

("declarants cannot attest to the out-of-court statement of others...[s]uch an affidavit would

involve double hearsay....").[1] For instance, Firth avers that

> NB has received information form clients establishing that Mr.
> Strochak and Ms. Jaffe have been directly and indirectly soliciting
> NB clients to whom they provided services to, while employed by
> NB, for the purpose of having those clients transfer their accounts
> from NB to Merrill Lynch. These clients are neither immediate
> family members of Mr. Strochak and Ms. Jaffe nor clients that Mr.
> Strochak and Ms. Jaffe were directly involved in bringing to NB
> from their previous firm.

(Firth Aff. ¶ 23.) Stiefel states that she

> contacted a client of NB who was solicited by Scott Strochak ("Mr.
> Strochak") and Alisa Jaffe ("Ms. Jaffe") to move their assets from
> NB to Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrill
> Lynch"). The client held five (5) NB accounts and is neither a
> member of Mr. Strochak or Ms. Jaffe [sic] immediate family nor a
> client that they were directly involved in bringing to their firm

---

[1] NB argues that the hearsay statements are admissible because it did not have time to procure statements from alleged solicitees. "Affidavits and other hearsay materials are often received in preliminary injunction hearings. The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding." CBS, Inc. v. Prime Time 24 Joint Venture, 9 F.Supp.2d 1333, 1341-42 (S.D. Fla. 1998) (quoting Asseo v. Pan American Grain Co., 805 F.2d 23, 26 (1st Cir. 1986)). NB also explains that it was loathe to obtain statements from its clients for fear of alienating them. Neither of these arguments is well-taken. NB claims that the order setting the preliminary injunction hearing for Friday, February 18, 2005 was not entered until Monday, February 14, 2005, thus leaving it with insufficient time to obtain affidavits or depositions from the alleged solicitees. Although the notice of hearing was not docketed until February 14, the Court signed the notice late in the morning of February 11, 2005. A member of the Court's staff called counsel for each side and read the terms of the order over the telephone, which included a provision that discovery was to commence immediately. Vilardo's affidavit states that he spoke with alleged solicitees as early as January 19, 2005, indicating that NB had notice of these individuals' identities. See infra, p. 7. The Court further notes that NB requested expedited review of the preliminary injunction motion. NB's fear of alienating its broad client base does not explain its failure to provide any client statements detailing the circumstances of the alleged solicitation.

before joining NB. The client had his account serviced by Mr.
Strochak while Mr. Strochak was employed at NB.

(Stiefel Aff. ¶ 3.) Vilardo claims that he met with and spoke to four NB clients whom Strochak

and Jaffe solicited to transfer their accounts to Merrill Lynch. His accounts of the conversations

are as follows:

> I met with a physician client of NB on January 25, 2005.
> At that meeting, the client explained that he previously met with
> both Strochak and Jaffe and that they encouraged him to move his
> accounts to Merrill Lynch. Further, the client advised me that he
> was told that he should move his account to Merrill Lynch because
> they had lower fees.
>
> On January 20, 2005, I met with a female client of NB.
> The client stated that she was contacted by Strochak telephonically
> on numerous occasions and, during those telephone calls, Strochak
> encouraged her to move her account to Merrill Lynch. The client
> was also told that Merrill Lynch has access to the same money
> manager that is providing services to her through NB. The fact that
> Strochak knew who was managing the client's account at NB could
> be used by Strochak to provide a competitive advantage to him at
> Merrill Lynch since that information is confidential to NB and not
> known to the public or NB's competitors.
>
> On January 19, 2005, I met with another physician client of
> NB's West Palm Beach office. The physician advised me that he
> was contacted by Strochak, who encouraged him to move his NB
> account to Merrill Lynch. The physician advised me that Strochak
> assured him that Merrill Lynch could manage his accounts at a
> lower cost.
>
> On February 2, 2005, I met with another physician client of
> NB's West Palm Beach office. The physician stated that he
> previously met with Strochak and, perhaps, Jaffe. At that meeting,
> Strochak attempted to move the physician's account to Merrill
> Lynch and presented the physician with Merrill Lynch's account
> transfer forms.

