# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

WELLS FARGO INSURANCE SERVICES USA, INC.,

        Plaintiff,

        v.

EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK,

        Defendants.

CIVIL DIVISION

NO. GD-17-14022

**PRELIMINARY INJUNCTION HEARING JOINT EXHIBIT LIST**

Counsel of Record for Plaintiff:

Gerald J. Stubenhofer Jr. (Pa. I.D. #72921)
Jarrod Shaw (Pa. I.D. #93459)
Natalie Zagari (Pa. I.D. #316221)

McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222
(412) 667-6000

Counsel of Record for Defendants:

William J. Moorhead (Pa. I.D. #52761)

COZEN O'CONNOR
One Oxford Centre, 26th Floor
301 Grant Street
Pittsburgh, PA 15219
(412) 620-6500

Steven D. Pearson (*pro hac vice*)
Mitchell J. Edlund (*pro hac vice*)
Corey T. Hickman (*pro hac vice*)

COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, IL 60606
(312) 474-7900

FILED

17 DEC 11 PM 4:08

DEPT. OF COURT RECORDS
CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

*EXHIBIT "N"*

# PLAINTIFF'S EXHIBITS

| Binder Tab | Exhibit Description | Objection? |
|---|---|---|
| 1. | WFIS Code of Conduct (Under Seal) | No |
| 2. | WFIS/Acordia Agreements | |
| a. | Krauss | No |
| b. | Mendelson | No |
| c. | Andreas | No |
| d. | Zewe | No |
| e. | Karstens | No |
| f. | Kostorick | No |
| g. | Wakim | No |
| h. | Yorio | No |
| 3. | USI Stock Purchase Agreement (Under Seal) | No |
| 4. | ACO Stock Purchase Agreement | No |
| 6. | Broker of Record Letters ("BORs") | |
| a. | Krauss | No |
| b. | Mendelson | No |
| c. | Andreas | No |
| d. | Zewe | No |
| e. | Karstens | No |
| f. | Kostorick | No |
| 8. | New Team Member Acknowledgment | |
| a. | Krauss | No |
| b. | Mendelson | No |
| c. | Andreas | No |
| d. | Zewe | No |
| e. | Karstens | No |
| f. | Kostorick | No |

| T | Kostorick e-mail announcement sample | No |
|---|---|---|
| U | Krauss e-mail announcement sample | No |
| V | Yorio e-mail announcement sample | No |
| W | Solicitation dictionary definitions | No |
| X | Ron Lenart NDA with Lockton | No |

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

WELLS FARGO INSURANCE SERVICES
USA, INC.,

          Plaintiff,

      v.

EDGEWOOD PARTNERS INSURANCE
CENTER, SEAN ANDREAS, ZACHARY
MENDELSON, CHARLES YORIO,
PHILLIP WAKIM, JANICE ZEWE, SALLY
KRAUSS, KURT KARSTENS and PETER
KOSTORICK,

          Defendants.

CIVIL DIVISION

NO. GD-17-14022

**DEFENDANTS' MEMORANDUM OF
LAW IN SUPPORT OF EMERGENCY
MOTION TO DISSOLVE OCTOBER 13,
2017 ORDER**

Filed on behalf of: DEFENDANTS
EDGEWOOD PARTNERS INSURANCE
CENTER, SEAN ANDREAS, ZACHARY
MENDELSON, CHARLES YORIO, PHILLIP
WAKIM, JANICE ZEWE, SALLY KRAUSS,
KURT KARSTENS and PETER KOSTORICK

Counsel of Record for this Party:

William J. Moorhead, Esquire
Pa. I.D. #52761

COZEN O'CONNOR
One Oxford Centre, 26th Floor
301 Grant Street
Pittsburgh, PA 15219

(412) 620-6500

Steven D. Pearson (*pro hac vice* pending)
Mitchell J. Edlund (*pro hac vice* pending)
Corey T. Hickman (*pro hac vice* pending)

COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, IL 60606

(312) 474-7900


FILED

17 OCT 23 PM 3: 32

DEPT. OF COURT RECORDS
CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

I.      **WFIS' Unsuccessful Federal Court Filing** ....................................................1

II.     **WFIS' Sale to USI Insurance Services**........................................................3

FACTUAL BACKGROUND ......................................................................................................6

      A.     WFIS Agrees to Sell Its Entire Insurance Business to USI and
              USI Demands Acceptance of Non-Negotiable New Employment
              Agreements ........................................................................................6

      B.     The Individual Defendants Reject Joining the USI "Team" and
              Instead Join EPIC ..............................................................................7

ARGUMENT .........................................................................................................................9

I.      **WFIS Fails to Establish a Likelihood of Prevailing on the Merits**............13

      A.     WFIS Neither Has Standing Nor Is It the Real Party in Interest
              to the Pleaded Claims.........................................................................13

      B.     WFIS' Claims are Barred by the Equitable Doctrine of Unclean Hands ...........15

II.     **WFIS Has Not Demonstrated It Will Suffer Irreparable Harm In the
          Absence of Injunctive Relief** .....................................................................16

      A.     WFIS Has an Adequate Remedy at Law – Money Damages
              Are Adequate ....................................................................................16

      B.     No Irreparable Harm Can Possibly Occur Because There Is No
              Evidence of Active Solicitation and the Unsolicited Acceptance of
              Business Cannot be Enjoined..............................................................18

III.    **The Balance of the Harms Does Not Favor WFIS** ......................................20

IV.    **WFIS Cannot Establish that Injunctive Relief is in the Public Interest**..................22

CONCLUSION .....................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

*Adhesives Research, Inc. v. Newsom,*
    1:15-CV-0326, 2015 WL 1638557 (M.D. Pa. Apr. 13, 2015).........................12, 16, 22

*All-Pak, Inc. v. Johnston,*
    694 A.2d 347 (Pa. Super. Ct. 1997).........................................................................22

*Arthur J. Gallagher & Co.,*
    2007 WL 1877895 ...................................................................................16, 19, 20

*Banks v. Ryan,*
    124 Pa. Cmwlth. 603, 556 A.2d 950 (1989) ............................................................18

*Beck Computing Services Inc. v. Anderson,*
    362 Pa. Super 505 (1987)..........................................................................................9

*Big Bass Lake Cmty. Ass'n v. Warren,*
    950 A.2d 1137 (Pa. Commw. Ct. 2008) ...................................................................10

*Clark v. Cambria County Bd. of Assessment Appeals,*
    747 A.2d 1242 (Pa. Commw. Ct. 2000) ...................................................................13

*Com. v. U.S. Steel Corp.,*
    57 Pa. D & C.2d 583 (Pa. Com. Pl. 1971) ...............................................................18

*Deangelo Bros., Inc. v. Clarius,*
    3:CV-06-0466, 2006 WL 7553206 (M.D. Pa. Aug. 17, 2006) ...................................20

*Diodato v. Wells Fargo Ins. Services, USA, Inc.,*
    44 F. Supp. 3d 541 (M.D. Pa. 2014)...................................................................19, 22

*Eckman v. Erie Ins. Exch.,*
    2011 PA Super 87 (2011) ........................................................................................10

*Fumo v. City of Philadelphia,*
    601 Pa. 322 (2009)..................................................................................................13

*Greenmoor, Inc. v. Burchick Const. Co., Inc.,*
    2006 PA Super 252 (2006) ......................................................................................18

*Herman v. Dixon,*
    393 Pa. 33 (1958)....................................................................................................21

*Hess v. Gebhard & Co. Inc.,*
    570 Pa. 148, 808 A.2d 912 (2002) .....................................................................13, 14

*Jacobs v. Halloran,*
    551 Pa. 350 (1998).................................................................................................15

*John G. Bryant Co. Inc. v. Sling Testing & Repair, Inc.,*
    471 Pa. 1 (1977)....................................................................................................16

*Latuszewski v. Valic Financial Advisors, Inc.*
    2007 WL 4462739 (W.D. Pa. 2007)....................................................................15

*Lycoming County v. Pennsylvania Labor Relations Bd.,*
    943 A.2d 333 (Pa. Commw. Ct. 2007) ..................................................................8

*McMullan v. Wohlgemuth,*
    444 Pa. 563, 281 A.2d 836 (1971)..................................................................10, 22

*Mettler-Toledo, Inc. v. Acker,*
    908 F. Supp. 240 (M.D. Pa. 1995)..................................................................16, 21

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Moose,*
    365 Pa. Super. 40 (1987)................................................................................19, 22

*Salomon Smith Barney Inc. v. Vockel,*
    137 F. Supp. 2d 599 (E.D. Pa. 2000)..............................................................15, 21

*Sanford Inv. Co., Inc. v. Ahlstrom Mach. Holdings, Inc.,*
    198 F.3d 415 (3d Cir. 1999).................................................................................13

*Schaeffer v. Frey,*
    403 Pa. Super 560 (1991).....................................................................................16

*Shepherd v. Pittsburgh Glass Works, LLC,*
    2011 PA Super 156 (2011) ..............................................................................10, 14

*Viad Corp. v. Cordial,*
    299 F. Supp. 2d 466 (W.D. Pa. 2003)..................................................................12

*Wells Fargo Insurance Services USA, Inc. v. Alliant Insurance Services, Inc.,*
    Case No. 2017-0540-JTL, Court of Chancery, State of Delaware ....................6, 7, 8

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)..................................................................................................20

*WPNT Inc. v. Secret Commc'n Inc.,*
    443 Pa. Super. 269 (1995)......................................................................................9

Defendants, Edgewood Partners Insurance Center ("EPIC"), Sean Andreas ("Andreas"), Zachary Mendelson ("Mendelson"), Charles Yorio ("Yorio"), Phillip Wakim ("Wakim"), Janice Zewe ("Zewe"), Sally Krauss ("Krauss"), Kurt Karstens ("Karstens"), and Peter Kostorick ("Kostorick") (collectively the "Individual Defendants"), by their undersigned counsel, Cozen O'Connor, submit their Memorandum of Law in Support of Emergency Motion to Dissolve the Court's October 13, 2017 Order.

## INTRODUCTION

### I. WFIS' Unsuccessful Federal Court Filing

Plaintiff, Wells Fargo Insurance Services USA, Inc. ("WFIS") filed this lawsuit in the United States District Court for the Western District of Pennsylvania on October 4, 2017, attempting to enforce unenforceable provisions of employment agreements containing post-employment restrictive covenants executed between the Individual Defendants and WFIS or its alleged predecessors. On October 5, 2017, WFIS first sought a temporary restraining order and preliminary injunction. Extensive legal and evidentiary briefing on the merits of that motion was submitted by Defendants in opposition to WFIS' motion. On October 6, 2017, Judge Cercone of the United States District Court set WFIS' request for TRO for hearing on October 12, 2017.

Two days prior to the scheduled October 12, 2017 hearing, WFIS filed a Corporate Disclosure Statement containing information regarding its ownership. Defendants researched the veracity of that disclosure and found that the information submitted in WFIS' disclosure was inconsistent with its allegations in cases it had filed elsewhere. Upon further investigation prompted by these inconsistencies, Defendants discovered that, not only had WFIS failed to allege any principal place of business in its federal complaint which would permit that Court to exercise subject matter jurisdiction, it appeared WFIS had intentionally omitted this fundamental

allegation from its federal court complaint in an attempt to manufacture federal subject matter jurisdiction. Accordingly, Defendants timely filed a Motion to Dismiss for failure to properly plead subject matter jurisdiction.

At the scheduled October 12, 2017 hearing on its request for TRO, WFIS' counsel urged Judge Cercone to disregard Defendants' subject matter jurisdiction objection, claiming an absolute right to amend and representing that it would amend within "ten minutes" to "cure" the jurisdictional defect if given the opportunity. (Transcript, attached as Exhibit A, 3:22-24, 6:14-23, 9:24-10:3). WFIS' counsel urged Judge Cercone to accept that representation and immediately proceed with the TRO hearing. Counsel for Defendants questioned whether amendment would be possible given WFIS' Rule 11 obligations, and requested an opportunity to brief and be heard on the jurisdictional issues before proceeding. Judge Cercone agreed with Defendants, finding he could not hear the merits of WFIS' request for TRO due to its failure to adequately establish diversity jurisdiction, and granted WFIS' request for leave to amend subject to expedited discovery on WFIS' principal place of business, and continued the TRO hearing to the his next available date of October 27, 2017 (initially indicating November 9, 2017).

After forcing Defendants to expend substantial time and resources on an expedited basis to respond to a request for TRO, including two separate motions to dismiss WFIS' plainly flawed federal court complaint, and after specifically asking and being granted by Judge Cercone leave to file an amended complaint and for "exceptionally expedited discovery," WFIS, within twenty-four hours of making such requests, abruptly voluntarily dismissed its federal case on October 13, 2017 and immediately re-filed this case, seeking on that same day the exact same temporary restraining order that Judge Cercone declined to hear the previous day. Quite remarkably, as part of this forum shopping effort, WFIS gave Defendants less than one hour's notice of its

"emergency" request in this Court so as to deprive Defendants of the opportunity to resubmit any of the extensive federal court filings to this Court. After learning this Court was not available the afternoon of October 13 to hear WFIS' request for "emergency relief," WFIS ultimately appeared before Judge Hertzberg who issued a status quo order. Even more outrageously, WFIS purposefully failed to disclose to Judge Hertzberg that the identical motion had been pending and fully briefed before Judge Cercone the prior day.[1]

## II. WFIS' Sale to USI Insurance Services

What prompted this case and the resignations of the Individual Defendants from WFIS who WFIS seeks to enjoin,[2] was WFIS' public announcement of the sale of its entire national insurance operations to the highest bidder in June of this year, leaving the professional careers and livelihoods of the Individual Defendants in jeopardy. The missing and real party in interest in this case, USI Insurance Services ("USI"), won the auction to buy the entire United States operations of WFIS. With the sale of WFIS to USI set to close next month, USI presented new employment agreements to each of the Individual Defendants on a non-negotiable, "take it or leave it" basis. Those new employment "offers," directed by USI through its Director of Acquisition Integration and Senior Vice President of Human Resources, were in actuality not offers at all, but rather unilateral and non-negotiable ultimatums by USI that if the Individual

---

[1] Fortunately, this "sand-bag" effort proved unsuccessful for WFIS as Judge Hertzberg allowed lead counsel for Defendants in Chicago to dial in and inform him that the order being sought by WFIS was based upon contractual provisions which were unenforceable and contrary to Pennsylvania law.

[2] WFIS is the insurance arm of scandal-plagued Wells Fargo Bank. WFIS employs approximately 3,500 people across the country, generating $980.8 million in annual revenue in 2016. It is most currently ranked as the tenth largest insurance brokerage in the United States based on total revenue. USI is even larger, ranking as the ninth largest national insurance brokerage with 2016 annual revenue of over $1 billion.

Defendants wished to continue working, they had until October 6, 2017 to sign new one-sided employment agreements to join the USI "team" or be terminated. Desiring to have a say in who they would be employed by and the terms of their employment, the Individual Defendants rejected the USI "team" and instead chose to work for a different team, EPIC, a company that demonstrated the commitment to support the same professional career desires of the Individual Defendants by agreeing to operational and cultural terms regarding their employment—just the opposite of USI's "take it or leave it" approach.

The Individual Defendants were eight of approximately 3,500 employees of WFIS. Each of the Individual Defendants (five service employees and three salespersons specializing in commercial insurance brokerage), for both personal and professional reasons, did not want to become employed by USI, a firm that lacked the employee culture they desired. Rather than accept employment with USI dictated by the sale of WFIS in the midst of the scandals engulfing Wells Fargo Bank and forced upon them without their consent, the Individual Defendants instead sought employment on terms of their choosing with a company having goals and aspirations they each shared, ultimately opting for a much smaller but growing firm, EPIC. It was for these reasons the Individual Defendants resigned during the time period of September 27, 2017 through October 2, 2017.

The interim status quo Order entered on an emergency basis by Judge Hertzberg should be dissolved and WFIS' request for a special and preliminary injunction denied because WFIS' Petition fails to set forth any evidence, much less the clear evidence needed to meet the standard of proof required for the extraordinary remedy of injunctive relief. In this unique situation, where WFIS has already announced that is has agreed to sell its entire insurance brokerage business to

USI, any alleged harm to WFIS necessarily is solely a matter of monetary damages.[3] WFIS' wholesale sale of its business operations by auction to the highest bidder is an acknowledgement of its absence of any protectable interest in any particular clients who choose to follow the Individual Defendants to EPIC. Discovery of the terms of the WFIS/USI transaction will assuredly show that USI contemplated the potential loss of accounts in its transaction with WFIS, and the transaction documents, once discovered, will likely reveal that both USI and WFIS contemplated adjustments to the sale price based on "leakage" (the loss of clients as a result of the sale). Even more likely, the small fraction of business at issue triggered no material adverse consequence. Whichever entity is the real party in interest in this case, the clients were not owned by that entity, and the terms of the transaction agreement itself, once turned over in discovery, will show it contemplated the costs of the loss of clients—meaning that money damages would fully compensate any claimed harm, making injunctive relief improper. Consequently, before even reaching the terms of the employment agreements or the conduct of the Individual Defendants in resigning their employment to join EPIC, WFIS' request for injunctive relief fails.

Additionally, WFIS comes to this Court with unclean hands because its Managing Director, Mark Susco, aided and abetted the Individual Defendants' departure from WFIS. WFIS seeks equitable relief on the sole basis of the Affidavit of Mr. Susco, when it was Mr. Susco who actively encouraged the Individual Defendants to prepare for their departure from WFIS by having a "Plan B." As demonstrated by the supporting Affidavits of Sean Andreas and Zachary Mendelson, Mr. Susco himself directed the Individual Defendants to prepare to leave WFIS for a

---

[3] Indeed, WFIS has not come forward with any evidence that the departure of the Individual Defendants (whose collective $5 million in revenue represents less than one-half of 1% of WFIS' overall annual revenue) constitutes a material adverse change or affect causing any downward adjustments to the agreed-upon USI purchase price.

direct competitor, and arranged meetings for them with Alliant Insurance Services, Inc. ("Alliant") (ranked the eleventh largest insurance brokerage operation in the United States with 2016 annual revenue of $966,770.00). It was the Individual Defendants who opted not to pursue employment with Alliant because WFIS was already embroiled in litigation with Alliant in the Delaware Court of Chancery, *Wells Fargo Ins. Servs. v. Alliant Ins. Servs., Inc.*, 2017-0540-JTL. The Individual Defendants chose instead to accept lawful offers of employment made by EPIC.

WFIS also cannot establish irreparable harm because the evidence of record establishes that no solicitation is taking place. WFIS speculates, without <u>any</u> evidence whatsoever (much less clear evidence), that because certain WFIS clients have requested to move their accounts to EPIC, there must be active solicitation taking place in violation of the restrictive covenants. Not only is WFIS' assertion purely guesswork insufficient to establish a clear right to relief, it is blatantly untrue. Each of the former WFIS clients that has moved to EPIC contacted the Individual Defendants on their own volition, and without solicitation, all pursuant to their right to continue to do business with the insurance professionals of their choice. There is simply nothing to enjoin.

In short, WFIS' Petition fails in any respect to prove, much less by clear evidence, that it is entitled to the extraordinary relief that it seeks.

## FACTUAL BACKGROUND

**A.  WFIS Agrees to Sell Its Entire Insurance Business to USI and USI Demands Acceptance of Non-Negotiable New Employment Agreements**

In May 2017, Wells Fargo Bank began exploring the sale of its insurance brokerage arm, WFIS. (Andreas Aff., attached as Exhibit B, ¶¶ 1, 3; Verified Complaint in *Wells Fargo Insurance Services USA, Inc. v. Alliant Insurance Services, Inc.*, Case No. 2017-0540-JTL, Court of Chancery, State of Delaware ("WFIS/Alliant Complaint"), attached as Exhibit C, ¶¶ 2, 14). In

furtherance of this objective, an "auction" was staged in June 2017, wherein large brokers and investors were invited to submit offers so WFIS could be sold to the highest bidder. During the time of this "auction," the Individual Defendants were directed by Mark Susco, WFIS' Managing Director and Affiant in support of its Petition for Special and Preliminary Injunction, that they needed to have a "Plan B" because the outcome of the auction process was uncertain and the employees of the Pittsburgh office "needed to stick together to protect themselves." (Andreas Aff., ¶¶ 5-9; Mendelson Aff., attached as Exhibit D, ¶¶ 5-8).