(Vilardo Aff. ¶¶ 6-9.) Even if the Court were to take the hearsay statements at face value, they

say nothing about the actual objectionable conduct in which Defendants allegedly engaged. NB

has not provided the details of any statements made that allegedly constitute solicitation. Nor has

NB provided evidence to contradict Defendants' sworn statements that any information they

provided to customers was in response to customer inquiries. Despite numerous hearsay

allegations that Defendants solicited multiple NB clients, NB has failed to provide any client

statements to that effect. Without more specific facts about the content and context of the

alleged objectionable statements, the Court cannot say that NB is likely to prevail on its claim

that Defendants engaged in solicitation.

The record before the Court demonstrates Defendants either called customers to inform

them of their leaving NB or were on the receiving end of customer calls. Merely announcing that

a financial planner has joined a new firm is not solicitation. See Merrill Lynch, Pierce, Fenner &

Smith, Inc. v. O'Connor, 194 F.R.D. 618, 620 (N.D. Ill. 2000) ("It would be unlawful, as well as

unreasonable, for Merrill Lynch to seek to prohibit O'Connor from giving his former customers

an announcement of his intent to move to other employment and notice where he should be

reached should the customers wish to contact him[.]"). Defendants' conduct is distinguishable

from other cases in which courts have found solicitation. See Merrill Lynch v. Dunn, 191

F.Supp.2d 1346, 1351-52 (S.D. Fla. 2002) (former employees inputted confidential customer

information into their computers at their new workplace and solicited plaintiff's customers via

phone, mail and personal meetings); Merrill Lynch v. Hagerty, 808 F.Supp. 1555, 1557 (S.D. Fla.

1992) (former employee maintained database of client information in home computer and gave

the information to his new employer, who, along with defendant, solicited plaintiff's former

clients); Lynch v. Silcox, 2001 WL 1200656, No. 01-8800-CIV, at *3 (S.D. Fla. Oct. 4, 2001)

(defendant former employee took confidential customer information and used the information to mail pre-prepared account transfer forms to his former clients); <u>Merrill Lynch v. Lovekamp</u>, 2001 WL 810749, No. 4:01CV318SPM, at *3 (N.D. Fla. Jul. 16, 2001) (defendant former employee did not deny sending solicitation letters along with pre-prepared account transfer forms).

NB's evidence that Defendants currently possess confidential information is also lacking. Although Firth avers that he saw Strochak return numerous files to the West Palm Beach office the day of Defendants' termination, he had no knowledge of the contents of the files. (Firth Aff. ¶ 19.) Even if the files contained confidential information, Strochak had access to such information as an NB financial planner.

Since NB has failed to demonstrate a substantial likelihood of success on the merits, the Court declines to address the remaining elements that must be satisfied prior to imposition of a preliminary injunction. Accordingly, NB's motion for preliminary injunction is denied.

### III. CONCLUSION

THE COURT, having considered the affidavits and deposition, as well as counsels' oral and written arguments, hereby

ORDERS AND ADJUDGES that NB's Motion for Preliminary Injunction, filed February 8, 2005 [DE 2] is DENIED. It is further

ORDERED AND ADJUDGED that Defendants' Motion to Strike Affidavits, filed February 16, 2005 [DE 14] is GRANTED. The affidavits of Firth, Newman, Vilardo and Stiefel are stricken to the extent that they contain hearsay statements. It is further

ORDERED AND ADJUDGED that Defendant's Motion to Strike the Affidavit of

Allison Newman, filed February 22, 2005 **[DE 28]** is DENIED as MOOT.

DONE AND ORDERED at Chambers in West Palm Beach, Florida, this _11_ day of

March, 2005.

KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE

Copies provided:
Leonard K. Samuels, Esq.
Lyle E. Shapiro, Esq.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CHARLES SCHWAB & CO., INC.,

     Plaintiff,

v.                                   Case No. 2:11-cv-00184-36DNF

NICHOLAS CARR, and BRUCE ELIOT
LEGATES,

     Defendants.

---

### ORDER

This cause comes before the Court on Plaintiff Charles Schwab & Co., Inc.'s Motion for Preliminary Injunction (Doc. 4), filed on April 4, 2011. On April 18, 2011, Defendants Nicholas Carr and Bruce Eliot Legates filed a Response (Doc. 17). The Court heard oral argument on this matter on May 3, 2011. For the following reasons, Plaintiff's Motion will be denied.

### BACKGROUND

Defendants Nicholas Carr and Bruce Eliot Legates worked for Plaintiff Charles Schwab & Co., Inc. in its Naples, Florida office from 2005 until the date of their voluntary departure on February 18, 2011. Doc. 4 at 2. During their employment, Defendants worked as financial consultants and were responsible for servicing Plaintiff's private client investors. *Id.* at 2–3.