On June 27, 2017, it was announced that USI had won the "auction". (Andreas Aff., ¶ 6; Mendelson Aff., ¶ 3; *see* WFIS/Alliant Complaint, ¶ 37). Under that purchase agreement, WFIS agreed to sell and USI agreed to acquire the entire WFIS insurance book of business, with a closing of the transaction in November 2017. (Andreas Aff., ¶¶ 1, 3; Mendelson Aff., ¶¶ 1, 3). In late September 2017, the Individual Defendants were informed that USI had established a deadline of October 6, 2017, by which WFIS insurance producers had to execute one-sided and non-negotiable employment agreements to join the USI "team," or be out of work.[4]

**B.      The Individual Defendants Reject Joining the USI "Team" and Instead Join EPIC**

At the urging of Mr. Susco, the Individual Defendants began exploring a potential "Plan B" with EPIC in the summer of 2017. (Andreas Aff., ¶¶ 8, 10; Mendelson Aff., ¶ 8). Mr. Susco told Sean Andreas to keep him informed of this potential opportunity with EPIC. (Andreas Aff., ¶ 8). Mr. Susco, however, desired that Andreas, Mendelson, and another WFIS producer, Ron Lenart, consider joining a different competitor of WFIS, Alliant. (Andreas Aff., ¶ 9; Mendelson Aff., ¶ 7). Mr. Susco arranged for Andreas, Mendelson, and Lenart to meet with the Managing

---

[4] (*See* Andreas Aff., ¶ 2; Mendelson Aff., ¶ 2; Yorio Aff., attached as Exhibit E, ¶ 2; Wakim Aff., attached as Exhibit F, ¶ 2; Zewe Aff., attached as Exhibit G, ¶ 2; Krauss Aff., attached as Exhibit H, ¶ 2; Karstens Aff., attached as Exhibit I, ¶ 2; Kostorick Aff., attached as Exhibit J, ¶ 2).

Director of Alliant, Kevin Kenny, on September 12, 2017. (Andreas Aff., ¶ 9; Mendelson Aff., ¶ 7).[5] Following these meetings with Mr. Kenny, Andreas and Mendelson informed Mr. Susco that they thought joining Alliant was not a wise choice as Alliant was already engrossed in litigation with WFIS over an alleged breach by Alliant of a non-disclosure agreement Alliant executed as part of the "auction" process to buy WFIS. (*Id.*).[6]

Each of the Individual Defendants declined to sign the "take it or leave it" USI Employment Agreements. On September 27, 2017, Andreas, Mendelson, Yorio, Wakim, Zewe and Krauss submitted their resignations and accepted positions at EPIC's Pittsburgh office. (Complaint, ¶¶ 61, 83, 97). Kostorick resigned on September 28, 2017. (*Id.*, ¶ 113). Karstens resigned on October 2, 2017. (*Id.*, ¶ 71). WFIS hand-delivered letters to each of the Individual Defendants following their respective resignations. Those letters recognized the sale of WFIS' insurance business to USI, stating: "[W]e take the position that USI Insurance Services, LLC's purchase of Wells Fargo Insurance has no impact on the enforceability of your Agreement." (Complaint, ¶ 61; *see* Letters, attached as Exhibits L-N).

---

[5] Mr. Kenny previously worked for WFIS for 30 years, including roles as the head of national growth and business development and national head of insurance brokerage and consulting before departing WFIS to take a leadership role at Alliant. (*See* Affidavit of Kevin Kenny in *Wells Fargo Insurance Services USA, Inc. v. Alliant Insurance Services, Inc.*, Case No. 2017-0540-JTL, Court of Chancery, State of Delaware, attached as Exhibit K). *See also Lycoming County v. Pennsylvania Labor Relations Bd.*, 943 A.2d 333, 335 n. 8 (Pa. Commw. Ct. 2007) ("It is well settled that this Court may take judicial notice of pleadings and judgments in other proceedings where appropriate.").

[6] Mr. Susco, as a Senior Manager of WFIS, would have known that at the time he personally arranged the meetings between Andreas, Mendelson, and Ron Lenart with Mr. Kenny that Mr. Kenny was the primary target of WFIS' lawsuit filed in Delaware which had been commenced months earlier on July 26, 2016. Attached as Exhibit B to the WFIS/Alliant Complaint is a cease and desist letter directed to the conduct of Mr. Kenny in soliciting WFIS producers from WFIS' Atlanta, Charlotte, Phoenix, Tampa, and South Florida offices. In addition, in that same letter WFIS asserted that Mr. Kenny was also in breach of restrictions in his former WFIS employment agreement. (*See* Ex. B to WFIS/Alliant Complaint).

Upon their resignation from WFIS, the Individual Defendants sent out email announcements to their personal and professional contacts notifying them of the change in their employment, and providing a link to EPIC's website.[7] These announcement e-mails were sent to inform those WFIS clients which had been serviced by the Individual Defendants for years (and with whom each of the Individual Defendants had built longstanding relationships) that the Individual Defendants had resigned from WFIS and accepted new positions with EPIC. The notifications did not invite the clients to move their business away from WFIS to EPIC. Since these notifications were sent, the Individual Defendants, other than Yorio, have not initiated any contact with a single WFIS client.[8] All communications have been responsive to phone calls and correspondence from clients the Individual Defendants serviced while at WFIS who initiated contact with the Individual Defendants in response to learning of the Individual Defendants' change in their employment.[9]

## ARGUMENT

The grant of injunctive relief is an "extraordinary remedy, and the trial court's power to enter such an injunction should be exercised only after careful deliberation has resulted in the conclusion that such relief is a necessity." *Beck Computing Services Inc. v. Anderson*, 362 Pa. Super. 505, 508 (1987). As such, injunctive relief may only be awarded where the movant "establishes a *clear right* to the requested relief." *WPNT Inc. v. Secret Commc'n Inc.*, 443 Pa.

---

[7] (*See* Andreas Aff., ¶ 11; Mendelson Aff., ¶ 9; Yorio Aff., ¶ 4; Wakim Aff., ¶ 4; Zewe Aff., ¶ 4; Krauss Aff., ¶ 4; Karstens Aff., ¶ 4; Kostorick Aff., ¶ 4).

[8] (*See* Andreas Aff., ¶¶ 11-12; Mendelson Aff., ¶¶ 9-10; Yorio Aff., ¶¶ 4-5; Wakim Aff., ¶¶ 4-5; Zewe Aff., ¶¶ 4-5; Krauss Aff., ¶¶ 4-5; Karstens Aff., ¶¶ 4-5; Kostorick Aff., ¶¶ 4-5). Yorio, who is not a producer, telephoned three clients who he had close personal relationships with because he felt he owed them the professional courtesy of a call to simply advise them he had changed employment. (Yorio Aff., ¶ 4).

[9] *Id.*

Super. 269, 272 (1995) (emphasis added); *Big Bass Lake Cmty. Ass'n v. Warren*, 950 A.2d 1137, 1144 (Pa. Commw. Ct. 2008) ("[Injunction] is an extraordinary remedy that should be issued with caution and 'only where the rights and equity of the plaintiff are *clear and free from doubt*, and where the harm to be remedied is great and irreparable.'") (emphasis added); *McMullan v. Wohlgemuth*, 444 Pa. 563, 572 (1971) ("A preliminary injunction of any kind should not be granted unless both the right of the plaintiff is clear and immediate and irreparable injury would result were the preliminary injunction not granted.").

On its Petition for injunctive relief, WFIS has the burden to establish that: "(1) relief is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by money damages; (2) greater injury will occur from refusing to grant the injunction than from granting it; (3) the injunction will restore the parties to their status quo as it existed before the alleged wrongful conduct; (4) the petitioner is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and (6) the public interest will not be harmed if the injunction is granted." *Shepherd v. Pittsburgh Glass Works, LLC*, 2011 PA Super 156 (2011) (affirming this Court's denial of injunctive relief on the grounds that the restrictive covenants at issue were not enforceable because former employer had no protectable interest where former employees testified that they would not reveal trade secrets or confidential information of former employer). For an injunction to issue, "every one of the prerequisites must be established; if the petitioner fails to establish *any* one of them, there is no need to address the others." *Eckman v. Erie Ins. Exch.*, 2011 PA Super 87 (2011) (emphasis added).

The injunctive relief sought here—enforcement of the one-sided agreements offered on a "take it or leave it" ultimatum by USI—is improper because WFIS has failed to meet the required elements for such extraordinary relief. Indeed, this lawsuit is nothing more than a

heavy-handed attempt by WFIS to shut down these Pittsburgh-area residents so that WFIS can maximize its sale proceeds without any regard for the desires of WFIS clients.

First, WFIS cannot establish that it has any likelihood of prevailing on the merits because it has no standing and/or is not the real party in interest here, having agreed to sell its entire insurance brokerage business to USI. WFIS maintains no protectable interest in the client accounts purportedly solicited by the Individual Defendants, or in the enforcement of the Individual Defendants' restrictive covenants.

WFIS also has unclean hands and is unlikely to prevail on that basis. WFIS has engaged in highly suspect tactics to even obtain the temporary status quo Order it did by failing to disclose material facts to Judge Hertzberg regarding the matters previously pending in federal court before Judge Cercone. Moreover, its own sole Affiant in support of its request for injunctive relief actually aided and abetted the very conduct of which WFIS complains. Because WFIS is tainted with inequitableness as to the very matter for which it seeks equitable relief, its unclean hands bar it from obtaining the equitable relief it seeks.

Further, the Court's October 13, 2017 Order should be dissolved because WFIS cannot establish that it will suffer irreparable harm in the absence of an injunction. There is simply no evidence to support WFIS' allegation that it risks ongoing harm to its customer base or goodwill. WFIS has already agreed to sell its insurance brokerage business to USI along with any customer goodwill. There is no ongoing action on the part of Defendants to enjoin. Because no active solicitation is taking place, there is no threat of irreparable harm and the entry of an injunction serves no purpose. For this same reason, an injunction will not "abate the offending activity," because there is no offending activity taking place, rendering an injunction improper. *Summit Towne Ctr., Inc.*, 573 Pa. 637, 646–47 (2003). Irreparable harm also cannot be established

because money damages would fully compensate WFIS if it ultimately succeeds on the merits. "[T]he loss of customers due to solicitation by a former employee is not a harm that is irreparable." *Adhesives Research, Inc. v. Newsom*, 1:15-CV-0326, 2015 WL 1638557, at *7 (M.D. Pa. Apr. 13, 2015); *Viad Corp. v. Cordial*, 299 F. Supp. 2d 466, 481 (W.D. Pa. 2003) (finding no irreparable harm where there was no evidence of continuing solicitation taking place).

Finally, the balance of the harms and the injury to public interest factors weigh heavily in favor of Defendants. WFIS, and particularly Mr. Susco, simply cannot credibly claim any harm before this Court when WFIS aided and abetted the very conduct for which WFIS complains. WFIS' position is further flawed because, not only did Mr. Susco encourage the Individual Defendants' exit from WFIS, but the purported harm to WFIS, a massive corporation with nearly a billion dollars in annual revenue, would be minimal—less than one half of 1% of its annual revenue—and easily addressed monetarily as already anticipated by the likely terms of the WFIS/USI transaction agreement. Moreover, third-party clients would be dramatically and negatively affected, as their respective businesses would be disrupted due to the loss of the ability to use and continue to rely upon those trusted insurance advisors with whom they have built longstanding relationships.

Because WFIS cannot establish the factors necessary to establish a clear right to injunctive relief, the Court's October 13, 2017 Order should be dissolved and WFIS' Petition should be denied.

I.     **WFIS Fails To Establish a Likelihood of Prevailing on the Merits**

    A.     **WFIS Neither Has Standing Nor Is It the Real Party in Interest to the Pleaded Claims**

WFIS' Complaint is fundamentally flawed because WFIS lacks standing to assert the pleaded claims. "In seeking judicial resolution of a controversy, a party must establish as a threshold matter that he has standing to maintain the action." *Fumo v. City of Philadelphia*, 601 Pa. 322, 336 (2009). "An individual can demonstrate that he has been aggrieved if he can establish that he has a substantial, direct and immediate interest in the outcome of the litigation." *Id.* "The interest is direct if there is a causal connection between the asserted violation and the harm complained of; it is immediate if that causal connection is not remote or speculative." *Id.*

Similarly, "all actions shall be prosecuted by and in the name of the real party in interest." Pa.R.C.P. No. 2002. A real party in interest "must not merely have an interest in the result of the action, but must be in such command of the action as to be legally entitled to give a complete acquittal or discharge to the other party upon performance." *Clark v. Cambria County Bd. of Assessment Appeals*, 747 A.2d 1242, 1246 (Pa. Commw. Ct. 2000).

A party which has assigned its rights under a contract to a third-party neither has standing nor is it a real party in interest that may enforce that contract. *Sanford Inv. Co., Inc. v. Ahlstrom Mach. Holdings, Inc.*, 198 F.3d 415, 425 (3d Cir. 1999) ("Plainly American does not have standing as the real party in interest under Fed.R.Civ.P. 17. American completely assigned its right to enforce payment under the 1993 Letter Agreement to National, and consequently, American lacks standing to sue Ahlstrom."). In *Hess v. Gebhard & Co. Inc.*, 570 Pa. 148, 169, 808 A.2d 912, 924 (2002), the plaintiff sought to enforce a restrictive covenant in an employment agreement after that plaintiff had sold its insurance business to a third-party. There, the Supreme Court of Pennsylvania found that the plaintiff may not enforce the terms of the

restrictive covenants because they had already sold the business that the restrictive covenants aimed to protect: "[B]ecause Hoaster has sold the insurance accounts and is no longer in the insurance business, Hoaster has no legally protectible business interest in those insurance accounts. Without a protectible business interest, Hoaster may not enforce the covenant not to compete." *Id.*

Just as in *Hess*, WFIS is not a real party in interest because it has no protectable interest in the client accounts that it has already agreed to sell to USI. WFIS cannot substantiate any alleged "injury" that can be redressed where it has already agreed to sell the client accounts at issue. It is undisputed that this transaction has taken place, as WFIS sent letters to Defendants Andrea, Mendelson, and Yorio, wherein its counsel stated: "[W]e take the position that **USI Insurance Services, LLC's purchase of Wells Fargo Insurance** has no impact on the enforceability of your Agreement." (*See* Exhibits L-N) (emphasis added). In addition, USI, as the purchaser of WFIS' entire insurance operations, had demanded that WFIS employees, including the Individual Defendants, execute new and onerous employment agreements with USI, with USI imposing a deadline of October 6, 2017. (Andreas Aff., ¶ 2; Mendelson Aff., ¶ 2).

WFIS has no current protectable interest in the client accounts at issue, nor in the enforcement of the Individual Defendants' restrictive covenants. As such, WFIS has not shown any right to relief, much less the required "clear" right to relief to justify the extraordinary remedy of injunctive relief.[10]

---

[10] WFIS also has no likelihood of success on the merits because its Complaint is premised on the incorrect notion that the mere "identities" of its clients are confidential information and/or trade secrets. *Shepherd*, 2011 PA Super 156, 25 ("The kinds of business interests that are considered legitimate and protectable under a restrictive covenant include trade secrets and confidential information, as well as other items."). It is axiomatic that merely contacting WFIS clients, without more, is not misappropriation of confidential information or trade secrets under Pennsylvania law. If it were, WFIS would effectively have a perpetual non-compete/non-

**B.    WFIS' Claims are Barred By the Equitable Doctrine of Unclean Hands**

WFIS is estopped from seeking injunctive relief because it plainly has come to this Court with unclean hands. The doctrine of unclean hands is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith." *Jacobs v. Halloran*, 551 Pa. 350, 359, (1998). Courts have denied injunctive relief on the basis of the doctrine of unclean hands where, as here, the movant encouraged and assisted in the very conduct it seeks to enjoin. *Salomon Smith Barney Inc. v. Vockel*, 137 F. Supp. 2d 599, 603 (E.D. Pa. 2000) ("Smith Barney seeks the help of a court of equity to prevent the same conduct by Vockel which it had previously abetted and from which it has handsomely profited.").

Here, WFIS' own Managing Director and sole Affiant, Mark Susco, actively encouraged the Individual Defendants to have a "Plan B" with a competitor of WFIS. (Andreas Aff., ¶¶ 5-9; Mendelson Aff., ¶¶ 5-7). Mr. Susco, fully aware of the Individual Defendants' interest in EPIC, suggested that the Individual Defendants instead defect to Alliant. (Andreas Aff., ¶ 9; Mendelson Aff., ¶ 7). Mr. Susco took affirmative steps to cause the Individual Defendants to leave WFIS and join Alliant, even setting up a meeting with Alliant's Managing Director, Kevin Kenny. (Andreas Aff., ¶ 9; Mendelson Aff., ¶ 7). Mr. Susco himself also considered joining EPIC.

---

solicitation provision with regards to its entire book of business. This proposition has been expressly rejected under Pennsylvania law. *See, e.g. Latuszewski v. Valic Financial Advisors, Inc.*, 2007 WL 4462739, at *22 (W.D. Pa. 2007) ("The court will not permanently enjoin The Employees from contacting their former customers, on the assumption that such contact would constitute a use of VALIC's trade secrets. To do so, would, in effect, grant VALIC a perpetual non-compete covenant, for which it did not bargain, and of which it likely could not have obtained enforcement.").

(Andreas Aff., ¶ 10; Mendelson Aff., ¶ 8). WFIS cannot obtain relief from a Court of equity where WFIS' own Affiant suggested, facilitated, and actively participated in the very conduct it complains of.

## II.     WFIS Has Not Demonstrated It Will Suffer Irreparable Harm in the Absence of Injunctive Relief

### A.     WFIS Has an Adequate Remedy at Law – Money Damages Are Adequate

WFIS also cannot show that it will suffer irreparable harm without an injunction because it can be fully compensated by money damages, <u>which it expressly seeks in its Complaint</u>. (*See generally* Complaint). The availability of adequate monetary damages belies a claim of irreparable injury. *Schaeffer v. Frey*, 403 Pa. Super. 560, 565 (1991). Pennsylvania District Courts have specifically held that the loss of customers is compensable by money damages. In *Mettler-Toledo, Inc. v. Acker*, 908 F. Supp. 240, 248–49 (M.D. Pa. 1995), the Court found no threat of irreparable harm, holding:

> We also remain unpersuaded that plaintiff will suffer irreparable harm, i.e. harm not compensable in monetary damages if the injunction is not granted. What is at stake is the possibility that customers will shift their business from Mettler–Toledo to PIS during the pendency of this action. If that occurs and if plaintiff prevails on the liability issues at trial, damages can be readily ascertained by reviewing the customer lists and receivables of both for the Harrisburg area and determining which customers shifted their business from Mettler–Toledo to PIS during the interim period.

*See also Adhesives Research, Inc. v. Newsom*, 1:15-CV-0326, 2015 WL 1638557, at *7 (M.D. Pa. Apr. 13, 2015) ("[T]his court has held that the loss of customers due to solicitation by a former employee is not a harm that is irreparable."); *Arthur J. Gallagher*, 2007 WL 1877895, *8 ("[W]here a loss of customers to a competitor could be quantified and compensated by money damages, irreparable harm was found lacking.").

The sole Pennsylvania state court case relied on by WFIS, *John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 7 (1977), does not support WFIS' position. There, the

Court found there was a threat of irreparable harm where it was undisputed that the former employee was actively soliciting restricted clients in violation of the covenants at issue. The Court reasoned, "[i]t is not the initial breach of a covenant which necessarily establishes the existence of irreparable harm but rather the threat of the unbridled continuation of the violation . . ." *Id.* at 5.

Here, even if WFIS somehow were able to prove in this unique situation where its business is being sold that a solicitation took place upon the resignation of the Individual Defendants who chose not to work for a new employer, <u>the evidence is undisputed that there is no current, active solicitation taking place</u>. Additionally, money damages in the form of an adjustment to the USI purchase price would almost certainly be an adequate measure of damages to WFIS. In the federal proceedings, WFIS stated it would provide Defendants with the pertinent terms of the WFIS/USI transaction but, despite requests that it do so since the dismissal of the federal court case, has failed to provide those terms. The failure to come forward with these terms is highly probative that Defendants' assumption is correct.[11]

Accordingly, if anything, there was only an "initial breach," and nothing currently to enjoin. Any losses that WFIS claims to have sustained resulting from any theoretical "initial breach" are fully compensable by monetary damages.

---

[11] Unless WFIS affirmatively shows that the WFIS/USI agreement does not contain such an adjustment, this Court should assume that the parties to that transaction (WFIS and USI) addressed such a scenario. Simply put, in the same way WFIS was hiding the ball with Judge Cercone and Judge Hertzberg, its failure to explain or disclose the provisions of its purchase agreement is highly suspect and not to be trusted.