As a condition of their employment, Defendants executed Confidentiality, Nonsolicitation and Assignment Agreements upon joining Plaintiff in 2005. *Id.* at 3. The Nonsolicitation Agreements state that, should Defendants' relationship with Plaintiff end, Defendants would be prohibited from soliciting any of Plaintiff's clients for a period of 18 months. *Id.* at 4. An addendum

to the Agreements provided that "in addition to all of the obligations set forth in the Confidentiality, Nonsolicitation and Assignment Agreement previously executed by me (which I hereby reaffirm), I will not, for a period of one year following the termination of my employment with Schwab initiate any contact for any purpose with any of the Relationship Practice Accounts...." *Id.* The Agreements also required Defendants to refrain from disclosing, reproducing, using, or disseminating any of Plaintiff's "Confidential Information" except to the extent necessary to perform their job duties. *Id.* The definition of "Confidential Information" encompasses the identities of Plaintiff's clients and their contact information. *Id.*

In 2010, Defendants signed renewed Confidentiality, Nonsolicitation, and Intellectual Property Ownership Agreements. The 2010 Agreements contained promises not to solicit any of Plaintiff's clients and not to use or disclose any of Plaintiff's "Confidential Information" in the event of Defendants' departure from Schwab. *Id.* at 5. The 2010 Agreements do not contain language prohibiting contact for any purpose with any of the Relationship Practice Account clients.

On February 18, 2011, Defendants voluntarily resigned from Schwab and joined Merrill Lynch, a competitor of Plaintiff. *Id.* at 2, 7. Plaintiff alleges that since that time, Defendants have breached their Nonsolicitation Agreements by using Plaintiff's customer information to contact, solicit, and induce clients to transfer their accounts to Merrill Lynch. *Id.* at 7.

On March 30, 2011, Plaintiff filed a Complaint alleging breach of contract, misappropriation and misuse of confidential information, breach of the duty of loyalty, conversion, unfair competition, and tortious interference with business relations (Doc. 1). The Complaint also seeks injunctive relief. On April 4, 2011, Plaintiff filed a Motion for Preliminary Injunction (Doc. 4). Through the Motion, Plaintiff seeks to prohibit Defendants' continued solicitation of Plaintiff's clients and

2

Defendants' use of Plaintiff's confidential customer information. Doc. 4 at 13 n. 4.

## ANALYSIS

A preliminary injunction is an "extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion." *McDonald's Corp., v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). A preliminary injunction may be granted only if the moving party establishes four elements: (1) a substantial likelihood of success on the merits; (2) an immediate and irreparable injury absent injunctive relief; (3) a threatened harm to plaintiff that outweighs any injury the injunction would cause the nonmovant; and (4) the injunction will not disserve the public interest. *Carillon Importers v. Frank Pesce Int'l Group Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997). A preliminary injunction is not appropriate if the movant has an adequate remedy at law. *Ferraro v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991).

### I. Success on the Merits

Here, Plaintiff has failed to establish a breach of the Nonsolicitation Agreements. Specifically, Plaintiff has been unable to show that Defendants engaged in solicitations rather than mere announcements when they corresponded with Schwab clients to notify them of their departures from Schwab, and Plaintiff has also been unable to show that Defendants misappropriated any trade secrets or other proprietary information.[1]

---

[1] Plaintiff maintains that Defendants' Nonsolicitation Agreements also proscribed any contact with former clients. *See* Doc. 4 at 14–15. The Court disagrees. The 2010 Agreements, which control, for purposes of this proceeding, do not limit all contact with former clients. Instead, the 2010 Agreements limit contact which amounts to direct or indirect solicitations made in an attempt to "divert, transfer, or otherwise take away business from Schwab." Docs. 17-1, 17-2 at 2. Likewise, the 2005 Nonsolicitation Agreements only proscribe contacts made "for the purposes of soliciting or inducing" the transfer of business. Doc. 1-1 at 4.