**B.    No Irreparable Harm Can Possibly Occur Because There is No Evidence of Active Solicitation and the Unsolicited Acceptance of Business Cannot Be Enjoined**

It is well established that injunctive relief cannot be granted absent a showing of "concrete evidence" demonstrating "actual proof of irreparable harm." *Greenmoor, Inc. v. Burchick Const. Co., Inc.*, 2006 PA Super 252, ¶ 10 (2006). Irreparable harm cannot be based "solely on speculation and hypothesis." *Id.* Rather, there must be a clear showing of "continuing irreparable harm." *Com. v. U. S. Steel Corp.*, 57 Pa. D. & C.2d 583, 593 (Pa. Com. Pl. 1971); *Banks v. Ryan*, 124 Pa. Cmwlth. 603, 610, 556 A.2d 950, 954 (1989) (noting that movant must establish a "clear showing of immediate irreparable injury.").

WFIS' claim of irreparable harm is based on nothing but "speculation and hypothesis" that is wholly insufficient to meet its burden. *Greenmoor*, 2006 PA Super 252, ¶ 10. WFIS simply speculates, without <u>any</u> evidence whatsoever (much less clear evidence) that because certain WFIS clients have requested to move their accounts to EPIC, the Individual Defendants must be engaging in continuous and active solicitation of WFIS clients. WFIS' assertion is purely guesswork insufficient to establish a clear right to relief, and is contradicted by all of the evidence of record. Each of the former WFIS clients that has moved to EPIC contacted the Individual Defendants on their own volition, and without solicitation.[12] EPIC and the Individual Defendants merely accepted this unsolicited business.[13]

---

[12] (*See* Andreas Aff., ¶¶ 11-13; Mendelson Aff., ¶¶ 9-11; Yorio Aff., ¶¶ 4-6; Wakim Aff., ¶¶ 4-6; Zewe Aff., ¶¶ 4-6; Krauss Aff., ¶¶ 4-6; Karstens Aff., ¶¶ 4-6; Kostorick Aff., ¶¶ 4-6).

[13] Clients who have executed Broker of Record letters to date transferring their insurance business to EPIC have acknowledged their decision to transfer their business to EPIC was not the product of solicitation. (*See* Various Client Affidavits, attached as Exhibits O-Y). WFIS' quantum leap in logic—that because former WFIS clients are now with EPIC, there *must* be active solicitation—is not only completely unsupported in fact, it is contradicted by all of the evidence of record, including the evidence adduced from the actual clients.

Under Pennsylvania law, the mere acceptance of unsolicited business from a client of the former employer is not solicitation. *See, e.g., Diodato v. Wells Fargo Ins. Services, USA, Inc.*, 44 F. Supp. 3d 541, 570 (M.D. Pa. 2014) (finding unenforceable the exact same non-acceptance provision in the Wells Fargo Agreements here on the grounds that it "unreasonably restrains not only [former employee's] ability to earn a living following his termination, but more broadly restrains free trade."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Moose*, 365 Pa. Super. 40, 47 (1987) (affirming injunction as to solicitation of customers, but not to "accepting business which came to them, without further solicitation," because the persons "most affected by a more encompassing order would be the innocent customers of Merrill Lynch who would be denied the privilege of entrusting their [business] to the broker of their choice.").

Here, WFIS has put forth *no evidence, whatsoever, that any active solicitation is or has taken place*. In fact, the only evidence of record establishes that, besides the courtesy e-mail notifications, the Individual Defendants did not initiate <u>any</u> contact with a single WFIS client and clients have come to the Individual Defendants not through solicitation, but rather due to their long-standing relationships of trust and confidence in the Individual Defendants.[14] No active solicitation is occurring, and as such, there is nothing to "abate." WFIS cannot enjoin that which is not taking place. *See Arthur J. Gallagher*, 2007 WL 1877895, at *17-18 (denying injunctive relief where, "[a]s to the possibility that other customers of Gallagher will shift their business to Reisinger, Gallagher offered no evidence of the actual or imminent loss of additional customers, such as proof that Reisinger was **actively soliciting** its other customers . . .") (emphasis added).[15]

---

[14] (*See* Andreas Aff., ¶¶ 11-13; Mendelson Aff., ¶¶ 9-11; Yorio Aff., ¶¶ 4-6; Wakim Aff., ¶¶ 4-6; Zewe Aff., ¶¶ 4-6; Krauss Aff., ¶¶ 4-6; Karstens Aff., ¶¶ 4-6; Kostorick Aff., ¶¶ 4-6).

[15] Nor can WFIS rely on the irreparable harm clauses in the Individual Defendants' agreements to satisfy this requirement. "Absent any other evidence in support of a showing of irreparable harm, [a] contractual provision in [an agreement], standing alone, does not provide an adequate

Similarly, WFIS puts forth zero evidence to support the contention that any Individual Defendant engaged in improper solicitation of a WFIS employee. To the contrary, the evidence shows that each of the Individual Defendants responded to lawful recruitment opportunities presented by EPIC. Quite understandably, if things at WFIS were not already bad enough due to the strain on client relationships caused by the many highly publicized scandals at Wells Fargo Bank, all WFIS employees were further on edge regarding WFIS' decision to exit the insurance brokerage business and sell WFIS to an unknown bidder who would become their new employer. When the successful bidder was announced, it was a Senior Management official of WFIS, Mark Susco, who pushed the Individual Defendants over the edge to leave WFIS and ultimately join EPIC. The fact that the Individual Defendants left *en masse* is to be expected under such challenging circumstances, and is nothing more than evidence that Mr. Susco's advice to find a "Plan B" was heeded by the Individual Defendants.

Because no solicitation of either clients or employees is taking place, injunctive relief here serves no purpose and will not have any effect on the harms alleged by WFIS. Accordingly, the Court's October 13, 2017 Order should be dissolved.

## III.     The Balance of the Harms Does Not Favor WFIS

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

---

basis for a finding of irreparable harm." *Deangelo Bros., Inc. v. Clarius*, 3:CV-06-0466, 2006 WL 7553206, at *13 (M.D. Pa. Aug. 17, 2006); *Arthur J. Gallagher & Co.*, 2007 WL 1877895, at *24 ("Although a contract may contain a provision to the effect that breach of the restrictive covenant will cause irreparable harm, a court is not bound by this provision absent any other evidence in support of a showing of irreparable harm.").

The balance of the harms here weighs heavily in favor of Defendants. The interests of a former employee who has begun doing business with former clients of the employer greatly outweigh the interests of a large, corporate employer. *Mettler-Toledo, Inc. v. Acker*, 908 F. Supp. 240, 248 (M.D. Pa. 1995). In *Mettler-Toledo, Inc.*, the Court balanced the equities in favor of the departing employee, reasoning:

> Issuing the injunction would require, in effect, the immediate cessation of most business by [the new employer]. [Former employee] would have to cancel existing service contacts with any former [of former employer's] customer. . . Conversely, [former employer] will not be placed in any peril if the injunction does not issue. Its sales revenues from the Harrisburg territory are an insignificant percentage of its total revenue and it will, in all likelihood, be deprived of only an insubstantial portion of that revenue during the pendency of this action.

*Id.* at 248-49; *Herman v. Dixon*, 393 Pa. 33, 38 (1958) ("[N]ot only would defendant be deprived of his practice but also that it appears that he and his family would suffer the greater injury if the relief granted were allowed to stand.").

Here, the amount of total revenue which the Individual Defendants have produced in the past is roughly a combined total of $5 million, a miniscule percentage of the nearly $1 billion in annual revenue of WFIS. (Andreas Aff., ¶ 15). If the Individual Defendants were precluded from communicating with and accepting business from former WFIS clients with whom they have long-standing relationships built over years, they would be required to abandon those clients and effectively start all over. Any loss of revenues from clients that willingly exercise their lawful right to move their businesses to EPIC is an inconsequential percentage of WFIS' total revenue. Accordingly, the equities lie clearly in favor of Defendants.

This is especially true where, as here, WFIS plainly has unclean hands. *Salomon Smith Barney Inc.*, 137 F. Supp. 2d at 603. WFIS' own Managing Director and sole affiant, Mark Susco, actively encouraged the Individual Defendants to have a "Plan B" with a competitor of

WFIS, and even took affirmative steps to cause the Individual Defendants to defect to Alliant. (Andreas Aff., ¶¶ 5-9; Mendelson Aff., ¶¶ 5-7). The equities cannot favor WFIS where its own Affiant suggested, facilitated, and actively participated in the very conduct it complains of.

IV.     **WFIS Cannot Establish that Injunctive Relief is in the Public Interest**

"[W]here an adverse effect upon the public will result from the issuance of a preliminary injunction, it should not be granted." *McMullan v. Wohlgemuth*, 444 Pa. 563, 572, 281 A.2d 836, 841 (1971). There is an important public interest in an employee "being able to earn a living in his chosen profession." *All-Pak, Inc. v. Johnston*, 694 A.2d 347, 351 (Pa. Super. Ct. 1997); *Adhesives Research, Inc. v. Newsom*, 1:15-CV-0326, 2015 WL 1638557, *8 (M.D. Pa. Apr. 13, 2015) ("There is an important public interest in the right of an employee to be free to work for whom they please."). There is also a public interest in the protection of "the innocent customers of [the former employer] who would be denied the privilege of entrusting their [businesses] to the broker of their choice." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Moose,* 365 Pa. Super. 40, 48 (1987).

Were an injunction entered here, the Individual Defendants would be unduly restricted from working for the employer of their choosing. The Individual Defendants chose to work for EPIC, in large part due to the prompting of WFIS' own Managing Director who was critical of USI and encouraged the Individual Defendants find a "Plan B" employer. (Andreas Aff., ¶¶ 5-9; Mendelson Aff., ¶¶ 5-7). The public interest clearly would not be served by permitting WFIS to facilitate and even assist in the Individual Defendants' exit from WFIS, and then penalize them for following WFIS' direction.

Moreover, the entry of an injunction would interfere with the "free will of the businesses the [Individual Defendants] formerly serviced." *Diodato*, 44 F. Supp. 3d at 570. WFIS clients

have a right to hire the service providers of their choosing. If the Individual Defendants were prohibited from responding to inquiries and/or accepting business from WFIS clients, those clients would be adversely effected by the loss of their free will to utilize the trusted insurance broker of their choice with whom they have developed a longstanding relationship.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Court dissolve the Court's Order of October 13, 2017, deny Plaintiff Wells Fargo Insurance Services USA, Inc.'s Petition for Special and Preliminary Injunction, and grant such other and further relief the Court deems just and equitable.

DATED:        October 23, 2017

                                        COZEN O'CONNOR

By:    _____

                                        COZEN O'CONNOR
                                        Steven D. Pearson
                                        Mitchell J. Edlund
                                        Corey T. Hickman
                                        123 N. Wacker Drive, Suite 1800
                                        Chicago, Illinois 60606
                                        (312) 382-3100 (phone)
                                        (312) 382-8920 (fax)

                                        COZEN O'CONNOR
                                        William Moorhead
                                        One Oxford Centre
                                        301 Grant Street
                                        26th Floor
                                        Pittsburgh, PA 15219
                                        (412) 620-6500 (phone)
                                        (412) 275-2390 (fax)

## CERTIFICATE OF SERVICE

I, William Moorhead, an attorney, hereby certify that on October 23, 2017, I served the

foregoing Memorandum of Law in Support of Emergency Motion to Dissolve October 13, 2017

Order on the following counsel of record, via e-mail and U.S. Mail:


Gerald J. Stubenhofer Jr.
Jarrod Shaw
Natalie Zagari
McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222
gstubenhofer@mcguirewoods.com
jshaw@mcguirewoods.com
nzagari@mcguirewoods.com

100% Recycled  30% PCW

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3    WELLS FARGO SERVICES, USA,
    INC.,
4               Plaintiff,
      vs.                Civil Action 17-1287
5
    EPIC INSURANCE BROKERS &
6    CONSULTANTS, SEAN ANDREAS,
    ZACHARY MENDELSON, CHARLES
7    YORIO, PHILLIP WAKIM, JANICE
    ZEWE, SALLY KRAUSS, KURT
8    KARSTENS and PETER KOSTORICK,
              Defendants.
9

10      Transcript of Temporary Restraining Order Proceedings on
    Thursday, October 12, 2017, United States District Court,
11 Pittsburgh, PA, before, David Stewart Cercone, District Judge.

12  APPEARANCES:

13    For the Plaintiff:          Jarrod Shaw, Esq.
                                Gerald Stubenhofer, Jr., Esq.
14                            Natalie L. Zagari, Esq.
                              McGuireWoods LLP
15                            Tower Two-Sixty
                            Suite 1800
16                            Pittsburgh, PA  15222

17
    For the Defendants:         Steven D. Pearson, Esq.
18                            Corey T. Hickman, Esq.
                            COZEN O'CONNOR
19                            123 N. Wacker Drive
                            Suite 1800
20                            Chicago, IL 60606

21  Court Reporter:             Juliann A. Kienzle, RMR, CRR
                            5300 U.S. Courthouse
22                            700 Grant Street
                            Pittsburgh, PA 15219
23                            (412) 261-6122

24

      Proceedings recorded by mechanical stenography;
25 transcript produced by computer-aided transcription.

1  (Proceedings held in open court, Thursday, October 12, 2017.)

2        THE COURT:  Court is convened in the case of Wells

3  Fargo Insurance Services, USA, Inc., versus Edgewood Partners

4  Insurance Center, et al., Case No. 2:17-01287 of the Court's

5  civil docket for the Pittsburgh Division of the United States

6  District Court, the Western District of Pennsylvania.

7        Gentlemen, I think the first matter we have to deal

8  with is the motion that was recently filed to dismiss based

9  upon the plaintiff's failure to plead subject matter

10 jurisdiction.

11       Mr. Shaw, are you going to argue that?

12       MR. SHAW:  Yes, Your Honor.

13       THE COURT:  I just need to know which of your team is

14 going to argue that.

15       MR. SHAW:  Yes, Your Honor, Thank you.  As you know,

16 that was filed last evening, so we haven't had a ton of time to

17 dig into it, but I have a response for it, Your Honor.

18       THE COURT:  I'm sorry, maybe the defense should move,

19 it's their motion.

20       MR. PEARSON:  I think our motion is actually pretty

21 straightforward.  If Your Honor had any questions.

22       THE COURT:  You're right, it is.

23       MR. PEARSON:  I thought maybe -- it is our motion.  I

24 really have nothing further to add, unless Your Honor had some

25 questions about anything that was in the motion.

1          THE COURT:  No, not really.  It's pretty -- I can
2    read, you can see it's not there.

3          MR. PEARSON:  I think it is pretty straightforward.

4          MR. SHAW:  Your Honor, so I'll respond.

5          Your Honor, the motion which was filed last night
6    alleges or states forth an argument that we did not allege the
7    principal place of business of Wells Fargo Insurance.  The
8    first thing I would point out is a document, an exhibit that
9    plaintiffs filed, which is a complaint in another matter, the
10   Wells Fargo versus Alliant Insurance Services case, which is a
11   case pending in the Chancery Court in the State of Delaware.
12   What is alleged there, Your Honor, is that plaintiff, WIFS, is
13   a corporation incorporated under the laws of the State of North
14   Carolina with its principal place of business in North
15   Carolina.  WFIS is an affiliate of Wells Fargo & Company and
16   Wells Fargo Securities LLC.

17         This is a pleading that defendants in this case, Your
18   Honor, submitted, and Your Honor can take judicial notice of.

19         Secondly, and more importantly, in response to a
20   motion to dismiss, like the motion that they filed, we have
21   automatic leave to amend, which we can do.

22         We were going to do it this morning, Your Honor, but
23   we wanted to talk with you first.  We can have an amendment on
24   file this afternoon that will take care that issue.  To the
25   extent they want to challenge subject matter jurisdiction and

1 move into discovery on that, that is perfectly fine, and we can

2 do that, but the complaint will be sufficient and the hearing

3 here today is still warranted, so we would propose to move

4 forward.

5         THE COURT: I don't have jurisdiction at this moment.

6 I just don't. It hasn't been alleged.

7         Now, the question is, how do we practically proceed

8 from this point? Let me propose this.

9         Why don't we proceed on your arguments.

10         I understand there are going to be no witnesses

11 presented.

12         MR. SHAW: That is correct, Your Honor. I don't want

13 to speak on behalf --

14         MR. PEARSON: We don't have any witnesses.

15         THE COURT: You are going to introduce exhibits, I

16 take it?

17         MR. SHAW: All of which are in the record, at least

18 for plaintiff.

19         THE COURT: I was going to suggest proceeding, if we

20 can all agree, and then you can proceed later, you said, even

21 today, to file your amended complaint, and then I'll make my

22 ruling based upon your arguments and your submissions after you

23 amend the complaint and after I have jurisdiction.

24         MR. SHAW: That's perfectly --

25         THE COURT: I would only do that --

1        MR. PEARSON: May I be heard on that, Your Honor?

2        THE COURT: -- if there is an agreement because I

3 don't have jurisdiction.

4        MR. PEARSON: Respectfully, I can't agree to that,

5 Your Honor, because respectfully, on the facial challenge, Your

6 Honor has no jurisdiction. The complaint is defective.

7        We have also raised very serious questions factually

8 with respect to whether plaintiffs can actually establish

9 diversity in this case. Based on the information -- the reason

10 I pointed Your Honor to the verified complaint in the Delaware

11 proceeding is there's something going on with regard to WFIS,

12 we can't quite yet figure it out, but their principal place of

13 business and who actually owns these claims seems to be a bit

14 of a moving target. I pointed to the Alliant complaint because

15 it proves they know full well how to make these allegations,

16 they made them elsewhere, didn't make them here for some

17 particular reason, and I suspect they didn't make them here,

18 Judge, because there are issues with regard to Rule 11

19 compliance in doing that.

20        We attached as an exhibit to our motion to dismiss the

21 publicly available information that we've seen with regard to

22 where the principal place of business of plaintiff is, and we

23 believe it's California, which would render plaintiff

24 nondiverse from my client, EPIC, who is a California

25 corporation. So, I think it's improper for Your Honor to

1 proceed until this issue is fully vetted out.

2       THE COURT: My suggestion was simply a matter of

3 practicality, if it didn't really matter and everyone agreed to

4 it, that's all, but if there's a bona fide issue of subject

5 matter jurisdiction and where the principal place of business

6 is, certainly I understand your right to object.

7       MR. PEARSON: We're happy to do that discovery on an

8 expedited basis, but there's a real issue here, Your Honor.

9       THE COURT: The next date I could give you isn't

10 tomorrow or the next day, it's --

11       Law CLERK: We can't hear the TRO until November 9th.

12       MR. SHAW: Your Honor, may I be heard on that issue?

13       THE COURT: Yes.

14       MR. SHAW: Your Honor, may I make a different proposal

15 then? We take a short recess, ten minutes, we'll file our

16 amended complaint which will adequately allege the principal

17 place of business of North Carolina, creating diversity for

18 this court, and then proceed on the hearing today. They're in

19 from Chicago, we're here today and prepared. It is a TRO,

20 which we believe there are immediate and necessary issues that

21 need to be heard. As soon as we file the amended complaint,

22 Your Honor, we'll have jurisdiction and the motion for

23 preliminary injunction will still be viable.

24       THE COURT: But jurisdiction is so fundamental, they

25 want to object to jurisdiction.

1          MR. PEARSON:  That's correct, Your Honor.

2          THE COURT:  It appears that this isn't frivolous,

3 there may be something there.  Just because you file an amended

4 complaint and you say there's jurisdiction doesn't make it so.

5 If they want to object to it, in good faith, I feel compelled

6 to give them a short but reasonable time to challenge the

7 jurisdiction.

8          MR. SHAW:  Your Honor, the evidence that they put on

9 is an evidentiary issue alleging that it's California, which we

10 know not to be the case, Your Honor.  And we can submit --

11          THE COURT:  I could very well be proceeding and

12 potentially granting a TRO on something that I don't have

13 jurisdiction over.

14          MR. SHAW:  We would submit, Your Honor, that you hear

15 the evidence today and you not issue the TRO until you get a

16 ruling on the subject matter jurisdiction issue, but we're here

17 today, Your Honor, to be able to present it.

18          THE COURT:  I'm not pointing fingers, but you're the

19 one that didn't allege the principal place in your motion.

20          I'm going to go with --

21          MR. SHAW:  May I ask one question, Your Honor?  How do

22 we allege, they file their motion, we would be in the same

23 position, given the argument they raised, that they're

24 challenging the jurisdiction of this court as a basis of

25 subject matter jurisdiction, which is something they could have

1 raised a week ago and they elected to do it last night. I

2 would simply, as a matter of equity, request that your court

3 hear the TRO so that when we cure the amended pleading, we can

4 move forward and concurrently do discovery on the subject

5 matter jurisdiction and the discovery for the TRO because we're

6 going to be able to show Your Honor that this is not a

7 California principal place of business.

8     We have a corporate representative here today who we

9 can ask questions of and put evidence in.