3

## A. Defendants Did Not Engage In Solicitations

The record before the Court indicates that Defendants did not encourage Schwab clients to move their accounts to Merrill Lynch. Instead, their declarations demonstrate that Defendants contacted Schwab clients to notify them of their departures. Dec. of Nicholas Carr at ¶11; Dec. of Bruce Eliot Legates at ¶11 ("I also understand that I am not permitted to ask my clients...to transfer their assets to Merrill Lynch or to stop doing business with Schwab...[t]o be clear, to the best of my knowledge and my understanding of the Agreement, I have **not** solicited clients to transfer their business from Schwab to Merrill Lynch, either before or after my resignation from Schwab") (emphasis in originals). These mere announcements, which allowed the clients to make informed decisions as to the future management of their finances, do not give rise to impermissible solicitations because there is insufficient evidence that the announcements were made with an intent to divert the clients' business.[2] *Compare Neuberger Berman, LLC v. Strochak*, Case No. 9:05-80112-cv-Ryskamp/Vitunac, at Doc. 57 *8 (S.D. Fla. March 11, 2005) ("Merely announcing that a financial planner has joined a new firm is not solicitation") (citation omitted) *and Sanford Bernstein & Co., Inc., v. Brief*, Case No. 9:2000-8373-cv-Ryskamp/Vitunac, at Doc. 43 (S.D. Fla. September 25, 2000) (finding that the movant was unable to demonstrate a solicitation when its former

---

[2] The only evidence Plaintiff has offered tending to refute Defendants' assertions that they did not engage in solicitations is contained within the declaration of Schwab employee Bryon Westerfield. In his declaration, Westerfield states that "Dozens of Schwab clients have reported to Schwab that the Defendants have called them to discuss their resignation from Schwab...[o]ne client who received a message from Defendants stated "obviously they want me to move my business over there." Dec. of Westerfield at ¶24. Such second-hand statements constitute hearsay and are inadmissible to support a motion for a preliminary injunction. *See Ocean Bio-Chem v. Turner Network Television*, 741 F. Supp. 1546, 1559 (S.D. Fla. 1990).

employee contacted clients to notify them of his move to a competitor and to inform them of the competitor's services) *with Charles Schwab & Co. v. Aviles*, Case No. 1:07-21745-cv-Graham/O'Sullivan, at Doc. 27 *16 (S.D. Fla. August 23, 2007) (finding that the defendant did engage in solicitation when he called a former client "several times a day over a period of two weeks" and told her that Schwab was "going down hill" even after she demanded he stop) *and Merrill Lynch, Pierce, Penner & Smith v. Lovekamp*, 2001 WL 810749, at *3, Case No. 4:01-cv-318-SPM (N.D. Fla. July 16, 2001) (granting a temporary restraining order to restrict a former employee's solicitations where defendant did not deny "recently sending solicitation letters to some or all of the clients she served at Merrill Lynch and does not deny providing transfer of account forms along with these letters"). In fact, the FINRA standards of professional conduct seem to allow for such announcements, and prevent interference with a customer's request to transfer his or her account. *See* FINRA Rule 2140 (generally prohibiting interference with the transfer of customer accounts). Accordingly, Plaintiff has failed to establish that Defendants breached the Nonsolicitation Agreements because their limited contacts with their former clients did not give rise to impermissible solicitations.

## B. Defendants Did Not Misappropriate Proprietary Materials or Information

The record before the Court indicates that Defendants did not misappropriate any proprietary materials or information upon their departures from Schwab. *Compare See SimplexGrinnell, L.P. v. Ghiran*, 2008 U.S. Dist. LEXIS 57368, at *5–6 (M.D. Fla. July 9, 2008) ("If there was a customer list, plaintiff has not provided any evidence demonstrating that the customer list allegedly in the possession of defendant contains any information not readily available from public sources, or that they incurred great expense in compiling such a list") *with Merrill Lynch v. Dunn*, 191 F. Supp. 2d

undisputed"). If the clients' information was not publicly available, Defendants Carr and Legates did not contact them. Dec. of Carr at ¶13; Dec. of Legates at ¶13. Thus, Plaintiff has failed to produce evidence demonstrating that Defendants stole or misappropriated any of its proprietary information.

## II. Irreparable Injury

Under Florida law, the use of specific trade secrets is presumed to result in irreparable injury. Fla. Stat. §542.33; *Lovekamp*, 2001 WL 810749 at *4[3]. Courts have found against the presumption of irreparable harm in non-compete cases where evidence is available to prove damages. *See, e.g., First Miami Sec. v. Bell*, 758 So.2d 1229, 1230 (Fla. 4th DCA 2000) (finding against the presumption of irreparable injury where damages could "readily be calculated from the commission derived by Defendant at his new place of employment").