10     THE COURT: I understand, Mr. Shaw. I said I would

11 have gone that route if all the parties agreed to it, but I

12 don't feel comfortable with it because right now I don't have

13 jurisdiction. They have the right to -- jurisdiction is the

14 first step to establish that and if they want to challenge it

15 before I -- I know it's only a TRO, but it still can impact the

16 parties and the rights of the parties and you're asking me to

17 stop somebody from doing something. I feel I have to give them

18 an opportunity to challenge jurisdiction.

19     I know there's added expense, coming in from out of

20 town and the like, but, unfortunately, that's where we are.

21     MR. SHAW: Your Honor, on that issue, we'd as for an

22 exceptionally expedited discovery period on that.

23     THE COURT: As I said, the first day that I have that

24 I can give you is November 9th.

25     We'll take a look. I'll take a look.

1      LAW CLERK:  We can give them expedited discovery, but
2  it's only going to be until we schedule the TRO, correct?

3      THE COURT:  What I'm saying is, how long do you think
4  this TRO proceeding will last?

5      MR. SHAW:  Today, or when we do it?

6      THE COURT:  When we do it.

7      MR. SHAW:  Two hours, Your Honor.

8      THE COURT:  So even if I have to squeeze it in over
9  lunch, we'll squeeze it in before that.  I do have a trial but
10  I'll come up with something.

11      How much time do you need, the least amount of time?

12      MR. PEARSON:  Judge, we'll fit it in.

13      THE COURT:  I mean for your discovery?

14      MR. PEARSON:  We'll fit it in within the time before
15  Your Honor is able to hear us again.  The parties have been
16  working cooperatively, we'll get our discovery out, we'll
17  notice the deposition and we'll get it done.

18      THE COURT:  Let me check my calendar and we'll come
19  out and give you a date.  I'll give you as soon as I possibly
20  can.

21      (Whereupon, there was a brief pause in the proceedings.)

22      MR. SHAW:  May I be heard on one more point?

23      THE COURT:  Proceed.

24      MR. SHAW:  Your Honor, if you would give us a
25  ten-minute recess and allow us to file the amended complaint,

1  the jurisdictional issue goes away, the motion becomes moot,

2  and we have a right to amend under Rule 15 upon the filing of

3  the motion to dismiss.

4        THE COURT:  Counsel, they have the right to challenge

5  jurisdiction.  They have the right, before, even on a TRO, they

6  have the right to challenge it.  So, if you amend -- if I give

7  you time, even if it's 15 minutes to amend your complaint, I

8  have to afford them time to file a motion challenging

9  jurisdiction.  We're right back where we started from.

10        MR. SHAW:  Thank you, Your Honor.  I wanted to raise

11  the issue.

12        THE COURT:  I researched the law.  I don't have

13  jurisdiction over this case right now.  I just don't.  As I

14  said, even on a TRO they have the right to challenge

15  jurisdiction.

16        So, although I'm in a jury trial, I will start my jury

17  in the afternoon.  I'll have the jury come in about one o'clock

18  on Friday, October 27, so I'll give you that date in the

19  morning.

20        So, we'll give you from ten until noon on Friday,

21  October 27.

22        MR. PEARSON:  Thank you, Your Honor.

23        MR. SHAW:  Thank you, Your Honor.

24     (Court adjourned.)

25

1

2                          CERTIFICATE

3

4          I, Juliann A. Kienzle, certify that the foregoing is a
correct transcript from the record of proceedings in the
5    above-titled matter.

6
s/Juliann A. Kienzle, RMR, CRR
7    _____
Juliann A. Kienzle, RMR, CRR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

100% Recycled   30% PCW

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO INSURANCE SERVICES USA, INC., | CIVIL DIVISION |
| Plaintiff, | NO. GD-17-14022 |
| v. | |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | |
| Defendants. | |

## AFFIDAVIT OF SEAN K. ANDREAS

I, SEAN K. ANDREAS, being duly sworn upon his oath, state as follows:

1.      I am over the age of eighteen and am fully competent to testify to the matters set forth herein. I am a commercial insurance broker employed with EPIC Insurance Brokers and Consultants ("EPIC") in its recently opened Pittsburgh office. Prior to my employment with EPIC, I was employed by Wells Fargo Insurance Services USA, Inc. ("WFIS") in the same capacity, also in Pittsburgh. As background, WFIS (the tenth largest retail insurance brokerage in the United States) has agreed to sell its insurance brokerage business to USI Insurance Services ("USI") (the ninth largest retail insurance brokerage in the United States). I understand that sale is set to close in November 2017. WFIS agreed to sell its entire insurance brokerage business without my approval or consent, and apparently expected I would be told who my new employer would be and that WFIS, acting in concert with that new employer, would dictate unilaterally what the terms of my new employment would be without my input or negotiation. I am not a chattel. I am an insurance brokerage professional.

2.    Based on information conveyed to me at an August 2017 meeting with representatives of both WFIS and USI, and based on a September 22, 2017 email by Clark Johnson, Director, Acquisition Integration of USI, stating that I must execute a new non-negotiable employment agreement with USI by October 6, 2017, I believed that I would be terminated if I did not accept USI's one-sided demand. I was also advised by Mr. Johnson that under no circumstances were the terms of my new employment with USI negotiable. But for my employment with EPIC, I would be out of work as I refused to sign the one-sided employment agreement with USI that was presented on a "take it or leave it" basis. I have no interest in working for an organization such as USI that does not value me enough to allow me to have any say in the terms of my employment, and that has a reputation for being a difficult place to work.

3.    USI was the successful bidder for WFIS following an "auction" wherein large brokers and institutional Wall Street investors were invited to submit offers to buy the WFIS insurance brokerage business. I became aware of this auction on May 8, 2017, when I read a Bloomberg article entitled "Wells Fargo said to Explore Sale of Insurance Brokerage Unit," attached as Exhibit A.

4.    My co-workers, and by my impression the bulk of the 3,500 person workforce of WFIS, were all very anxious when we learned a new employer would be imposed upon us, not knowing the future of our careers given the auction process. Rumors circled daily within the WFIS Pittsburgh office as to what might happen, and who might "win" the auction. The impact of this on our careers and our families was wildly uncertain. I have two young children under six years of age. Throughout the entire Pittsburgh office, employees of WFIS were in a very understandable way considering their employment alternatives. Not only was the sale to an unknown new employer, USI, causing great turmoil, but I was already suffering a loss of

business and the threat of additional losses due to the scandals associated with Wells Fargo Bank.

5.    Among the concerned employees of WFIS was Mark Susco, a Senior Vice President and Managing Director, including WFIS' Pittsburgh office.  At a regularly scheduled Pittsburgh office growth meeting on May 22, 2017 (shortly after the Bloomberg article), Mr. Susco announced to my co-workers and me that we needed to have a "Plan B" because we could not rely upon the auction process to deliver a satisfactory new employer for the Pittsburgh office. Mr. Susco was clear in his direction to us all that we should all have a "Plan B."

6.    On June 27, 2017, it was announced that USI had won the auction to purchase WFIS' operations. It should be noted that Alliant Insurance Services, Inc. ("Alliant"), another competitor of WFIS, was also a bidder to buy WFIS' operations. In various meetings with Mr. Susco after June 27, 2017, he expressed his concerns about going to work for USI. I asked him if he would have a position with USI and he stated that USI does not have Managing Directors of offices like his current role and thus he was not sure if he would have a position of similar stature with USI.

7.    In the spring of 2017, the co-workers I was closest to (each of the Individual Defendants in this action other than Kurt Karstens and Peter Kostorick) began exploring options for the same reasons suggested by Mark Susco.  Additionally, we were dealing with the massive negative publicity arising from the insidious internal scandals at Wells Fargo's banking operations, which continued to put a strain on our client relationships.  Scandals cause serious damage in the insurance brokerage and other financial services sectors because customers depend upon our skill, expertise and above all, they need to trust us.

8. Over the summer of 2017, we received an offer from a newcomer to the Pittsburgh insurance brokerage community named EPIC Insurance Brokers and Consultants ("EPIC"), whereby it would hire our group to start a Pittsburgh office. On or about September 1, 2017, I met with Mr. Susco and another of my WFIS co-workers, Ron Lenart, at the Wyndham Grand Pittsburgh Hotel to discuss further the details of a "Plan B" with EPIC as suggested by Mark Susco. Mr. Susco requested that I give him anything that we had in writing from EPIC, and on or about September 1, 2017, I provided, at Mr. Susco's request, a copy of the draft EPIC Producer Agreement to a family member of Mr. Susco to provide to him while he was on vacation. Not only did Mr. Susco not mention anything about me or others being "disloyal" to WFIS by looking at employment alternatives to USI, he affirmatively encouraged me to do so. I felt that since WFIS was exiting the business and had announced that within a short period of time we would have a new employer (USI) on terms we could not negotiate, WFIS had no expectation (as evidenced by Mr. Susco's conduct) that any one of its (soon to be former) employees were committed to stay on with either WFIS or USI.

9. Mark Susco is the most senior management employee of WFIS in its Pittsburgh office and further oversees the operations of other WFIS' midwest offices in addition to Pittsburgh. He encouraged myself and others in the Pittsburgh office to think of an option that he was pursuing himself whereby the entire WFIS Pittsburgh office would en masse accept employment with a different competitor of WFIS. To further this objective, Mr. Susco arranged for myself, Zachary Mendelson, and Ron Lenart to meet on September 12, 2017 with Kevin Kenny, Managing Director, Alliant Americas, a direct competitor of both WFIS and USI. After these meetings, Zachary Mendelson and I met with Mark Susco at his request to "debrief him" on the Alliant meetings he had arranged. We ultimately advised Mr. Susco that we were not

4

interested in Alliant given that it was embroiled in litigation with WFIS over an alleged breach of a non-disclosure agreement Alliant had signed as part of the auction process, barring it from recruiting WFIS employees it had learned about during the due diligence process. Indeed, it was my understanding that Mr. Kenny, who Mr. Susco had us meet with, was personally a target of the litigation which WFIS had filed against Alliant in Delaware. I felt Mr. Susco's interest in the Alliant opportunity was for his own self-interest because he would have had a more secure management position at Alliant in comparison to EPIC given Mr. Susco's close relationship with Kevin Kenny (a former WFIS executive).

10.      From September 12 to September 27, 2017, I led discussions with the EPIC leadership on behalf of the Individual Defendants other than Kurt Karstens and Peter Kostorick. On September 26, 2017, we finally agreed on terms. I resigned to Mark Susco on September 27, 2017. The day I resigned, I learned that Mr. Susco had cancelled a previously scheduled job interview he had arranged with EPIC for that same morning.

11.      Upon resigning from WFIS, I sent out email announcements of my departure to my personal and professional contacts. I have carefully followed a practice since September 27, 2017 of not communicating with WFIS customers unless they first reached out to me following receipt of the announcement.

12.      The term "solicitation" is not defined in my employment agreement with WFIS. I have not solicited my clients since leaving WFIS. Instead, I simply sent an announcement of change in employment (as was my right to do) and returned phone calls and correspondence from business contacts that reached out to me in response to the announcement.

13.      WFIS clients who have transferred their business to me at EPIC or contacted me have done so based upon my substantial skill and expertise in the insurance brokerage and risk

5

management profession I have practiced for over twenty years, as well as the long-standing personal relationships I share with those clients. Insurance brokerage is a relationship business, with the relationship being one of trust built upon skill, expertise and delivery of quality insurance advisory services.

14. WFIS and USI acknowledge my skill, expertise, and hard work regularly. In fact, as recently as October 5, 2017, I received a telephone call from Clark Johnson of USI encouraging me to return to WFIS/USI. Similar calls and texts have been made to me by Peter Gilbertson, Regional Managing Director of WFIS. The calls and texts have been made to me to encourage me to return to WFIS/USI because the professional relationships I have with my clients are based on their trust in my skill and expertise that I earned through my decades of hard work and dedication to those clients.

15. The total overall annual revenue of the clients which myself and the other Individual Defendants generated while at WFIS prior to resigning our positions with WFIS totaled in the range of $4-5 million, a tiny percentage of WFIS' last annual reported revenue for 2016 of nearly $1 billion.

AFFIANT FURTHER SAYETH NAUGHT

Under penalties as provided by law pursuant to 18 Pa.C.S. § 4904, I certify that the statements set forth in this instrument are true and correct (or are true and correct to the best of my knowledge, information and belief), and I expect to be able to prove the same at any hearing hereof.

Dated: October ___20___, 2017

_Sean K. Andreas_
Sean K. Andreas

6

# Wells Fargo Said to Explore Sale of Insurance Brokerage Unit

By **Matthew Monks**
May 8, 2017, 9:07 PM CDT
*Updated on* May 9, 2017, 7:21 AM CDT

→ Possible sale said to be worth $2 billion as bank cuts costs

→ Private equity firms seek insurer deals, lured by cash flow

Wells Fargo & Co. ‹https://www.bloomberg.com/quote/WFC:US› is weighing a sale of its insurance brokerage business, which could fetch about $2 billion, people familiar with the matter said.

The San Francisco-based lender has begun reaching out to private equity firms to gauge interest in Wells Fargo Insurance Services USA Inc. ‹https://www.bloomberg.com/quote/0597793D:US› , said the people, who asked not to be identified because the matter isn't public. While the company is planning to move forward with a sale, it hasn't set a timeline for holding a formal auction, one of the people said.

If Wells Fargo fetches $2 billion for the insurance services unit, it would be the company's largest divestiture on record, topping the sale last year of its crop insurance business to Zurich Insurance Group AG ‹https://www.bloomberg.com/quote/ZURN:VX› , according to data compiled by Bloomberg. In 2014, USI Insurance Services ‹https://www.bloomberg.com/quote/8212576Z:US› bought 40 of Wells Fargo's insurance brokerage and consulting offices.



Wells Fargo spokesman Alan Elias said the bank doesn't comment on market rumors or conjecture.

Wells Fargo, the largest retail bank in the U.S. by branch count, is pursuing the new sale as part of a broader push to boost profit by cutting costs ‹https://www.bloomberg.com/news/articles/2017-01-13/wells-fargo-plans-to-close-more-than-400-branches-through-2018› and exiting businesses where it doesn't get the best returns on investment, the people said. While its insurance services unit -- among the ‹http://www.alliant.com/Alliant-News/Industry%20News/BI_2016_Largest_Brokers.pdf› largest insurance brokers in the U.S. -- remains financially healthy with strong cash flow, it doesn't contribute much to the bank's overall return on equity, one of the people said. It's a relatively easy business for Wells Fargo to carve out, as it isn't deeply enmeshed with the rest of the company, the person said.

Private equity firms have shown a strong appetite for insurance brokerages, making it a good time for Wells Fargo to bring its unit to market, the people said.

## KKR, Blackstone

Private equity likes brokerages because they generate a lot of cash, which means they can service the debt incurred in a buyout. This year, KKR & Co. and Caisse de Depot et Placement du Quebec <https://www.bloomberg.com/quote/1118Z:CN> agreed to buy <https://www.bloomberg.com/news/articles/2017-03-17/kkr-cdpq-agree-to-buy-onex-s-usi-insurance-in-4-3-billion-deal> Onex Corp.'s USI Insurance Services for about $2 billion. Blackstone Group LP <https://www.bloomberg.com/quote/BX:US> said it would purchase human-resources and benefits-administration platforms from broker Aon Plc <https://www.bloomberg.com/quote/AON:US> for as much as $4.8 billion.

Wells Fargo Insurance Services, like other brokers, is an intermediary between people and businesses looking to buy insurance and companies selling policies. It employs some 3,500 people in 27 states, and writes or places about $9 billion worth of risk premiums annually in property, casualty, benefits and other types of insurance, according to its website.

Wells Fargo's shares were flat on Monday, closing at $55.04, giving the firm a market value of just over $275 billion. It's spent much of the past year trying to emerge from a scandal over employees creating fake accounts to meet sales goals, a debacle that's cost the bank millions of dollars in legal fees and its former chief executive officer his job.

Wells Fargo executives are expected to update analysts and shareholders on their strategy at an investor day scheduled for Thursday. They will probably highlight efforts to focus on customer service rather than product sales, and emphasize the strength of the bank's economic model, Eric Wasserstrom, an analyst at Guggenheim Securities, said in a note to investors Tuesday.

"The one incremental action that we expect is for WFC to announce additional cost reductions," he wrote, using the bank's ticker symbol.

Terms of Service Trademarks Privacy Policy
©2017 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices    Website Feedback Help

100% Recycled  30% PCW

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WELLS FARGO INSURANCE SERVICES USA, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. _____ - ___ |
| ALLIANT INSURANCE SERVICES, INC., | ) ) ) | |
| Defendant. | ) ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Wells Fargo Insurance Services USA, Inc. ("WFIS") hereby files this Verified Complaint against Defendant Alliant Insurance Services, Inc. ("Alliant") stating as follows:

### Nature of the Action

1.     In this action, WFIS seeks injunctive, equitable, and other relief to prevent and restrain WFIS's persistent and overreaching competitor, Alliant, from soliciting and diverting away the employees of WFIS in violation of contractual obligations to WFIS, and monetary damages to compensate for damages that have occurred to date.

2.     As widely reported in the press, in the spring of 2017, discussions regarding a potential sale of WFIS occurred. Among other potential purchasers, Alliant sought to evaluate the possible purchase of WFIS. As a condition to receiving highly-confidential Evaluation Materials pertaining to the potential sale

of WFIS, Alliant entered into a signed Confidentiality Agreement that imposed obligations on Alliant restricting Alliant's use and disclosure of the information and restricting Alliant's solicitation of WFIS's employees. Included among those obligations was the promise to use the Evaluation Materials "solely for the purpose" of evaluating a possible transaction and not for any other purpose. Alliant also explicitly agreed that for a period of eighteen months from the date of the Confidentiality Agreement it would not solicit or hire certain WFIS employees—including WFIS's sales executives.

3. Despite these contractual obligations, Alliant has breached the Confidentiality Agreement by improperly soliciting WFIS's employees to leave their employment with WFIS. This action seeks to stop Alliant's unlawful activities, to prevent Alliant from continuing its unlawful conduct, and to remedy the damages that have occurred to date.

## Parties, Jurisdiction, and Venue

4. Plaintiff WFIS is a corporation incorporated under the laws of the State of North Carolina with its principal place of business in North Carolina. WFIS is an affiliate of Wells Fargo & Company and Wells Fargo Securities, LLC.

5. Defendant Alliant is a corporation incorporated under the laws of the State of Delaware with its principal place of business in California.

2

6.     This Court has subject matter jurisdiction over this Verified Complaint pursuant to 10 Del. C. Section 341, because Plaintiff seeks injunctive relief.

7.     This Court has personal jurisdiction over Alliant by virtue of its incorporation under the laws of the State of Delaware.

8.     This Court has personal jurisdiction over Alliant by virtue of its voluntary submission to personal jurisdiction in Delaware in the Confidentiality Agreement.

9.     Venue is proper in this Court by virtue of Alliant's voluntary submission to venue in this Court in the Confidentiality Agreement.

## Factual Allegations

### *WFIS's Sales Executives*

10.     WFIS is one of the largest insurance brokerages in the United States. WFIS provides insurance brokerage and administrative services, as well as a wide range of financial and consulting services, to thousands of customers.

11.     To provide these services, WFIS employs "Sales Executives," among other employees. Sales Executives are responsible for managing customer relationships at WFIS, including maintaining relationships with existing customers, attracting and developing new customers, expanding current customer

3

relationships, and planning, marketing, and developing future customer opportunities.

12. WFIS provides its Sales Executives with extraordinary and specialized training in advising, obtaining, servicing and retaining WFIS's customers. WFIS also provides its Sales Executives with extensive confidential information and access to trade secrets belonging to WFIS, including customer lists, lists of potential customer prospects, and operational and other business information regarding WFIS.

13. WFIS enters into various agreements with its employees, including agreements containing restrictive covenants, in order to protect numerous legitimate business interests of WFIS, including, without limitation, WFIS's ongoing customer goodwill, substantial relationships with actual and prospective customers, employee relationships, investment in extraordinary and specialized training, and its need to protect confidential and proprietary business information and trade secrets.

*WFIS's Sale Transaction*

14. In the Spring of 2017, WFIS, through its affiliates, began soliciting interest in the sale of WFIS.

15. Prospective purchasers who wished to evaluate and engage in discussions regarding the potential sale were required to sign a confidentiality

4

agreement in order to receive access to confidential and trade secret information regarding WFIS.

16. Among others, Alliant entered into discussions regarding the possible purchase of WFIS.

17. As a condition to accessing the confidential and trade secret information made available by WFIS in connection with the potential sale, Alliant signed and agreed to a non-disclosure agreement entitled the "Confidentiality Agreement."

18. A true and correct copy of the Confidentiality Agreement is attached as Exhibit A and incorporated herein by reference.

19. The Confidentiality Agreement was signed by WFIS's affiliate on behalf of and for the benefit of WFIS and other affiliates in connection with the proposed sale transaction.