Plaintiff argues that there is a presumption of irreparable injury in this case because Defendants misappropriated a trade secret. However, for the presumption of irreparable injury to attach, the Court must find that Defendants misappropriated a trade secret. *Select Portfolio Servicing, Inc. v. Evaluation Solutions, L.L.C.*, 2006 U.S. Dist. LEXIS 67276, at *36 (M.D. Fla. September 20, 2006). As discussed, *supra*, Plaintiff has not established that Defendants misappropriated any trade secrets or other proprietary information. Thus, the presumption of irreparable injury does not apply. *Id.* at *36–37.

Moreover, Plaintiff has an adequate remedy at law. Specifically, Plaintiff included a

---

[3]Such a presumption is conditioned upon the Court's finding that the owner of the trade secret took reasonable efforts to maintain its secrecy. Fla. Stat. § 688.0002(4)(b); *Lovekamp*, 2001 WL 810749 at *3. Since the Court has no evidence to conclude that the Nonsolicitation Agreements were breached, it need not consider whether Schwab took reasonable efforts to maintain the secrecy of its customer lists.

liquidated damages clause in its Nonsolicitation Agreement as a means of quantifying potential losses. The Agreement characterizes the enumerated liquidated damages as "reasonable estimates of the compensatory damages that Schwab will incur as a result of [a breach of the Agreements]." Docs. 17-1, 17-2 at 5. Thus, given the highly regulated nature of the industry, as well as Plaintiff's admittedly reasonable estimate of the actual damages that a breach of the Nonsolicitation Agreement would pose, the Court finds that there is no threat of irreparable injury. *See Bell*, 758 So.2d at 1230.

**III. The Public Interest**

The issuance of an injunction would not serve the public interest. In cases where noncompete agreements have been breached, an injunction serves to enforce the terms of the contract. *See Schwab v. Karpiak*, 2007 WL 136743. at *15 ("Unless the court enforces the terms of the contracts entered into by the sophisticated parties and entities in this case, the court will be undermining the legitimate business expectations not only of the parties here, but of all contracting parties"). Similarly, in situations where the terms of a noncompete agreement have not been breached, the Court honors the intent of the contracting parties by not imposing an injunction. *See, e.g., Strochak*, 05-80112 at *5–6. As discussed, *supra*, there is no evidence that Defendants have violated the terms of their Nonsolicitation Agreements. Thus, public policy favors upholding the agreed-upon terms of the Nonsolicitation Agreements by denying Plaintiff's request for an injunction.

Additionally, the clients, whose financial well-being is at stake, have the right to know of Defendants' move. It is in the best interest of the public, then, that affected clients have the opportunity to decide whether to move their accounts to Merrill Lynch or to remain clients of Schwab. As the Southern District of Florida noted:

8

> It is in the best interest of the public...that these affected clients be informed of [the defendant's] move so that they might decide on their own whether to follow her to Prudential or to stay with Merrill Lynch to be serviced by another broker there. Merrill Lynch is not restricted in any way from in good faith attempting to convince these clients to keep their accounts at Merrill Lynch but ultimately it is each client's own informed decision to make.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McCullen*, 1995 WL 799537, at *3 (S.D. Fla. December 13, 1995); *see also* FINRA Rule 2140. Accordingly, the public interest would not be served by the issuance of a preliminary injunction.

**IV. The Balance of Harms**

Finally, the harm that injunctive relief would pose to Defendants far outweighs the benefit it would afford Plaintiff. Given that there is insufficient evidence that Defendants have violated the terms of their Nonsolicitation Agreements, an injunction, even one that would merely prevent Defendants from contacting their former clients, would be especially inequitable. *See Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Napolitano*, 85 F. Supp. 2d 491, 499 (E.D. Pa. 2000) (noting that the balance of equities favored an injunction where the Defendant knowingly violated the terms of his employment contract, stating "[t]he self-inflicted nature of any harm suffered by the wrongdoer weighs heavily in favor of granting injunctive relief").

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.   Plaintiff Charles Schwab and Co., Inc's Motion for a Preliminary Injunction is **DENIED** (Doc. 4)..

**DONE** and **ORDERED** in Fort Myers, Florida, May 17, 2011.

Charlene Edwards Honeywell
United States District Judge

COPIES FURNISHED TO:
Counsel of Record

10