20. The Confidentially Agreement was specifically designed to benefit WFIS by preserving its confidential and trade secret information concerning, among other things, its business practices, financial performance, employees, and customers and by protecting WFIS's employee relationships.

21. According to its agreement in the Confidentiality Agreement, Alliant would receive highly-confidential "Evaluation Materials" in exchange for Alliant's promises (1) to not use or disclose the Evaluation Materials for any purpose other

than evaluating a potential transaction; and (2) to not solicit certain WFIS employees for a period of eighteen months.

22.    Specifically, Alliant acknowledged and agreed that the Evaluation Materials were confidential and that it would use the Evaluation Materials "solely for the purpose" of evaluating the possible transaction, and that it would not otherwise "use any of the Evaluation Materials for any purpose":

> Confidentiality of Evaluation Materials and Existence of Any Evaluation Materials and Process
>
> You will treat confidentially all information and documents that we furnish to you in connection with your evaluation of a Possible Transaction, whether in written, oral or electronic form, including Seller's interest in a Possible Transaction, the existence of a Possible Transaction and the process being conducted by Seller directed toward a Possible Transaction, together with analyses; compilations, studies or other documents or records prepared by you, or by your Representatives (as defined below), which contain or otherwise reflect such information or are generated from such information (collectively, the "Evaluation Materials"). You recognize and acknowledge that there is competitive value to the Evaluation Materials and that damage would result to Seller if the Evaluation Materials were used or disclosed except as authorized by this agreement.
>
> The term "Evaluation Materials" includes any and all information concerning Seller and the Business furnished to you or your Representatives orally or in writing (whatever the form or storage medium) or gathered by inspection, and regardless of whether such information is specifically identified as "confidential" . . . .
>
> Use of Evaluation Materials
>
> You will use the Evaluation Materials solely for the purpose of evaluating a Possible Transaction. You will keep the Evaluation Materials strictly confidential exercising not less than the same

6

standard of care as you use to protect your own confidential information and you will not disclose the Evaluation Materials to any person . . . . Without limiting the generality of the foregoing, in the event that a Possible Transaction is not consummated, neither you nor your Representatives shall use any of the Evaluation Materials for any purpose. You will be responsible for any unauthorized use or disclosure of the Evaluation Materials by your Representatives (it being understood that such responsibility shall be in addition to and not by way of limitation of any right or remedy that Seller may have against your Representatives with respect to any such breach).

Confidentiality Agreement at 2.

23. Alliant further agreed that it would not disclose the Evaluation Materials and that these Evaluation Materials remained the sole and exclusive property of WFIS. Confidentiality Agreement at 3–4.

24. The Confidentiality Agreement also contains restrictive covenants necessary to protect numerous legitimate business interests of WFIS, including, without limitation, WFIS's employee retention, and its need to protect confidential and proprietary business information and trade secrets.

25. The Confidentiality Agreement contains a bargained-for restrictive covenant in which Alliant agreed that for a period of eighteen months it would not solicit or hire WFIS's employees:

No Unauthorized Contact or Solicitation

In connection with your evaluation of a Possible Transaction, you agree that you and your Representatives on your behalf will not directly or indirectly contact or communicate with any customers, employees, contractors or vendors of the Business regarding the Possible Transaction. During the course of your evaluation of a

7

Possible Transaction, all inquiries and other communications regarding a Possible Transaction are to be made directly to the deal team members identified and approved by Seller from time to time. Seller will discuss with you and agree upon appropriate contacts for your due diligence purposes at the appropriate time.

Without Seller's prior written consent, for a period of eighteen (18) months from the date of this agreement you will not, directly or indirectly, nor will any of your Representatives acting on your behalf, solicit to hire or hire or cause or seek to cause to leave the employ of Seller or interfere with any contractual arrangement such person has therewith or otherwise seek to terminate any status as a contractor thereof, (i) any employee (other than the Named Executives or sales executives of the Business) or contractor of the Business or Seller in each case with whom you have had direct contact or who (or whose performance) first became known (including on a no names basis) to you, your affiliates or Representatives in connection with your evaluation of the Possible Transaction; or (ii) any member of management set forth on Schedule 1 (the "Named Executives") or any sales executive of the Business; *provided, however*, that the foregoing provision will not prevent you from hiring or soliciting any such person described under clause (i) who contacts you in response to a bona fide public advertisement or general solicitation for employment placed by you or as a result of an inquiry through a third party search firm, provided they are not specifically targeted at Seller's employees or contractors or at the Business and you have not otherwise violated the terms of the foregoing provision; *provided, further*, that the foregoing provision will not prevent you from hiring any person, including any sales executive, (other than the Named Executives) who responds to your recruitment processes conducted in the ordinary course of business consistent with past practices and without direct or indirect direction of your Representatives who participate in the evaluation of a Possible Transaction.

Confidentiality Agreement at 5.

26. In the Confidentiality Agreement, Alliant explicitly agreed that should it violate the Confidentiality Agreement, the injury to WFIS would be irreparable

8

and that "money damages will not be a sufficient remedy." Confidentiality Agreement at 6.

27.    In the Confidentiality Agreement, Alliant also acknowledged and agreed that WFIS would be "entitled to seek specific performance and injunctive relief as remedies" for breach of the Confidentiality Agreement. Confidentiality Agreement at 6.

*Alliant Gains Restricted Access to WFIS's Confidential Information by Agreeing to the Confidentiality Agreement*

28.    Because it signed the Confidentiality Agreement, and for the sole purpose of evaluating a possible transaction, Alliant was given restricted access to the Evaluation Materials.

29.    These Evaluation Materials constitute sensitive and highly-confidential business documents containing confidential information and trade secrets regarding WFIS's business and its employees.

30.    More specifically and among other documents, Alliant was given restricted access to documents:

    (a)    Listing each WFIS Sales Executive (identified by a scrambled Employee ID number and not by name), and each Sales Executive's office location, job title, and hire date;

    (b)    Ranking each WFIS Sales Executive's detailed sales production and revenue from 2013–2016;

9

    (c)    Revealing each WFIS Sales Executive's agreement with WFIS, including any restrictive covenants; and

    (d)    Listing WFIS's 100 largest customers and providing detailed information about the net revenue received from each customer, the customer's industry or business, and the specific Sales Executive (by ID number) who serviced each customer.

31.    The documents were made available to prospective purchasers through a password-protected virtual data room with limited and controlled access. The documents were made available only to specifically identified contacts at each prospective purchaser through a secure connection.

32.    In addition to the information accessed through the virtual data room, prospective purchasers, including Alliant, also had telephone discussions and in-person meetings with representatives of WFIS during which the prospective purchasers received information relating to WFIS's Sales Executives, business processes, revenues, and other highly-confidential information.

33.    Alliant's Chairman and Chief Executive Officer, Tom Corbett, was one of Alliant's representatives who participated in the evaluation and discussions regarding the possible purchase of WFIS. As part of the evaluation process, Mr. Corbett participated in telephone discussions and in-person meetings with representatives of WFIS during which information about WFIS's Sales Executives,

10

business processes, revenues and other highly-confidential information was discussed.

34.    WFIS's confidential information in the Evaluation Materials is neither generally known nor readily ascertainable by proper means from publicly available sources. This information is related directly to and used by WFIS's business, including information about WFIS's Sales Executives, revenues generated, industries, types of insurance; and could be used by direct competitors, such as Alliant, to unfairly target, solicit, and recruit WFIS's Sales Executives in order to gain access to WFIS's customers.

35.    As such, WFIS uses reasonable and diligent efforts to protect the information in the Evaluation Materials. These efforts include, but are not limited to, prohibiting access to the information by the general public; and restricting access to its Confidential Information to potential purchasers who agree to maintain its confidentiality and to use the Confidential Information only for evaluating a potential transaction.

*Alliant Violates the Confidentiality Agreement*

36.    Following its receipt of the Evaluation Materials, and after several weeks of discussions, Alliant did not reach an agreement to purchase WFIS.

37.     Instead, another competitor of both WFIS and Alliant entered into an agreement to purchase WFIS.  The purchase agreement was publicly announced on June 27, 2017, and the sale is scheduled to close in the fourth quarter of 2017.

38.     After the announcement that a different purchaser had entered into an agreement to purchase WFIS, Alliant commenced an aggressive campaign to solicit WFIS's Sales Executives to leave their employment with WFIS and to accept employment with Alliant.

39.     Alliant, through its representatives and through third-party search firms, has solicited Sales Executives in WFIS's offices located in Atlanta, Charlotte, Tampa, Miami, Coconut Grove, Dallas, Irvine, Sacramento, Philadelphia and Cincinnati.

40.     In its solicitation efforts, Alliant is targeting WFIS's "top producers" (*i.e.*, the Sales Executives who service customers whose accounts generate the highest amount of revenue).

41.     In a departure from past practices, Alliant's senior executives are personally calling WFIS's Sales Executives in an effort to solicit them to leave their employment with WFIS and accept employment with Alliant.

42.     In addition, in June 2017, Alliant hired a former WFIS Executive Vice President who had national managerial responsibilities relating to sales and business development for WFIS ("Former WFIS Sales Manager").

43. During his employment with WFIS, by virtue of his senior office, the Former WFIS Sales Manager had access to highly-confidential information, including, but not limited to, the identities of all of WFIS's Sales Executives, including WFIS's top producers; their office locations, contact information, and job titles; detailed information concerning the revenues generated from the WFIS accounts they serviced, including the amount of new, recurring, and lost business; and the commissions and other compensation paid to Sales Executives.

44. The Former WFIS Sales Manager is subject to contractual restrictive covenants restricting him from using or disclosing WFIS's confidential information such as referenced in paragraph 43 above. On information and belief, the Former WFIS Sales Manager, now an agent and representative of Alliant, is using WFIS's confidential information in violation of his contractual obligations to WFIS as part of Alliant's improper solicitation campaign by targeting WFIS's top producers.

45. The Former WFIS Sales Manager has met in person with and contacted by telephone many of WFIS's top producers. In addition, third-party search firms are using the Former WFIS Sales Manager's name in making solicitation calls to the WFIS Sales Executives.

46. Alliant's recent actions in specifically targeting top producers immediately upon learning it was not the successful purchaser of WFIS is not

consistent with the recruitment processes conducted in the ordinary course of business consistent with past practices.

47.    The timing of the solicitations and the specific targeting of WFIS's top producers suggest that Alliant is using the highly-confidential information known by the Former WFIS Sales Manager or the highly-confidential Evaluation Materials (or both) to identify, target, and solicit top producers. Alliant would not be able to identify, target, and solicit WFIS's top producers in the ordinary course of business because the information is not generally known or available to the public or to WFIS's competitors.

48.    On July 11, 2017, WFIS's counsel faxed and mailed to Alliant a letter reminding Alliant of its legal obligations under the Confidentiality Agreement. WFIS also asked Alliant to destroy and to confirm that it had destroyed the Evaluation Materials. The letter further asked that Alliant cease and desist its improper solicitation activities.

49.    A true and correct copy of the letter sent to Alliant is attached as Exhibit B.

50.    In response to another inquiry by an affiliate of WFIS, Alliant represented that as of July 14, 2017 it had destroyed the Evaluation Materials. Alliant has not confirmed, however, that it will no longer improperly solicit WFIS's employee's covered by the Confidentiality Agreement.

51.     Instead of discontinuing its improper solicitation of WFIS's employees, Alliant has continued to target and solicit WFIS's top producers.

52.     Mr. Corbett, Chairman and CEO of Alliant, has stated that he meets every salesperson before he or she is hired to work at Alliant.

53.     On information and belief, Mr. Corbett has met with WFIS Sales Executives and is thereby participating in directing Alliant's recruitment process.

54.     As a result of Alliant's actions, WFIS has already suffered and will continue to suffer irreparable harm to its business, revenues, and employee retention at a uniquely vulnerable period of WFIS's corporate existence.

### Count I: Breach of Contract- Solicitation of WFIS's Employees

55.     WFIS incorporates the allegations contained in Paragraphs 1 through 54 by reference as if fully restated herein.

56.     The Confidentiality Agreement is a binding and enforceable contract.

57.     Pursuant to the Confidentiality Agreement, Alliant is obligated to not contact or solicit WFIS's Sales Executives for an eighteen month period commencing on May 1, 2017.

58.     The obligations contained in the foregoing section of the Confidentiality Agreement are reasonable in time, area, and line of business; and are supported by one of more legitimate business interests of WFIS, including among other things WFIS's substantial relationships with specific employees;

WFIS's substantial relationships with specific prospective and actual existing customers; and WFIS's goodwill.

59.   Alliant breached the Confidentiality Agreement by soliciting WFIS Sales Executives to leave their employment with WFIS.

60.   Alliant's breach of the Confidentiality Agreement has caused and continues to cause WFIS to suffer immediate and irreparable harm, which is presumed under these circumstances pursuant to the Agreement.

61.   WFIS is entitled to specific performance of the Confidentiality Agreement pursuant to the terms of the Confidentiality Agreement and because WFIS has been damaged and harmed by Alliant's breach; has no adequate remedy at law; and the public interest is served through the issuance of such relief under these facts.

## Count II: Preliminary and Permanent Injunction

62.   WFIS incorporates the allegations contained in Paragraphs 1 through 61 by reference as if fully restated herein.

63.   As already explained in Count I, WFIS has a meritorious claim that will succeed against Alliant.

64.   Alliant's conduct already has caused and will continue to cause WFIS irreparable and immediate injury, loss, and damage for which WFIS has no adequate remedy at law.

65.    Unless Alliant is enjoined from the foregoing conduct, WFIS will be irreparably harmed by: (a) loss of personnel, damage to office stability, and a threat to the enforcement of reasonable contracts; and (b) present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

66.    The issuance of injunctive relief against Alliant's continued violations of the Confidentiality Agreement and wrongful solicitation of WFIS's employees will prevent any further irreparable and immediate injury, loss, and damage to WFIS.

67.    The balance of harms strongly favors issuing an injunction prohibiting Alliant from engaging in conduct that violates the Confidentiality Agreement, specifically including, but not limited to soliciting or hiring (directly or indirectly) WFIS's employees covered by the Confidentiality Agreement for a period from May 1, 2017 through November 1, 2018.


## **Request for Relief**

WFIS respectfully requests that the Court enter a judgment in favor of WFIS and against Alliant:

a. Requiring Alliant to specifically perform its contractual duties under the Confidentiality Agreement, including but not limited to, requiring Alliant

to cease and desist soliciting (directly or indirectly) WFIS's employees covered by the Confidentiality Agreement for a period from May 1, 2017 through November 1, 2018;

b. Enjoining and restraining Alliant from engaging in conduct that violates the Confidentiality Agreement, specifically including soliciting (directly or indirectly) WFIS's employees covered by the Confidentiality Agreement for a period from May 1, 2017 through November 1, 2018;

c. Awarding damages in an amount to be determined at trial, incurred by WFIS as a result of the unlawful actions of Alliant;

d. Restitution and disgorgement of any and all ill-gotten gains unjustly obtained by Alliant through the acts complained of herein; and

e. Awarding WFIS any such other and further relief as the Court deems appropriate.

Respectfully submitted, this 26th day of July, 2017.

Dated July 26, 2017

OF COUNSEL:

Nancy H. Baughan
Georgia Bar Number 042575
PARKER, HUDSON, RAINER &
DOBBS LLP
303 Peachtree Street NE
Suite 3600
Atlanta, Georgia 30308
Phone: 404-523-5300
Fax: 404-522-8409
nhb@phrd.com

*/s/ Kevin J. Mangan*
Kevin J. Mangan (#3810)
Ericka F. Johnson (#5024)
Nicholas T. Verna (#6082)
WOMBLE CARLYLE SANDRIDGE &
RICE LLP
222 Delaware Avenue, Suite 1501
Wilmington, Delaware 19801
Phone:  (302) 252-4361
Fax:  (302) 661-7729
kmangan@wcsr.com
erjohnson@wcsr.com
nverna@wcsr.com

*Attorneys for Plaintiff Wells Fargo
Insurance Services USA, Inc.*

EFiled: Jul 26 2017 06:48PM
Transaction ID 60903165
Case No. 2017-0540-

# EXHIBIT B



NANCY H. BAUGHAN

DIRECT DIAL
(404) 420-4309
TELECOPIER
(678) 533-7725
nbaughan@phrd.com

LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW

OFFICES IN:

ATLANTA, GEORGIA
TALLAHASSEE, FLORIDA

July 11, 2017

**Via Facsimile and U.S. Mail**
Jennifer E. Baumann, Esq.
Assistant General Counsel
Alliant Insurance Services, Inc.
1301 Dove Street, Suite 200
Newport Beach, CA 92626

RE:  Alliant's Obligations Under May 1, 2017 Confidentiality Agreement

Dear Ms. Baumann:

My firm represents Wells Fargo Insurance Services USA, Inc. ("Wells Fargo Insurance") relating to this matter. In accordance with the terms of the Confidentiality Agreement dated May 1, 2017 in connection with Project Jaguar, I write to request that Alliant Insurance Services, Inc. ("Alliant") destroy all Evaluation Materials and Company Analyses (as those terms are defined in the Confidentiality Agreement). Please ensure all Alliant employees and representatives have destroyed all Evaluation Materials and Company Analyses (in whatever form or storage medium) in full compliance with the Confidentiality Agreement, including the section entitled "Destruction of Documents" on page 4. Please provide written confirmation of Alliant's compliance as soon as possible. We appreciate your prompt attention to this matter.

Wells Fargo Insurance also wants to remind Alliant of its agreement to "use the Evaluation Materials solely for the purpose of evaluating" the possible transaction and of its obligation to refrain from soliciting Wells Fargo Insurance's employees as outlined in the Confidentiality Agreement. Regarding non-solicitation, Alliant agreed that for a period eighteen (18) months from May 1, 2017 it:

> will not, directly or indirectly, nor will any of [its] Representatives acting on [its] behalf, solicit to hire or hire or cause or seek to cause to leave the employ of Seller or interfere with any contractual arrangement such person has therewith or otherwise seek to terminate any status as a contractor thereof, (i) any employee (other than the Named Executives or sales executives of [Wells Fargo Insurance]) or contractor of [Wells Fargo Insurance] or Seller in each case with whom you have had direct contact or who (or whose performance) first became known (including on a no names basis) to you, your affiliates or Representatives in connection with your evaluation of the Possible Transaction; or (ii) any member of management set forth on Schedule 1 (the "Named Executives") or any sales executive of [Wells Fargo Insurance].

Wells Fargo Insurance has information that Alliant, through its employee, Kevin Kenny, and through headhunters, has been soliciting Wells Fargo Insurance employees who are covered by the preceding provision in violation of the Confidentiality Agreement, including employees located in Wells Fargo Insurance's Atlanta, Charlotte, Phoenix, Tampa, and South Florida offices. Wells Fargo Insurance demands that Alliant immediately cease and desist the solicitation of Wells Fargo Insurance's covered employees, and that Alliant fully comply with its obligations under the Confidentiality Agreement. Wells Fargo Insurance will be monitoring this situation very carefully to protect Wells Fargo Insurance's rights and legitimate business interests. If Alliant, through its representatives, continues to violate the Confidentiality Agreement, Wells Fargo Insurance will pursue, vigorously and aggressively, all legal remedies it believes necessary or appropriate.

Wells Fargo Insurance also demands that Alliant take all necessary steps to preserve all documents in its possession, custody, or control (including hard copy documents, emails, text messages, voice messages, and any information stored on personal devices, such as laptops, computers, tablets, and cellular devices) relating in any way to: (i) Alliant's solicitation of Wells Fargo Insurance employees from May 1, 2017 to present; (ii) Alliant's communications with Wells Fargo Insurance employees from May 1, 2017 to present; (iii) communications between Alliant and Kevin Kenny relating to Wells Fargo Insurance employees; and (iv) communications between Alliant and Kevin Kenny relating to Wells Fargo Insurance's business.

Mr. Kenny, a former Wells Fargo Insurance employee, owes contractual non-disclosure obligations to Wells Fargo Insurance separate and apart from Alliant's obligations under the Confidentiality Agreement. I am writing separately to Mr. Kenny to remind him of those obligations.

If you have any questions, please contact me. Wells Fargo reserves all rights and remedies under applicable law, including with respect to the issues described above.

Sincerely,

Nancy H. Baughan

Nancy H. Baughan

NHB/cgar

D

100% Recycled   30% PCW

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO INSURANCE SERVICES USA, INC., | CIVIL DIVISION |
| Plaintiff, | NO. GD-17-14022 |
| v. | |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | |
| Defendants. | |

## AFFIDAVIT OF ZACHARY MENDELSON

I, ZACHARY MENDELSON, being duly sworn upon his oath, state as follows:

1.     I am over the age of eighteen and am fully competent to testify to the matters set forth herein. I am a commercial insurance broker employed with EPIC Insurance Brokers and Consultants ("EPIC) in its recently opened Pittsburgh office. Prior to my employment with EPIC, I was employed by Wells Fargo Insurance Services USA, Inc. ("WFIS") in the same capacity, also in Pittsburgh. As background, WFIS (the tenth largest retail insurance brokerage in the United States) has agreed to sell its insurance brokerage business to USI Insurance Services ("USI") (the ninth largest retail insurance brokerage in the United States). I understand that sale is set to close in November 2017. WFIS agreed to sell its entire insurance brokerage business without my approval or consent, and apparently expected I would be told who my new employer would be and that WFIS, acting in concert with that new employer, would dictate unilaterally what the terms of my new employment would be without my input or negotiation. I am not a chattel. I am an insurance brokerage professional.

2.     Based on information conveyed to me at an August 2017 meeting with representatives of both WFIS and USI, and based on a September 22, 2017 email by Clark Johnson, Director, Acquisition Integration of USI, stating that I must execute a new non-negotiable employment agreement with USI by October 6, 2017, I believed that I would be terminated if I did not accept USI's one-sided demand. I was also advised by Mr. Johnson that under no circumstances were the terms of my new employment with USI negotiable. But for my employment with EPIC, I would be out of work as I refused to sign the one-sided employment agreement with USI that was presented on a "take it or leave it" basis. I have no interest in working for an organization such as USI that does not value me enough to allow me to have any say in the terms of my employment, and that has a reputation for being a difficult place to work.

3.     USI was the successful bidder for WFIS following an "auction" to purchase WFIS' insurance brokerage business.

4.     The employees within the Pittsburgh WFIS office were very anxious when we learned a new employer, USI, would be unilaterally imposed on us. The impact upon our careers and families was highly uncertain. As a result, employees in the Pittsburgh WFIS office were considering their employment alternatives. I was already very concerned about the loss of business and client confidence in WFIS due to the ongoing scandals associated with Wells Fargo Bank. The sale to an unknown company rumored to be very difficult to work for created additional anxiety and uncertainty. When I was told by USI's Mr. Johnson that the terms of my employment with USI were on a "take it or leave it," non-negotiable basis, it confirmed the rumors I had been told about USI and confirmed for me that it was not who I wanted to continue my career with.

5.    Among the concerned employees of WFIS was Mark Susco, a Senior Vice President and Managing Director, including WFIS' Pittsburgh office.  At a regularly scheduled Pittsburgh office growth meeting on May 22, 2017, Mr. Susco announced to my co-workers and me that we needed to have a "Plan B" because we could not rely upon the auction process to deliver a satisfactory new employer for the Pittsburgh office.   Mr. Susco was clear in his direction to us all that we should all have a "Plan B."

6.    In the spring of 2017, the co-workers I was closest to (each of the Individual Defendants in this action other than Kurt Karstens and Peter Kostorick) began exploring options for the same reasons suggested by Mark Susco.  Additionally, we were dealing with the massive negative publicity arising from the insidious internal scandals at Wells Fargo's banking operations, which continued to put a strain on our client relationships.  Scandals cause serious damage in the insurance brokerage and other financial services sectors because customers depend upon our skill, expertise and above all, they need to trust us.

7.    Mark Susco is the most senior management employee of WFIS in its Pittsburgh office and further oversees the operations of other WFIS' midwest offices in addition to Pittsburgh. He encouraged myself and others in the Pittsburgh office to think of an option that he was pursuing himself whereby the entire WFIS Pittsburgh office would en masse accept employment with a different competitor of WFIS. To further this objective, Mr. Susco arranged for myself, Sean Andreas, and Ron Lenart to meet on September 12, 2017 with Kevin Kenny, Managing Director, Alliant Americas, a direct competitor of both WFIS and USI.  After these meetings, Sean Andreas and I met with Mark Susco at his request to "debrief him" on the Alliant meetings he had arranged.   We ultimately advised Mr. Susco that we were not interested in Alliant given that it was embroiled in litigation with WFIS over an alleged breach of a non-

disclosure agreement Alliant had signed as part of the auction process, barring it from recruiting WFIS employees it had learned about during the due diligence process. Indeed, it was my understanding that Mr. Kenny, who Mr. Susco had us meet with, was personally a target of the litigation which WFIS had filed against Alliant in Delaware. I felt Mr. Susco's interest in the Alliant opportunity was for his own self-interest because he would have had a more secure management position at Alliant in comparison to EPIC given Mr. Susco's close relationship with Kevin Kenny (a former WFIS executive).

8.      From September 12 to September 27, 2017, I had discussions with EPIC leadership. On September 26, 2017, we finally agreed on terms. I resigned to Mark Susco on September 27, 2017. The day I resigned, I learned that Mr. Susco had cancelled a previously scheduled job interview he had arranged with EPIC for that same morning.

9.      Upon resigning from WFIS, I sent out email announcements of my departure to my personal and professional contacts. I have carefully followed a practice since September 27, 2017 of not communicating with WFIS customers unless they first reached out to me following receipt of the announcement.

10.     The term "solicitation" is not defined in my employment agreement with WFIS. I have not solicited my clients since leaving WFIS. Instead, I simply sent an announcement of change in employment (as was my right to do) and returned phone calls and correspondence from business contacts that reached out to me in response to the announcement.

11.     WFIS clients who have transferred their business to me at EPIC or contacted me have done so based upon my substantial skill and expertise in the insurance brokerage and risk management profession I have practiced for over thirty years, as well as the long-standing personal relationships I share with those clients. Insurance brokerage is a relationship business,

with the relationship being one of trust built upon skill, expertise and delivery of quality insurance advisory services.

12.     WFIS and USI acknowledge my skill, expertise, and hard work regularly.  In fact, as recently as October 1, 2017, I received a telephone call and texts from Peter Gilbertson, Regional Managing Director of WFIS.  The calls and texts have been made to me to encourage me to return to WFIS/USI because the professional relationships I have with my clients are based on their trust in my skill and expertise that I earned through my decades of hard work and dedication to those clients.


AFFIANT FURTHER SAYETH NAUGHT


Under penalties as provided by law pursuant to 18 Pa.C.S. § 4904, I certify that the statements set forth in this instrument are true and correct (or are true and correct to the best of my knowledge, information and belief), and I expect to be able to prove the same at any hearing hereof.


Dated: October 20th, 2017

_____
Zachary Mendelson



100% Recycled    30% PCW

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO INSURANCE SERVICES USA, INC., | CIVIL DIVISION |
| Plaintiff, | NO. GD-17-14022 |
| v. | |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | |
| Defendants. | |

## AFFIDAVIT OF CHARLES YORIO

I, CHARLES YORIO, being duly sworn upon his oath, state as follows:

1. I am over the age of eighteen and am fully competent to testify to the matters set forth herein. I am a risk control consultant employed with EPIC Insurance Brokers and Consultants ("EPIC) in its recently opened Pittsburgh office. Prior to my employment with EPIC, I was employed by Wells Fargo Insurance Services USA, Inc. ("WFIS") in the same capacity, also in Pittsburgh. As background, WFIS (the tenth largest retail insurance brokerage in the United States) has agreed to sell its insurance brokerage business to USI Insurance Services ("USI") (the ninth largest retail insurance brokerage in the United States). I understand that sale is set to close in November 2017. WFIS agreed to sell its entire insurance brokerage business without my approval or consent, and apparently expected I would be told who my new employer would be and that WFIS, acting in concert with that new employer, would dictate unilaterally what the terms of my new employment would be without my input or negotiation. I am not a chattel. I am a risk control professional.

2.     Based on information conveyed to me at an August 2017 meeting with representatives of both WFIS and USI, and based on a September 22, 2017 email by Clark Johnson, Director, Acquisition Integration of USI, stating that I must execute a new non-negotiable employment agreement with USI by October 6, 2017, I believed that I would be terminated if I did not accept USI's one-sided demand. I was also advised by Mr. Johnson that under no circumstances were the terms of my new employment with USI negotiable. But for my employment with EPIC, I would be out of work as I refused to sign the one-sided employment agreement with USI that was presented on a "take it or leave it" basis. I have no interest in working for an organization such as USI that does not value me enough to allow me to have any say in the terms of my employment, and that has a reputation for being a difficult place to work.

3.     I resigned my employment with WFIS on September 27, 2017, and began my employment with EPIC that same day.

4.     Upon resigning from WFIS, I sent out email announcements of my departure to my personal and professional contacts. I have carefully followed a practice since September 27, 2017 of not communicating with WFIS customers unless they first reached out to me following receipt of the announcement. I have additionally placed calls to three close personal friends, Linda Kelly, Darlaine Taylor, and Bindy Bucci, but only to advise them personally of my change of employment, not to solicit them, as I felt that I owed them and our relationship the professional courtesy of an actual phone call.

5.     The term "solicitation" is not defined in my employment agreement with WFIS. I have not solicited my clients since leaving WFIS. Instead, I simply sent an announcement of change in employment (as was my right to do) and returned phone calls and correspondence from business contacts that reached out to me in response to the announcement.

2

6. WFIS clients who have transferred their business to EPIC or contacted me have done so based upon my substantial skill and expertise as a risk control consultant, which I have practiced for over 30 years, as well as the long-standing personal relationships I share with those clients. Insurance brokerage and risk control is a relationship business, with the relationship being one of trust built upon skill, expertise and delivery of quality insurance advisory services.

AFFIANT FURTHER SAYETH NAUGHT

Under penalties as provided by law pursuant to 18 Pa.C.S. § 4904, I certify that the statements set forth in this instrument are true and correct (or are true and correct to the best of my knowledge, information and belief), and I expect to be able to prove the same at any hearing hereof.

Dated: October 20, 2017

_____
Charles Yorio

100% Recycled  30% PCW

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO INSURANCE SERVICES USA, INC., | CIVIL DIVISION |
| Plaintiff, | NO. GD-17-14022 |
| v. | |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | |
| Defendants. | |

## AFFIDAVIT OF PHILLIP WAKIM

I, PHILLIP WAKIM, being duly sworn upon his oath, state as follows:

1.     I am over the age of eighteen and am fully competent to testify to the matters set forth herein.   I am a claims consultant employed with EPIC Insurance Brokers and Consultants ("EPIC) in its recently opened Pittsburgh office. Prior to my employment with EPIC, I was employed by Wells Fargo Insurance Services USA, Inc. ("WFIS") in the same capacity, also in Pittsburgh.  My employment with WFIS was subject to a "Nondisclosure and Anti-Piracy Agreement" with Acordia that I executed in May 1996. As background, WFIS (the tenth largest retail insurance brokerage in the United States) has agreed to sell its insurance brokerage business to USI Insurance Services ("USI") (the ninth largest retail insurance brokerage in the United States).  I understand that sale is set to close in November 2017.  WFIS agreed to sell its entire insurance brokerage business without my approval or consent, and apparently expected I would be told who my new employer would be and that

WFIS, acting in concert with that new employer, would dictate unilaterally what the terms of my new employment would be without my input or negotiation. I am not a chattel. I am a claims consultant professional.

2.      Based on information conveyed to me at an August 2017 meeting with representatives of both WFIS and USI, and based on a September 22, 2017 email by Clark Johnson, Director, Acquisition Integration of USI, stating that I must execute a new non-negotiable employment agreement with USI by October 6, 2017, I believed that I would be terminated if I did not accept USI's one-sided demand. I was also advised by Mr. Johnson that under no circumstances were the terms of my new employment with USI negotiable. But for my employment with EPIC, I would be out of work as I refused to sign the one-sided employment agreement with USI that was presented on a "take it or leave it" basis. I have no interest in working for an organization such as USI that does not value me enough to allow me to have any say in the terms of my employment, and that has a reputation for being a difficult place to work.

3.      I resigned my employment with WFIS on September 27, 2017, and began my employment with EPIC that same day.

4.      Upon resigning from WFIS, I sent out email announcements of my departure to my personal and professional contacts. I have carefully followed a practice since September 27, 2017 of not communicating with WFIS customers unless they first reached out to me following receipt of the announcement.

2

5.    The term "solicitation" is not defined in my employment agreement with Acordia. I have not solicited my clients since leaving WFIS.    Instead, I simply sent an announcement of change in employment (as was my right to do) and returned phone calls and correspondence from business contacts that reached out to me in response to the announcement.

6.    WFIS clients who have transferred their business to EPIC or contacted me have done so based upon my substantial skill and expertise in the claims consulting profession I have practiced for over 27 years, as well as the long-standing personal relationships I share with those clients. Insurance brokerage and claims consulting is a relationship business, with the relationship being one of trust built upon skill, expertise and delivery of quality insurance advisory services.

AFFIANT FURTHER SAYETH NAUGHT

Under penalties as provided by law pursuant to 18 Pa.C.S. § 4904, I certify that the statements set forth in this instrument are true and correct (or are true and correct to the best of my knowledge, information and belief), and I expect to be able to prove the same at any hearing hereof.

Dated: October ___10___, 2017

Phillip Wakim

3

G

100% Recycled 30% PCW

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO INSURANCE SERVICES USA, INC., | CIVIL DIVISION |
| | NO. GD-17-14022 |
| Plaintiff, | |
| v. | |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | |
| Defendants. | |

## AFFIDAVIT OF JANICE ZEWE

I, JANICE ZEWE, being duly sworn upon her oath, state as follows:

1.      I am over the age of eighteen and am fully competent to testify to the matters set forth herein. I am a commercial insurance broker employed with EPIC Insurance Brokers and Consultants ("EPIC) in its recently opened Pittsburgh office. Prior to my employment with EPIC, I was employed by Wells Fargo Insurance Services USA, Inc. ("WFIS") in the same capacity, also in Pittsburgh. My employment with WFIS was subject to an employment agreement I signed with Acordia in 1995. As background, WFIS (the tenth largest retail insurance brokerage in the United States) has agreed to sell its insurance brokerage business to USI Insurance Services ("USI") (the ninth largest retail insurance brokerage in the United States). I understand that sale is set to close in November 2017. WFIS agreed to sell its entire insurance brokerage business without my approval or consent, and apparently expected I would be told who my new employer would be and that WFIS, acting in concert with that new

employer, would dictate unilaterally what the terms of my new employment would be without my input or negotiation. I am not a chattel. I am an insurance brokerage professional.

2. Based on information conveyed to me at an August 2017 meeting with representatives of both WFIS and USI, and based on a September 22, 2017 email by Clark Johnson, Director, Acquisition Integration of USI, stating that I must execute a new non-negotiable employment agreement with USI by October 6, 2017, I believed that I would be terminated if I did not accept USI's one-sided demand. I was also advised by Mr. Johnson that under no circumstances were the terms of my new employment with USI negotiable. But for my employment with EPIC, I would be out of work as I refused to sign the one-sided employment agreement with USI that was presented on a "take it or leave it" basis. I have no interest in working for an organization such as USI that does not value me enough to allow me to have any say in the terms of my employment, and that has a reputation for being a difficult place to work.

3. I resigned my employment with WFIS on September 27, 2017, and began my employment with EPIC that same day.

4. Upon resigning from WFIS, I sent out email announcements of my departure to my personal and professional contacts. I have carefully followed a practice since September 27, 2017 of not communicating with WFIS customers unless they first reached out to me following receipt of the announcement.

5. The term "solicitation" is not defined in my employment agreement with Acordia. I have not solicited my clients since leaving WFIS. Instead, I simply sent an announcement of change in employment (as was my right to do) and returned phone calls and correspondence from business contacts that reached out to me in response to the announcement.

6. WFIS clients who have transferred their business to me at EPIC or contacted me have done so based upon my substantial skill and expertise in the insurance brokerage and risk management profession I have practiced for over 30 years, as well as the long-standing personal relationships I share with those clients. Insurance brokerage is a relationship business, with the relationship being one of trust built upon skill, expertise and delivery of quality insurance advisory services.

AFFIANT FURTHER SAYETH NAUGHT

Under penalties as provided by law pursuant to 18 Pa.C.S. § 4904, I certify that the statements set forth in this instrument are true and correct (or are true and correct to the best of my knowledge, information and belief), and I expect to be able to prove the same at any hearing hereof.

Dated: October _20_, 2017

_____
Janice Zewe

3

H

100% Recycled 30% PCW

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO INSURANCE SERVICES USA, INC., | CIVIL DIVISION |
| Plaintiff, | NO. GD-17-14022 |
| v. | |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | |
| Defendants. | |

## AFFIDAVIT OF SALLY KRAUSS

I, SALLY KRAUSS, being duly sworn upon her oath, state as follows:

1.     I am over the age of eighteen and am fully competent to testify to the matters set forth herein. I am a commercial insurance broker employed with EPIC Insurance Brokers and Consultants ("EPIC) in its recently opened Pittsburgh office. Prior to my employment with EPIC, I was employed by Wells Fargo Insurance Services USA, Inc. ("WFIS") in the same capacity, also in Pittsburgh. My employment with WFIS was subject to an employment agreement I signed with Acordia in 1995. As background, WFIS (the tenth largest retail insurance brokerage in the United States) has agreed to sell its insurance brokerage business to USI Insurance Services ("USI") (the ninth largest retail insurance brokerage in the United States). I understand that sale is set to close in November 2017. WFIS agreed to sell its entire insurance brokerage business without my approval or consent, and apparently expected I would be told who my new employer would be and that WFIS, acting in concert with that new

employer, would dictate unilaterally what the terms of my new employment would be without my input or negotiation. I am not a chattel. I am an insurance brokerage professional.

2. Based on information conveyed to me at an August 2017 meeting with representatives of both WFIS and USI, and based on a September 22, 2017 email by Clark Johnson, Director, Acquisition Integration of USI, stating that I must execute a new non-negotiable employment agreement with USI by October 6, 2017, I believed that I would be terminated if I did not accept USI's one-sided demand. I was also advised by Mr. Johnson that under no circumstances were the terms of my new employment with USI negotiable. But for my employment with EPIC, I would be out of work as I refused to sign the one-sided employment agreement with USI that was presented on a "take it or leave it" basis. I have no interest in working for an organization such as USI that does not value me enough to allow me to have any say in the terms of my employment, and that has a reputation for being a difficult place to work.

3. I resigned my employment with WFIS on September 27, 2017, and began my employment with EPIC that same day.

4. Upon resigning from WFIS, I sent out email announcements of my departure to my personal and professional contacts. I have carefully followed a practice since September 27, 2017 of not communicating with WFIS customers unless they first reached out to me following receipt of the announcement.

5. The term "solicitation" is not defined in my employment agreement with Acordia. I have not solicited my clients since leaving WFIS. Instead, I simply sent an announcement of change in employment (as was my right to do) and returned phone calls and correspondence from business contacts that reached out to me in response to the announcement.

6.    WFIS clients who have transferred their business to me at EPIC or contacted me have done so based upon my substantial skill and expertise in the insurance brokerage and risk management profession I have practiced for over 30 years, as well as the long-standing personal relationships I share with those clients. Insurance brokerage is a relationship business, with the relationship being one of trust built upon skill, expertise and delivery of quality insurance advisory services.


AFFIANT FURTHER SAYETH NAUGHT


Under penalties as provided by law pursuant to 18 Pa.C.S. § 4904, I certify that the statements set forth in this instrument are true and correct (or are true and correct to the best of my knowledge, information and belief), and I expect to be able to prove the same at any hearing hereof.


Dated: October 20, 2017

_____
Sally Krauss

100% Recycled  30% PCW

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO INSURANCE SERVICES USA, INC., | CIVIL DIVISION |
| Plaintiff, | NO. GD-17-14022 |
| v. | |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | |
| Defendants. | |

## AFFIDAVIT OF KURT KARSTENS

I, KURT KARSTENS, being duly sworn upon his oath, state as follows:

1.      I am over the age of eighteen and am fully competent to testify to the matters set forth herein. I am a commercial insurance broker employed with EPIC Insurance Brokers and Consultants ("EPIC) in its recently opened Pittsburgh office. Prior to my employment with EPIC, I was employed by Wells Fargo Insurance Services USA, Inc. ("WFIS") in the same capacity, also in Pittsburgh. As background, WFIS (the tenth largest retail insurance brokerage in the United States) has agreed to sell its insurance brokerage business to USI Insurance Services ("USI") (the ninth largest retail insurance brokerage in the United States). I understand that sale is set to close in November 2017. WFIS agreed to sell its entire insurance brokerage business without my approval or consent, and apparently expected I would be told who my new employer would be and that WFIS, acting in concert with that new employer, would dictate unilaterally what the terms of my new employment would be without my input or negotiation. I am not a chattel. I am an insurance brokerage professional.

2.     Based on information conveyed to me at a July 10, 2017 meeting and a later September 15, 2017 meeting with representatives of both WFIS and USI, and based on a September 22, 2017 email by Clark Johnson, Director, Acquisition Integration of USI, stating that I must execute a new non-negotiable employment agreement with USI by October 6, 2017, I believed that I would be terminated if I did not accept USI's one-sided demand. I was also advised by Mr. Johnson that *under no circumstances were the terms of my new employment with USI negotiable.* But for my employment with EPIC, I would be out of work as I refused to sign the one-sided employment agreement with USI that was presented on a "take it or leave it" basis. I have no interest in working for an organization such as USI that does not value me enough to allow me to have any say in the terms of my employment, and that has a reputation for being a difficult place to work.

3.     I resigned my employment with WFIS on October 2, 2017, and began my employment with EPIC that same day.

4.     Upon resigning from WFIS, I sent out email announcements of my departure to my personal and professional contacts. I have carefully followed a practice since October 2, 2017 of not communicating with WFIS customers unless they first reached out to me following receipt of the announcement.

5.     The term "solicitation" is not defined in my employment agreement with WFIS. I have not solicited my clients since leaving WFIS. Instead, I simply sent an announcement of change in employment (as was my right to do) and returned phone calls and correspondence from business contacts that reached out to me in response to the announcement.

6.     WFIS clients who have transferred their business to me at EPIC or contacted me have done so based upon my substantial skill and expertise in the insurance brokerage and risk

management profession I have practiced for over 28 years, as well as the long-standing personal relationships I share with those clients. Insurance brokerage is a relationship business, with the relationship being one of trust built upon skill, expertise and delivery of quality insurance advisory services.

AFFIANT FURTHER SAYETH NAUGHT

Under penalties as provided by law pursuant to 18 Pa.C.S. § 4904, I certify that the statements set forth in this instrument are true and correct (or are true and correct to the best of my knowledge, information and belief), and I expect to be able to prove the same at any hearing hereof.

Dated: October 20TH, 2017

Kurt Karstens

100% Recycled   30% PCW

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO INSURANCE SERVICES USA, INC., | CIVIL DIVISION |
| Plaintiff, | NO. GD-17-14022 |
| v. | |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | |
| Defendants. | |

### AFFIDAVIT OF PETER KOSTORICK

I, PETER KOSTORICK, being duly sworn upon his oath, state as follows:

1.      I am over the age of eighteen and am fully competent to testify to the matters set forth herein.  I am a commercial insurance broker employed with EPIC Insurance Brokers and Consultants ("EPIC) in its recently opened Pittsburgh office.  Prior to my employment with EPIC, I was employed by Wells Fargo Insurance Services USA, Inc. ("WFIS") in the same capacity, also in Pittsburgh. My employment with WFIS was subject to a document entitled "Acordia Northeast, Inc. Agreement Regarding Trade Secrets, Confidential Information and Non-Solicitation," which I executed in 2006. As background, WFIS (the tenth largest retail insurance brokerage in the United States) has agreed to sell its insurance brokerage business to USI Insurance Services ("USI") (the ninth largest retail insurance brokerage in the United States). I understand that sale is set to close in November 2017.  WFIS agreed to sell its entire insurance brokerage business without my approval or consent, and apparently expected I would be told who my new employer would be and that WFIS, acting in concert with that new

employer, would dictate unilaterally what the terms of my new employment would be without my input or negotiation. I am not a chattel. I am an insurance brokerage professional.

2. Based on information conveyed to me at an August 2017 meeting with representatives of both WFIS and USI, and based on a September 22, 2017 email by Clark Johnson, Director, Acquisition Integration of USI, stating that I must execute a new non-negotiable employment agreement with USI by October 6, 2017, I believed that I would be terminated if I did not accept USI's one-sided demand. I was also advised by Mr. Johnson that under no circumstances were the terms of my new employment with USI negotiable. But for my employment with EPIC, I would be out of work as I refused to sign the one-sided employment agreement with USI that was presented on a "take it or leave it" basis. I have no interest in working for an organization such as USI that does not value me enough to allow me to have any say in the terms of my employment, and that has a reputation for being a difficult place to work.

3. I resigned my employment with WFIS on September 28, 2017, and began my employment with EPIC that same day.

4. Upon resigning from WFIS, I sent out email announcements of my departure to my personal and professional contacts. I have carefully followed a practice since September 28, 2017 of not communicating with WFIS customers unless they first reached out to me following receipt of the announcement.

5. The term "solicitation" is not defined in my employment agreement with Acordia. I have not solicited my clients since leaving WFIS. Instead, I simply sent an announcement of change in employment (as was my right to do) and returned phone calls and correspondence from business contacts that reached out to me in response to the announcement.

6.     WFIS clients who have transferred their business to me at EPIC or contacted me have done so based upon my substantial skill and expertise in the insurance brokerage and risk management profession I have practiced for over 18 years, as well as the long-standing personal relationships I share with those clients. Insurance brokerage is a relationship business, with the relationship being one of trust built upon skill, expertise and delivery of quality insurance advisory services.

AFFIANT FURTHER SAYETH NAUGHT

Under penalties as provided by law pursuant to 18 Pa.C.S. § 4904, I certify that the statements set forth in this instrument are true and correct (or are true and correct to the best of my knowledge, information and belief), and I expect to be able to prove the same at any hearing hereof.

Dated: October $\underline{22}$ , 2017

_____
Peter Kostorick



100% Recycled  30% PCW

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| WELLS FARGO INSURANCE SERVICES USA, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) C.A. No.: 2017-0540-JTL |
| ALLIANT INSURANCE SERVICES, INC. | ) ) ) |
| Defendant. | ) ) |

## AFFIDAVIT OF KEVIN KENNY

Personally appeared before me, the undersigned officer, duly authorized by law to administer oaths, Kevin Kenny, who, having been duly sworn, hereby states the following under oath:

1.

I am an Executive Vice President and Managing Director of Alliant Insurance Services, Inc. ("Alliant"). I submit this Affidavit in support of Alliant's Motion for Protective Order (the "Motion") in the above-captioned matter, and for any and all purposes authorized by law. I am over the age of eighteen years and am capable and competent to make this Affidavit. This Affidavit is made based upon my personal knowledge.

2.

I worked for Wells Fargo Insurance Services USA, Inc. ("WFIS") for more than 30 years. In the last one and a half years of my employment with WFIS, I served as WFIS' national head of growth and business development. Prior to that, I had served as WFIS' national head of insurance brokerage and consulting.

3.

I left WFIS's employment in April 2015. While I have not been employed with WFIS for several years, I still have long-standing, personal relationships with many producers and management executives still at WFIS. I have had some of these relationships for more than 30 years. I believe many people at WFIS like and trust me and would like to work with me again. I also believe many of them have lost trust and faith in WFIS due to WFIS' decision to part ways with me and changes that have taken place at WFIS since I left.

4.

I began discussing potential employment with Alliant in or around March 2017. Alliant hired me on June 12, 2017.

5.

The employee non-solicitation and non-recruitment covenants in my agreements with WFIS had expired at the time I became employed by Alliant.

6.

When it became known publicly that WFIS was for sale, I was contacted by numerous people in the insurance industry, including then current employees of WFIS, about the news. Many of these people inquired as to whether I was or would be involved in a potential acquisition of WFIS. Many of the people at WFIS who called me asked my thoughts and opinions regarding the various suitors who were thought to be involved in the possible acquisition of WFIS as well as my thoughts and opinions generally about the various players in

the industry. Many of them also expressed their concerns about the uncertainty they were facing due to the impending sale of the company and indicated that they were considering their options.

7.

I was not involved in Alliant's evaluation of the potential acquisition of WFIS. I did not and have not received any materials received from WFIS or Wells Fargo Securities, LLC during due diligence at any point in time.

8.

When I joined Alliant, I was contacted by numerous people in the insurance industry, including then current employees of WFIS. Some people contacted me to congratulate me on joining Alliant. Many others contacted me about possible employment opportunities at Alliant.

9.

Since I joined Alliant, I have participated in Alliant's efforts to recruit producers from WFIS. My recruitment efforts on behalf of Alliant have been based on my personal relationships with employees of WFIS. Some of the communications have been initiated by WFIS employees who have reached out to me about possible employment opportunities at Alliant. I have initiated others.

10.

WFIS employees who have spoken to me about employment opportunities at Alliant have done so in confidence with the understanding and expectation that I would not disclose these communications to anyone outside of Alliant and especially not disclose them to WFIS. In my conversations with WFIS employees, I have assured them that we would treat the discussions as highly confidential. If WFIS employees who have spoken to me about employment with Alliant learn that I or Alliant have disclosed this information to WFIS, my friendships and credibility

3

with these people that I have known over the last 30 years will be destroyed. In addition, word that Alliant has produced this information to WFIS will get out not only among others at WFIS, but throughout the industry. This would be disastrous for my and Alliant's reputations in the industry and our ability to recruit from WFIS and other brokers will be severely and irreparably damaged.

11.

I have learned through my friends at WFIS that WFIS management and lawyers have been interviewing employees to try to find out if they are talking to Alliant about potential employment. I understand these interviews have been conducted in a threatening manner. Even if WFIS is restricted to using information about those to whom I have spoken solely for purposes of this lawsuit, my friends and contacts at WFIS will learn that Alliant and I have disclosed the information to WFIS when WFIS interviews or speaks to them about their discussions with Alliant under the guise of gathering evidence for the case.

12.

Shortly after I joined Alliant, I received a call from Kevin Brogan who is the head of WFIS' property and casualty insurance practice. He left me a voice mail message in which he said "what are you doing talking to our people you shmuck – call me." I then received a letter from WFIS's counsel a copy of which is attached to this affidavit as Exhibit "A." The letter threatens legal action against me for my recruitment activities despite the fact that my non-recruitment and non-solicitation of employee covenants have expired.

4

13.

Based on my knowledge of the industry and my own observations, I understand that approximately 80 producers left WFIS last year alone. These producers controlled millions of dollars of business, much of which left with them.

I declare under penalty of perjury that the foregoing is true and correct.

Kevin Kenny

Sworn to and subscribed before me
this 11 day of August , 2017.

Notary Public
My Commission Expires: 12/24/19

POOJA A. GADKAR
NOTARY PUBLIC STATE OF NEW YORK
QUEENS COUNTY
LIC. # 02GA6179238
MY COMMISSION EXPIRES 12/24/20_9

5



NANCY H. BAUGHAN

DIRECT DIAL
(404) 420-4309
TELECOPIER
(678) 533-7725
nbaughan@phrd.com

LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW

OFFICES IN:
ATLANTA, GEORGIA
TALLAHASSEE, FLORIDA

July 11, 2017

**Via Certified Mail, Return Receipt Requested**

Kevin Kenny
9 Kerby Lane
Mendham, NJ 07945

      RE:    Confidentiality, Non-Disparagement, and Non-Disclosure Obligations to Wells Fargo Insurance

Dear Mr. Kenny:

This firm represents Wells Fargo Insurance Services USA, Inc. ("Wells Fargo Insurance") relating to this matter. On April 7, 2015, you executed a Departure Agreement and Release of Claims ("Departure Agreement") in connection with ending your active employment with Wells Fargo Insurance. The Departure Agreement sets forth various agreed terms and conditions relating to the cessation of your employment with Wells Fargo Insurance. I enclose a copy of the Departure Agreement for your reference.

In the Departure Agreement, you agreed, among other things, to certain Confidentiality, Non-Disparagement and Non-Disclosure provisions. Specifically, you agreed:

**7)    Confidentiality, Non-Disparagement and Non-Disclosure**

    a)    You agree to treat the fact and terms of this Agreement as strictly confidential. This means that you will not, unless required by law to do so, reveal any of the terms of the Agreement, the amounts referred to in this Agreement, or the fact of the payment of said amounts, to any person except your spouse, if applicable, attorney or tax preparer or other professional advisors to whom the disclosure is necessary for the purposes for which you have consulted such professional advisors.

    b)    You agree not to express any derogatory or damaging statements about Wells Fargo, the management of Wells Fargo, or the business condition of Wells Fargo in any public way or to anyone who could make these statements public.

    c)    You agree that you shall not disclose to any person or entity at any time or in any manner, directly or indirectly, any information relating to the operations of Wells Fargo which has not already been disclosed to the general public. This includes but is not limited to the following information: **all information about employees or former employees,** all product information, all

information relating to Wells Fargo's strategic business or marketing plans, proprietary information and/or trade secrets; customer lists and/or names; product and service prices; customer charges; contracts; contract negotiations; and employee relations matters.

As you reaffirmed in the Departure Agreement (¶ 12), you also remain subject to the restrictive covenants set forth in any Restricted Share Rights ("RSR") Award Agreements and any Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, and Assignment of Inventions ("TSA").

You entered into several RSR Award Agreements during your employment with Wells Fargo Insurance. I enclose an example for your reference. In Section 8(a) of the RSR Award Agreement, you agreed:

> During the course of your employment, you will acquire knowledge of [Wells Fargo Insurance's] Trade Secrets and other proprietary information relating to its business, business methods, **personnel**, and customers (collectively, "Confidential Information")....You agree that Confidential Information of [Wells Fargo Insurance] is to be used solely and exclusively for the purpose of conducting business on behalf of [Wells Fargo Insurance]. You agree to keep such Confidential Information confidential and will not divulge, use or disclose this information except for that purpose. In addition, you agree that, both during and after your employment, you will not remove, share, disseminate or otherwise use [Wells Fargo Insurance's] Trade Secrets to directly or indirectly solicit, participate in or promote the solicitation of any of [Wells Fargo Insurance's] clients, customers, or prospective customers for the purpose of providing products or services that are in competition with [Wells Fargo Insurance's] products or services.

Similarly, you executed a TSA in which you acknowledged and agreed that during the course of your employment with Wells Fargo Insurance, you would acquire knowledge of certain Wells Fargo Insurance trade secrets, as well as other confidential and proprietary information relating to Wells Fargo Insurance's "business methods, **personnel**, and customers (collectively references as 'Confidential Information')." (A copy of the TSA is enclosed for your reference. *See* sections II and IX) "Trade Secrets" include, but are not limited to information concerning Wells Fargo Insurance's customers and operations and "any other proprietary and/or confidential information relating to the Company's customers, **employees**, products, services, sales, technologies, or business affairs." By signing the TSA, you agreed that any "Confidential Information" would be used by you "solely and exclusively for the purpose of conducting business on behalf of [Wells Fargo Insurance]," and that you would not "divulge, use or disclose such information except for that purpose." In addition, the TSA provides that your obligation to protect the confidential nature of such information continues even though your employment relationship with Wells Fargo Insurance has ended. The TSA further provides that this information does not become any less confidential or proprietary because you may have committed some of it to memory or because you otherwise maintained this information outside of Wells Fargo Insurance's offices.

Wells Fargo Insurance understands that you have recently become employed by Alliant Insurance Services, Inc. ("Alliant"). My client also has information that you have been soliciting its employees to cease their employment with Wells Fargo Insurance and to consider employment with Alliant, including employees located in my client's Atlanta, Charlotte, Phoenix, Tampa, and South Florida offices. If you are violating the non-disclosure and non-disparagement obligations outlined above in soliciting Wells Fargo Insurance team members or in targeting for sales activities current Wells Fargo Insurance customers or customer prospects, Wells Fargo Insurance will pursue, vigorously and aggressively, all legal remedies it believes necessary or appropriate. Wells Fargo Insurance will be monitoring this situation very carefully to protect Wells Fargo Insurance's rights and legitimate business interests.

Wells Fargo Insurance demands that you take all necessary steps to preserve all documents in your possession, custody, or control (including hard copy documents, emails, text messages, voice messages, and any information stored on personal devices, such as laptops, computers, tablets, and cellular devices) relating in any way to: (i) your solicitation of Wells Fargo Insurance employees from May 1, 2017 to present; (ii) your communications with Wells Fargo Insurance employees from May 1, 2017 to present; (iii) communications between you and Alliant relating to Wells Fargo Insurance employees; and (iv) communications between you and Alliant relating to Wells Fargo Insurance's business.

Wells Fargo reserves all rights and remedies under applicable law, including with respect to the issues described above.

Sincerely,

Nancy H. Baughan

Nancy H. Baughan

NHB/cgar

Enclosures:

Departure Agreement and Release of Claims
RSR Award Agreement
TSA

**McGuireWoods LLP**
Tower Two-Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
Tel 412.667.6000
Fax 412.667.6050
www.mcguirewoods.com

Jarrod D. Shaw
Direct: 412.667.7907

jshaw@mcguirewoods.com

# McGUIREWOODS

September 28, 2017

Sean Andreas
4224 Woodwind Lane
Allison Park, PA 15101

Dear Mr. Andreas,

McGuireWoods LLP serves as outside counsel for Wells Fargo Insurance Services USA, Inc. ("Wells Fargo Insurance"). As you know, on September 27, 2017, you resigned your position from Wells Fargo Insurance informed us that you are going to EPIC Insurance Brokers and Consultants ("Epic"). As a result of your employment with Epic, you will be in direct competition with Wells Fargo Insurance. While Wells Fargo Insurance acknowledges your right to engage in lawful competition, we will be monitoring this situation very carefully to protect Wells Fargo Insurance's rights and legitimate business interests. This includes the impact of a core group of employees leaving Wells Fargo Insurance to begin employment with Epic and the unfair competition issues which may arise from the same. Please allow this letter to serve as a reminder of your ongoing contractual obligations to Wells Fargo Insurance. We also request that you provide a copy of this letter to your current employer, along with a copy of the enclosed Agreement.

First, all information concerning clients or potential clients of Wells Fargo Insurance, including contact information, such as their names, addresses, e-mail addresses, telephone numbers, etc. and personal and financial information, insurance needs and histories including coverage expirations dates of any account, customer, client, prospect or referral obtained by you while employed by Wells Fargo Insurance is confidential and proprietary information of Wells Fargo Insurance and, like all other such confidential and proprietary information, may not be revealed or disclosed to anyone, including your new employer, or used by you in your new position. You must not remove or destroy any files, copies of files or "working files", or any other documents. You must return all confidential information maintained by you in your office and/or at home, together with any personal electronic devices in your possession. Your obligation to protect the confidential nature of such information continues even though your employment relationship with Wells Fargo Insurance has ended. Moreover, this information does not become any less confidential or proprietary because you may have committed some of it to memory or because you otherwise maintained this information outside of Wells Fargo Insurance's offices.

Second, your use of such client information, whether or not maintained on a Wells Fargo Insurance document or record, may violate that client's right to financial privacy, your fiduciary duty to Wells Fargo Insurance, and your express agreement to maintain the confidential nature of such information. Moreover, such conduct would violate statutory and common law prohibiting the misappropriation of trade secrets.

Third, enclosed herein is a copy of the Agreement Regarding Trade Secrets, Confidential Information and Assignment of Inventions that you signed on December 17, 2009 (the "Agreement"). In the Agreement, you acknowledged and agreed that all information concerning customers or potential customers of Wells Fargo, including contact information, such as their names, addresses, e-mail addresses, telephone numbers, etc. and personal and financial information, insurance needs and histories including coverage expiration dates of any account, customer, client, prospect or referral obtained by you while employed by Wells Fargo is confidential and proprietary information of Wells Fargo Insurance and, like all other such confidential and proprietary information, may not be revealed or disclosed to anyone.

You also agreed that for a period of two years following your separation from Wells Fargo Insurance that that you would not do any of the following, directly or indirectly or through associates, agents or employees:

a. solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services;

b. solicit, participate in or promote the solicitation of any of the Company's clients, customers or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship; or

c. Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company:

i. with whom you had material Contact, and/or
ii. were clients or customers of the Company within six (6) months prior to my termination of employment.

Please further note that Wells Fargo Insurance takes the position that your agreement is valid and enforceable. Moreover, we take the position that USI Insurance Services,

LLC's purchase of Wells Fargo Insurance has no impact on the enforceability of your Agreement.

The purpose of this letter is to avoid any confusion or misunderstandings before they happen. Wells Fargo Insurance takes the position that should information come to Wells Faro Insurance's attention indicating that you have improperly targeted for sales activities current Wells Fargo Insurance customers or customer prospects, or solicited Wells Fargo Insurance team members, Wells Fargo Insurance will pursue, vigorously and aggressively, all legal remedies it believes are necessary or appropriate.

We also further request that you immediately contact us regarding collection of your personal electronic device for review and inspection. Our understanding is that you used that device for work related activities and pursuant to Wells Fargo's policies and procedures, Wells Fargo is entitled to review that device for any potentially confidential information.

If you are represented by counsel, please also have your attorney call me immediately to discuss these issues.

Sincerely,

Jarrod D. Shaw

Enclosures:
Trade Secrets Agreement (TSA)
Team Member Acknowledgement (TM Ack)

cc:     Daniel J. Crawford, Executive Vice President, General Counsel, Human Resources, EPIC Insurance Brokers and Consultants

M

100% Recycled 30% PCW

McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
Tel 412.667.6000
Fax 412.667.6050
www.mcguirewoods.com

Jarrod D. Shaw
Direct: 412.667.7907

# McGUIREWOODS

jshaw@mcguirewoods.com

September 28, 2017

Zachary Mendelson
124 Morgan Drive
Morgantown, WV 26505

Dear Mr. Mendelson:

McGuireWoods LLP serves as outside counsel for Wells Fargo Insurance Services USA, Inc. ("Wells Fargo Insurance"). As you know, on September 27, 2017, you resigned your position from Wells Fargo Insurance informed us that you are going to EPIC Insurance Brokers and Consultants ("Epic"). As a result of your employment with Epic, you will be in direct competition with Wells Fargo Insurance. While Wells Fargo Insurance acknowledges your right to engage in lawful competition, we will be monitoring this situation very carefully to protect Wells Fargo Insurance's rights and legitimate business interests. This includes the impact of a core group of employees leaving Wells Fargo Insurance to begin employment with Epic and the unfair competition issues which may arise from the same. Please allow this letter to serve as a reminder of your ongoing contractual obligations to Wells Fargo Insurance. We also request that you provide a copy of this letter to your current employer, along with a copy of the enclosed Agreement.

First, all information concerning clients or potential clients of Wells Fargo Insurance, including contact information, such as their names, addresses, e-mail addresses, telephone numbers, etc. and personal and financial information, insurance needs and histories including coverage expirations dates of any account, customer, client, prospect or referral obtained by you while employed by Wells Fargo Insurance is confidential and proprietary information of Wells Fargo Insurance and, like all other such confidential and proprietary information, may not be revealed or disclosed to anyone, including your new employer, or used by you in your new position. You must not remove or destroy any files, copies of files or "working files", or any other documents. You must return all confidential information maintained by you in your office and/or at home, together with any personal electronic devices in your possession. Your obligation to protect the confidential nature of such information continues even though your employment relationship with Wells Fargo Insurance has ended. Moreover, this information does not become any less confidential or proprietary because you may have committed some of it to memory or because you otherwise maintained this information outside of Wells Fargo Insurance's offices.

Second, your use of such client information, whether or not maintained on a Wells Fargo Insurance document or record, may violate that client's right to financial privacy, your fiduciary duty to Wells Fargo Insurance, and your express agreement to maintain the confidential nature of such information. Moreover, such conduct would violate statutory and common law prohibiting the misappropriation of trade secrets.

Third, enclosed herein is a copy of the Agreement Regarding Trade Secrets, Confidential Information and Assignment of Inventions that you signed on August 1, 2011 (the "Agreement"). In the Agreement, you acknowledged and agreed that all information concerning customers or potential customers of Wells Fargo, including contact information, such as their names, addresses, e-mail addresses, telephone numbers, etc. and personal and financial information, insurance needs and histories including coverage expiration dates of any account, customer, client, prospect or referral obtained by you while employed by Wells Fargo is confidential and proprietary information of Wells Fargo Insurance and, like all other such confidential and proprietary information, may not be revealed or disclosed to anyone.

You also agreed that for a period of two years following your separation from Wells Fargo Insurance that that you would not do any of the following, directly or indirectly or through associates, agents or employees:

    a.    solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services;

    b.    solicit, participate in or promote the solicitation of any of the Company's clients, customers or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship; or

    c.    Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company:

        i.    with whom you had material Contact, and/or
        ii.    were clients or customers of the Company within six (6) months prior to my termination of employment.

Please further note that Wells Fargo Insurance takes the position that your agreement is valid and enforceable. Moreover, we take the position that USI Insurance Services,

LLC's purchase of Wells Fargo Insurance has no impact on the enforceability of your Agreement.

The purpose of this letter is to avoid any confusion or misunderstandings before they happen. Wells Fargo Insurance takes the position that should information come to Wells Faro Insurance's attention indicating that you have improperly targeted for sales activities current Wells Fargo Insurance customers or customer prospects, or solicited Wells Fargo Insurance team members, Wells Fargo Insurance will pursue, vigorously and aggressively, all legal remedies it believes are necessary or appropriate.

We also further request that you immediately contact us regarding collection of your personal electronic device for review and inspection. Our understanding is that you used that device for work related activities and pursuant to Wells Fargo's policies and procedures, Wells Fargo is entitled to review that device for any potentially confidential information. Wells Fargo Insurance further requests that you return send P-Card directly to Mark Susco at 444 Liberty Avenue, Suite 1500, Pittsburgh PA 15222.

If you are represented by counsel, please also have your attorney call me immediately to discuss these issues.

Sincerely,

Jarrod D. Shaw

Enclosures:
Trade Secrets Agreement (TSA)
Team Member Acknowledgement (TM Ack)


cc:     Daniel J. Crawford, Executive Vice President, General Counsel, Human Resources, EPIC Insurance Brokers and Consultants

N

100% Recycled    30% PCW

Tower Two-Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
Tel 412.667.6000
Fax 412.667.6050
www.mcguirewoods.com

Jarrad D. Shaw
Direct: 412.667.7909

# McGUIREWOODS

jshaw@mcguirewoods.com

September 28, 2017

Charles Morio
9560 Saltsburg Road
Pittsburgh PA 15239

Dear Charles:

McGuireWoods LLP serves as outside counsel for Wells Fargo Insurance Services USA, Inc. ("Wells Fargo Insurance"). As you know, on September 27, 2017, you resigned your position from Wells Fargo Insurance informed us that you are going to EPIC Insurance Brokers and Consultants ("Epic"). As a result of your employment with Epic, you will be in direct competition with Wells Fargo Insurance. While Wells Fargo Insurance acknowledges your right to engage in lawful competition, we will be monitoring this situation very carefully to protect Wells Fargo Insurance's rights and legitimate business interests. This includes the impact of a core group of employees leaving Wells Fargo Insurance to begin employment with Epic and the unfair competition issues which may arise from the same. Please allow this letter to serve as a reminder of your ongoing contractual obligations to Wells Fargo Insurance. We also request that you provide a copy of this letter to your current employer, along with a copy of the enclosed Agreement.

First, all information concerning clients or potential clients of Wells Fargo Insurance, including contact information, such as their names, addresses, e-mail addresses, telephone numbers, etc. and personal and financial information, insurance needs and histories including coverage expirations dates of any account, customer, client, prospect or referral obtained by you while employed by Wells Fargo Insurance is confidential and proprietary information of Wells Fargo Insurance and, like all other such confidential and proprietary information, may not be revealed or disclosed to anyone, including your new employer, or used by you in your new position. You must not remove or destroy any files, copies of files or "working files", or any other documents. You must return all confidential information maintained by you in your office and/or at home, together with any personal electronic devices in your possession. Your obligation to protect the confidential nature of such information continues even though your employment relationship with Wells Fargo Insurance has ended. Moreover, this information does not become any less confidential or proprietary because you may have committed some of it to memory or because you otherwise maintained this information outside of Wells Fargo Insurance's offices.

Second, your use of such client information, whether or not maintained on a Wells Fargo Insurance document or record, may violate that client's right to financial privacy, your fiduciary duty to Wells Fargo Insurance, and your express agreement to maintain the confidential nature of such information. Moreover, such conduct would violate statutory and common law prohibiting the misappropriation of trade secrets.

Third, enclosed herein is a copy of the Agreement Regarding Trade Secrets, Confidential Information and Assignment of Inventions that you signed on November 17, 2014 (the "Agreement"). In the Agreement, you acknowledged and agreed that all information concerning customers or potential customers of Wells Fargo, including contact information, such as their names, addresses, e-mail addresses, telephone numbers, etc. and personal and financial information, insurance needs and histories including coverage expiration dates of any account, customer, client, prospect or referral obtained by you while employed by Wells Fargo is confidential and proprietary information of Wells Fargo Insurance and, like all other such confidential and proprietary information, may not be revealed or disclosed to anyone.

You also agreed that for a period of two years following your separation from Wells Fargo Insurance that that you would not do any of the following, directly or indirectly or through associates, agents or employees:

a.   solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services;

b.   solicit, participate in or promote the solicitation of any of the Company's clients, customers or prospective customers with whom I had Material Contact and/or regarding whom I received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between me and the customer, client or prospective customer within one (1) year prior to my last day as a team member which takes place to manage, service or further the business relationship; or

c.   Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company:

   i.    with whom you had material Contact, and/or
   ii.   were clients or customers of the Company within six (6) months prior to my termination of employment.

Please further note that Wells Fargo Insurance takes the position that your agreement is valid and enforceable. Moreover, we take the position that USI Insurance Services,

LLC's purchase of Wells Fargo Insurance has no impact on the enforceability of your Agreement.

The purpose of this letter is to avoid any confusion or misunderstandings before they happen. Wells Fargo Insurance takes the position that should information come to Wells Faro Insurance's attention indicating that you have improperly targeted for sales activities current Wells Fargo Insurance customers or customer prospects, or solicited Wells Fargo Insurance team members, Wells Fargo Insurance will pursue, vigorously and aggressively, all legal remedies it believes are necessary or appropriate.

We also further request that you immediately contact us regarding collection of your personal electronic device for review and inspection. Our understanding is that you used that device for work related activities and pursuant to Wells Fargo's policies and procedures, Wells Fargo is entitled to review that device for any potentially confidential information.

If you are represented by counsel, please also have your attorney call me immediately to discuss these issues.

Sincerely,

Jarrod D. Shaw

Enclosures:
Trade Secrets Agreement (TSA)

cc:     Daniel J. Crawford, Executive Vice President, General Counsel, Human Resources, EPIC Insurance Brokers and Consultants

O

100% Recycled  30% PCW

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WELLS FARGO INSURANCE, SERVICES USA, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.:   2:17-cv-01287-DSC |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### DECLARATION OF ROBERT CAPRINO

I, ROBERT CAPRINO, declare and state as follows:

1.      I am over the age of eighteen and am fully competent to testify to the matters set forth herein.

2.      I am the Vice President and Operations Manager of Sante Berarducci, Inc.

3.      I have placed my company's property and casualty insurance business through Peter Kostorick for the past nine (9) years.

4.      Peter has earned my trust and respect as an insurance professional.  I have decided of my own free will and without inducement or solicitation of any kind to move my company's insurance business from Wells Fargo to EPIC so that I may continue my relationship with Peter.

5.      Any suggestion or claim that Peter or anyone at EPIC "solicited" me to move my company's insurance business to EPIC is untrue.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this **6** day of October, 2017.

_Robert Caprino_

LEGAL\32808618\1

2

d

100% Recycled   30% PCW



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WELLS FARGO INSURANCE, SERVICES USA, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.:   2:17-cv-01287-DSC |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF ED TYAS

I, ED TYAS, declare and state as follows:

1.    I am over the age of eighteen and am fully competent to testify to the matters set forth herein.

2.    I am the Chief Financial Officer of Ace Wire & Cable Co., Inc.

3.    I have placed my company's property and casualty insurance business through Sean Andreas for over (10) years.

4.    Sean has earned my trust and respect as an insurance professional. I have decided of my own free will and without inducement or solicitation of any kind to move my company's insurance business from Wells Fargo to EPIC so that I may continue my relationship with Sean.

5.    Any suggestion or claim that Sean "solicited" me to move my company's insurance business to EPIC is untrue.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this 6th day of October, 2017.

Ed Tyas

LEGAL\32809143\1

2

C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WELLS FARGO INSURANCE, SERVICES USA, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No.:   2:17-cv-01287-DSC |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF MARION KIVIKOSKI

I, MARION KIVIKOSKI, declare and state as follows:

1.      I am over the age of eighteen and am fully competent to testify to the matters set forth herein.

2.      I am the VP of Finance for Lisy Corp.

3.      I have placed my company's property and casualty insurance business through Sean Andreas for over (10) years.

4.      Sean has earned my trust and respect as an insurance professional.  I have decided of my own free will and without inducement or solicitation of any kind to move my company's insurance business from Wells Fargo to EPIC so that I may continue my relationship with Sean.

5.      Any suggestion or claim that Sean "solicited" me to move my company's insurance business to EPIC is untrue.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this ⎯ day of October, 2017.

_____
Marion Kivikoski

LEGAL\32809143\1

2

R

100% Recycled   30% PCW



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WELLS FARGO INSURANCE, SERVICES USA, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No.:  2:17-cv-01287-DSC |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

<u>DECLARATION OF JAMES BALET</u>

I, JAMES BALET, declare and state as follows:

1.      I am over the age of eighteen and am fully competent to testify to the matters set forth herein.

2.      I am the principal Owner and Managing Member of Pittsburgh Universal, LLC.

3.      I have placed my company's property and casualty insurance business through Pete Kostorick for over (9) years.

4.      Pete has earned my trust and respect as an insurance professional. I have decided of my own free will and without inducement or solicitation of any kind to move my company's insurance business from Wells Fargo to EPIC so that I may continue my relationship with Pete.

5.      Any suggestion or claim that Pete or anyone from EPIC "solicited" me to move my company's insurance business to EPIC is untrue.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this _1_ day of October, 2017.

James Balet

LEGAL\32809143\1

2

S

100% Recycled 30% PCW

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WELLS FARGO INSURANCE, | ) | |
| SERVICES USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:   2:17-cv-01287-DSC |
| | ) | |
| EDGEWOOD PARTNERS INSURANCE | ) | |
| CENTER, SEAN ANDREAS, ZACHARY | ) | |
| MENDELSON, CHARLES YORIO, | ) | |
| PHILLIP WAKIM, JANICE ZEWE, | ) | |
| SALLY KRAUSS, KURT KARSTENS | ) | |
| and PETER KOSTORICK, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF MARK VISCONTI

I, MARK VISCONTI, declare and state as follows:

1.      I am over the age of eighteen and am fully competent to testify to the matters set forth herein.

2.      I am the Comtroller of Derry Construction Co., Inc

3.      I have placed my company's bonding business through Zach Mendelson for over (20) years.

4.      Zach has earned our trust and respect as a bonding professional. I have decided of my own free will and without inducement or solicitation of any kind to move our company's bonding business from Wells Fargo to EPIC so that I may continue my relationship with Zach.

5.      Any suggestion or claim that Zach "solicited" me to move our company's bond business to EPIC is untrue.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this 9th day of October, 2017.

_____
Mark Visconti

LEGAL\32809143\1

2

100% Recycled  30% PCW

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WELLS FARGO INSURANCE, SERVICES USA, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No.:   2:17-cv-01287-DSC |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### DECLARATION OF SCOTT HAINES

I, SCOTT HAINES, declare and state as follows:

1.     I am over the age of eighteen and am fully competent to testify to the matters set forth herein.

2.     I am the Vice-President of Casteel Corporation, Inc.

3.     I have recently placed my company's property and casualty (captive) insurance business through Zach, and he has handled our bonding business for over (10) years.

4.     Zach has earned my trust and respect as an insurance professional.  I have decided of my own free will and without inducement or solicitation of any kind to move my company's insurance and bond business from Wells Fargo to EPIC so that I may continue my relationship with Zach.

5.     Any suggestion or claim that Zach "solicited" me to move my company's insurance and bond business to EPIC is untrue.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this $\underline{9}^{th}$ day of October, 2017.

Scott Haines

LEGAL\32809143\1

2

100% Recycled  30% PCW



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WELLS FARGO INSURANCE, SERVICES USA, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No.:   2:17-cv-01287-DSC |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF JEFF TAPOLCI

I, JEFF TAPOLCI, declare and state as follows:

1.      I am over the age of eighteen and am fully competent to testify to the matters set forth herein.

2.      I am the Chief Executive Officer of ABG Capital/Ad-Base Group, Inc.

3.      I have placed my company's property and casualty insurance business through Sean Andreas for over (10) years.

4.      Sean has earned my trust and respect as an insurance professional.  I have decided of my own free will and without inducement or solicitation of any kind to move my company's insurance business from Wells Fargo to EPIC so that I may continue my relationship with Sean.

5.      Any suggestion or claim that Sean "solicited" me to move my company's insurance business to EPIC is untrue.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this ___ day of October, 2017.

DocuSigned by:

*Jeff Tapolci*

FAFE0C86FD984EF...

10/9/2017

Jeff Tapolci

LEGAL\32809143\1

2

100% Recycled    30% PCW

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WELLS FARGO INSURANCE,              )
SERVICES USA, INC.,                 )
                                    )
            Plaintiff,              )
                                    )
        v.                          )    Case No.:   2:17-cv-01287-DSC
                                    )
EDGEWOOD PARTNERS INSURANCE         )
CENTER, SEAN ANDREAS, ZACHARY       )
MENDELSON, CHARLES YORIO,           )
PHILLIP WAKIM, JANICE ZEWE,         )
SALLY KRAUSS, KURT KARSTENS         )
and PETER KOSTORICK,                )
                                    )
            Defendants.             )

## DECLARATION OF DOUGLAS REED

I, DOUGLAS REED, declare and state as follows:

1.      I am over the age of eighteen and am fully competent to testify to the matters set forth herein.

2.      I am the VP of Finance/CFO for Wisconsin Cheese Group, LLC.

3.      I have placed my company's property and casualty insurance business through Sean Andreas for over (5) years.

4.      Sean has earned my trust and respect as an insurance professional. I have decided of my own free will and without inducement or solicitation of any kind to move my company's insurance business from Wells Fargo to EPIC so that I may continue my relationship with Sean.

5.      Any suggestion or claim that Sean "solicited" me to move my company's insurance business to EPIC is untrue.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this _9TH_ day of October, 2017.

_____

Douglas Reed

LEGAL\32809143\1

2

100% Recycled

30% PCW

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WELLS FARGO INSURANCE, SERVICES USA, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No.:   2:17-cv-01287-DSC |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF PRESTON FARRINGTON

I, PRESTON FARRINGTON, declare and state as follows:

1.     I am over the age of eighteen and am fully competent to testify to the matters set forth herein.

2.     I am the Chief Financial Officer for 1A Auto, Inc.

3.     I have placed my company's property and casualty insurance business through Sean Andreas for over (5) years.

4.     Sean has earned my trust and respect as an insurance professional.  I have decided of my own free will and without inducement or solicitation of any kind to move my company's insurance business from Wells Fargo to EPIC so that I may continue my relationship with Sean.

5.     Any suggestion or claim that Sean or anyone from EPIC "solicited" me to move my company's insurance business to EPIC is untrue.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this _9_ day of October, 2017.

Preston Farrington

LEGAL\32809143\1

2

100% Recycled 30% PCW



## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WELLS FARGO INSURANCE,<br>SERVICES USA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>EDGEWOOD PARTNERS INSURANCE<br>CENTER, SEAN ANDREAS, ZACHARY<br>MENDELSON, CHARLES YORIO,<br>PHILLIP WAKIM, JANICE ZEWE,<br>SALLY KRAUSS, KURT KARSTENS<br>and PETER KOSTORICK,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.:   2:17-cv-01287-DSC |

## DECLARATION OF DALE LOSENEGGER

I, DALE LOSENEGGER, declare and state as follows:

1.     I am over the age of eighteen and am fully competent to testify to the matters set forth herein.

2.     I am the VP of Operations for Reynaldo's Mexican Food Company, LLC.

3.     I have placed my company's property and casualty insurance business through Sean Andreas for over (10) years.

4.     Sean has earned my trust and respect as an insurance professional. I have decided of my own free will and without inducement or solicitation of any kind to move my company's insurance business from Wells Fargo to EPIC so that I may continue my relationship with Sean.

5.     Any suggestion or claim that Sean or anyone from EPIC "solicited" me to move my company's insurance business to EPIC is untrue.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this 6th day of October, 2017.

Dale Losenegger

LEGAL\32809143\1

2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WELLS FARGO INSURANCE, SERVICES USA, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.:   2:17-cv-01287-DSC |
| EDGEWOOD PARTNERS INSURANCE CENTER, SEAN ANDREAS, ZACHARY MENDELSON, CHARLES YORIO, PHILLIP WAKIM, JANICE ZEWE, SALLY KRAUSS, KURT KARSTENS and PETER KOSTORICK, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF DENNIS FARKOS

I, DENNIS FARKOS, declare and state as follows:

1.     I am over the age of eighteen and am fully competent to testify to the matters set forth herein.

2.     I am the Chief Financial Officer for Panopto, Inc.

3.     I have placed my company's property and casualty insurance business through Kurt Karstens for over (10) years.

4.     Kurt has earned my trust and respect as an insurance professional. I have decided of my own free will and without inducement or solicitation of any kind to move my company's insurance business from Wells Fargo to EPIC so that I may continue my relationship with Kurt.

5.     Any suggestion or claim that Kurt or anyone from EPIC "solicited" me to move my company's insurance business to EPIC is untrue.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed this 9th day of October, 2017.

_____
DENNIS FARKOS

LEGAL\32809143\1

2