IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:17-cv-02895-VMC-TGW

USI INSURANCE SERVICES, LLC.,
a Delaware limited liability company
as assignee and successor in interest
to WELLS FARGO INSURANCE
SERVICES USA, INC., a North
Carolina corporation,

       Plaintiff,

vs.

LOCKTON COMPANIES, LLC, an
Illinois limited liability company, SOUTHEAST
SERIES OF LOCKTON COMPANIES, LLC,
an Illinois limited liability company
NORTHEAST SERIES OF LOCKTON
COMPANIES, LLC, a Missouri
limited liability company, JO LYNN RASMUSSEN,
SHARON TRAUTEWIG, and THOMAS BONAFEDE
      Defendants.

_____/

## AMENDED COMPLAINT

Plaintiff, USI Insurance Services, LLC, as assignee and successor in interest to Wells

Fargo Insurance Services USA, Inc. ("WFIS") sues Lockton Companies, LLC, , Southeast Series

of Lockton Companies, LLC, Northeast Series of Lockton Companies, LLC, Jo Lynn Rasmussen

("Rasmussen"), Sharon Trautewig ("Trautewig") and Thomas Bonafede ("Bonafede") and states:

## NATURE OF THE ACTION

1.    This action seeks relief against former WFIS employees Rasmussen, Trautewig and

Bonafede for their breaches of their contractual obligations to WFIS. As consideration for their

continued employment with WFIS, Rasmussen, Trautewig and Bonafede (also collectively

referred to as the "Individual Defendants") each signed an "Agreement Regarding Trade Secrets,

Confidential Information, Non-Solicitation, and Assignment of Inventions" (collectively the "Agreements"). WFIS seeks a judgment for breach of the Agreements against the Individual Defendants, that the Agreements are enforceable, governed by Florida law, and for temporary and permanent injunction against the Individual Defendants barring further violation of the restrictive covenants contained their Agreements.

2.      To prevent further irreparable harm caused by the Individual Defendants, WFIS also seeks relief against Lockton Companies, LLC, Northeast Series of Lockton Companies, LLC, and Southeast Series of Lockton Companies, LLC, who have aided and abetted the Individual Defendants and other former WFIS employees to solicit colleagues, clients, disclose confidential information in violation of their Agreements and accept business from clients and prospective clients of WFIS.

## THE PARTIES, JURISDICTION AND VENUE

3.      WFIS is incorporated and has its main office in North Carolina. WFIS is one of the largest insurance brokerages in the United States, with a substantial presence in the southeast, including Florida. WFIS provides insurance brokerage and administrative services, as well as a wide range of financial and consulting services to thousands of clients.

4.      USI Insurance Services, LLC, is a Delaware limited liability company that has acquired WFIS effective December 1, 2017. USI Insurance Services, LLC's sole member is USI, Inc. USI, Inc. is a Delaware corporation and has its principal place of business in New York. Therefore, USI Insurance Services, LLC is a citizen of the states of Delaware and New York for jurisdictional purposes.

5.      Rasmussen is a former WFIS sales executive and is domiciled in Hillsborough County, Florida. Rasmussen was employed by WFIS and its predecessors in interest in Florida since approximately 1999.

2

6. Trautewig is a former WFIS' sales executive and is domiciled in Hillsborough County, Florida. Trautewig was employed by WFIS in Florida since approximately 2011.

7. Bonafede is a former WFIS' sales executive and is domiciled in Hillsborough County, Florida. Bonafede was employed by WFIS in Florida since approximately 2015.

8. Lockton Companies, LLC is an Illinois limited liability company. Upon information and belief, Lockton Companies, LLC's sole member is Lockton Management, LLC. Upon information and belief, Lockton Management, LLC's sole member is Lockton Insurance Agency, Inc. Lockton Insurance Agency, Inc. is a Missouri corporation and has its principal place of business in Missouri. Therefore, Lockton Companies, LLC is a citizen of the state of Missouri for jurisdictional purposes.

9. Lockton Companies, LLC is registered to do business in Florida and has offices in the state of Florida. Per its website, "Lockton is the world's largest privately held, independent insurance broker."[1]

10. Northeast Series of Lockton Companies, LLC is a Missouri limited liability company. Upon information and belief, Northeast Series of Lockton Companies, LLC's sole member is Lockton Management, LLC. Upon information and belief, Lockton Management, LLC's sole member is Lockton Insurance Agency, Inc. Lockton Insurance Agency, Inc. is a Missouri corporation and has its principal place of business in Missouri. Therefore, Northeast Series of Lockton Companies, LLC is a citizen of the state of Missouri for jurisdictional purposes.

11. Northeast Series of Lockton Companies, LLC is **not** registered to conduct business in Florida.

---

[1] http://www.lockton.com/the-lockton-story

#54789807_v1

12.     Southeast Series of Lockton Companies, LLC is an Illinois limited liability company.  Upon information and belief, Southeast Series of Lockton Companies, LLC's sole member is Lockton Management, LLC.  Upon information and belief, Lockton Management, LLC's sole member is Lockton Insurance Agency, Inc. Lockton Insurance Agency, Inc. is a Missouri corporation and has its principal place of business in Missouri.  Therefore, Southeast Series of Lockton Companies, LLC is a citizen of the state of Missouri for jurisdictional purposes.

13.     Southeast Series of Lockton Companies, LLC is registered to conduct business in Florida and has offices in the state of Florida and stated in its 2009 Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida that its business to be conducted or promoted in Florida is "to provide retail insurance intermediary and risk management consulting services."

14.     Lockton Companies, LLC, Northeast Series of Lockton Companies, LLC, and Southeast Series of Lockton Companies, LLC, who will be collectively referred to herein as "Lockton," which is consistent with how Lockton Companies, LLC, Northeast Series of Lockton Companies, LLC and Southeast Series of Lockton Companies, LLC present the business entity to the public.

15.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, because this action includes claims arising under the laws of the United States. The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. §1367 over state law claims.

16.     This Court also has diversity jurisdiction under  28 U.S.C. §1332. The matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, and there is complete diversity of citizenship. Injunctive relief is sought pursuant to Federal Rule of Civil Procedure 65.

4

17. Venue is proper in this judicial district under 28 U.S.C. §1391(a) because it is the district in which the conduct complained of arose.

18. WFIS has retained the services of the undersigned law firm and has agreed to pay the firm reasonable attorneys' fees and costs in connection with this matter.

## MATERIAL ALLEGATIONS

19. WFIS is a nationwide insurance broker licensed in all 50 States and is engaged in the business of selling and providing insurance services and products to its clients/customers and prospective customers throughout the United States.

20. The Individual Defendants were, prior to their resignations from WFIS, members of the private risk management ("PRM") group, which consists of over 100 team members nationally.

21. Lockton is an insurance broker and part of the Lockton family of companies, which describes itself on its website as "the world's largest privately held, independent insurance broker" (http://www.lockton.com/the-lockton-story, last visited Dec. 19, 2017).

22. Lockton is a direct competitor of WFIS.

23. Among other things, the PRM group of WFIS provides personal lines insurance brokerage and related consulting services for high net worth individuals. Benefits professionals at WFIS typically reside near the local offices and communities where WFIS' clients conduct their business, rather than in a centralized corporate office setting.

24. The Individual Defendants were based in the Tampa office of WFIS. Prior to her resignation, Rasmussen was a Senior Vice President of Private Risk Management and was the division manager of the PRM group.

25. Although the leader of the PRM group is based in Tampa, WFIS employs professionals throughout the country to service the personal insurance brokerage needs of its

5

clients. To support its business efforts, WFIS provides access to its employees to confidential and trade secret information, including marking strategies, performance metrics, client contact information and individualized client insurance needs and histories.

26.     On or about November 28, 2017, led by Rasmussen, she and at least eight other PRM group team members that included Defendants Trautewig, Bonafede and Desire Albion, Jill Arnold Bull, Lorraine (Yumul) Gant, Shirley Gordon, Chad Elgas, and Michelle Shaner ("Departing Employees") all resigned from WFIS, *en masse*, to join Lockton. The resignation letters were virtually identical and showed the concerted nature of the conduct of the Departing Employees, all of whom announced that they were planning to join "Lockton."

27.     Like the Individual Defendants, each of the other Departing Employees signed non-disclosure and non-solicitation agreements that are substantially identical to the Agreements here.

28.     The actions of the Individual Defendants and the other Departing Employees to undermine WFIS are overt. They conspired to resign on the same day allowing for a group of nine (9) employees to depart at once to join Lockton. Upon information and belief, the Defendants are soliciting additional employees. On or about November 29, 2017, Bonafede updated his Linked In profile to reflect that he was employed by "Lockton Companies" as a "Vice President, Account Executive."

29.     Gordon, a former WFIS employee based in Seattle, Washington sent client information and contact information to her home email prior to her resignation. Such a transfer of information was a violation of WFIS protocol, and there was no legitimate business reason for Gordon to send such information to her home email. Upon information and belief, Gordon sent this information to her home email in order to solicit WFIS clients in violation of her Agreement upon her arrival at Lockton.

6

30.     Elgas, a former WFIS employee and member of the PRM group based in Chicago, Illinois, has, since his resignation from WFIS and employment with Lockton directly solicited WFIS clients. He also forwarded his WFIS office line to his personal cell phone.

31.     There is no public listing for the PRM group of WFIS. The departing team members are not identifiable from publicly available information. Upon information and belief, Lockton recruited the departing employees from contact information provided by Rasmussen, or Trautewig or Bonafede.

32.     Lockton facilitated the departure of the employees through a concerted and unlawful effort, wherein Lockton raided WFIS of its talent to exploit and ultimately convert WFIS's customer relationships and goodwill to Lockton and purposefully interfere with the contractual obligations of the employees to which they owed and continue to owe WFIS .

33.     Lockton conversed with and assisted the Individual Defendants and the Departing Employees with their departures while the employees were still employed by WFIS, owed WFIS duties of loyalty and then, after their departure, were restricted through the Agreement.

34.     On November 30, 2017, Departing Employee Gordon had a conversation with Tom Longhta of WFIS in which she confirmed that Rasmussen orchestrated the mass resignations of PRM group team members from WFIS.   On or about November 27, 2017, Gordon accepted an invitation from a Lockton recruiter to join a telephone conference regarding her upcoming employment with Lockton. To Gordon's surprise, when she joined the November 27, 2017 call, there were nine (9) other people on the line including the Individual Defendants and the other Departing Employees. The subject matter of this call was the coordination of the mass resignations and employment by Lockton.

35.     Notwithstanding the employees' obligations to WFIS, the Individual Defendants and the other Departing Employees have systematically breached their contractual obligations to WFIS —with encouragement and assistance from Lockton—and inflicted significant damage and irreparable harm to the relationship between WFIS and its clients and employees.

36.     WFIS has invested substantial time, effort, money and resources into creating and maintaining its relationships and goodwill with its customers.

37.     WFIS strives to provide all of its existing and prospective insurance accounts superior service. To meet that goal, WFIS employs and trains its staff, and in particular its sale and sales servicing staff, in the unique business model WFIS has developed over many years. Among other things, that model requires WFIS to promote and foster the development of close personal relationships between its sales and support staff and its clients, and to provide its employees with unfettered access to WFIS 's confidential trade secrets and customer information.

38.     A key and principal part of WFIS 's business is providing insurance products and services that are unique to the particular needs and specifications of its customers. Information concerning WFIS 's customers and the details of their insurance needs and policies, including but not limited to non-public internal procedures, programs, and forms, non-public lists of prospective and insured customers, non-public information compiled on behalf of WFIS regarding such facts as habits and insurance needs of customers and prospective customers, locations and descriptions of insured properties or properties proposed to be insured, expiration dates of insurance policies, and insurance daily reports (hereinafter, "Confidential Information"), is considered and treated as highly confidential within WFIS and is not shared with anyone outside of the Company.

39.     WFIS has developed and maintained its Confidential Information through considerable expenditure of time, effort, and expense.

8

40.     In addition to the time, effort, and money spent to develop this Confidential Information, WFIS has also expended significant time, effort, and money to develop relationships with its customers; to learn the particular insurance needs, specifications, and requirements of its customers; to develop substantial contacts and goodwill with customers; and to market and sell its insurance products and services to those customers.

41.     WFIS considers and treats all of its Confidential Information as having substantial competitive value to the company.

42.     WFIS Confidential Information is neither generally known nor readily ascertainable by proper means from publicly available sources; is related directly to and used by WFIS's business; and provides WFIS with a competitive advantage over those who do not know this information. The possession of WFIS' Confidential Information would give competitors, particularly companies like Lockton that compete directly with WFIS by providing similar insurance brokerage services in the same area as WFIS, an unfair economic advantage in developing, marketing, brokering, and selling competitive insurance services and products.

43.     As such, WFIS uses reasonable and diligent efforts to protect and keep secret its Confidential Information. These efforts include, but are not limited to, prohibiting access to the information by the general public; requiring employees to sign confidentiality agreements; limiting general employee access to the information; instructing employees not to share the information with competitors; and restricting access to its Confidential Information to WFIS employees who agree to maintain its confidentiality and to use the Confidential Information only for the benefit of WFIS .

9

44.     In addition to WFIS' efforts relating to customer information, WFIS works hard to recruit top-level talent.  WFIS works to train its employees and retain their talents as employees are the lifeblood of WFIS' business and ongoing success.

## Broker of Record

45.     At all relevant times there was and still is a general custom and usage in the insurance brokerage industry that a broker of record is the entity authorized by the customer to negotiate insurance policy terms on the customer's behalf.

46.     At all relevant times, there was and still is a general custom and usage in the insurance brokerage business that the broker of record, for services performed, is entitled to commissions based upon a percentage of the insurance premiums payable with respect to the insurance policies purchased by the customer.  In the ordinary situation, the customer pays the premium to the insurance company (which includes a charge for the commission to be paid to the broker of record), and the broker becomes entitled to receive commissions from the insurance company as those premiums are received by the insurance company from the customer.

47.     Thus, an insurance broker like WFIS is entitled to receive a commission from the insurance company for every insurance policy on which WFIS is listed as the broker of record.

48.     When a change in the broker of record occurs, the "new" broker of record is entitled to receive commissions from the insurance company for every policy on which it is listed as the broker of record, and the "old" broker of record is no longer entitled to receive such commissions.

## WFIS Agreements with Rasmussen, Trautewig and Bonafede

49.     In consideration for their employment by WFIS, the Individual Defendants and the Departing Employees each signed agreements with WFIS that provided for a period of two years after termination of employment for any reason that they were (1) not to solicit, recruit, or promote

10

the solicitation or recruitment of any employee of WFIS for the purpose of encouraging that employee to leave employment with WFIS; (2) not to solicit, participate in, or promote the solicitation of any WFIS client, customer, or prospective customer with whom they had Material Contact[2] or regarding whom they received confidential information, for the purpose of providing Competitive Products/Services;[3] and (3) not to accept insurance business from and/or provide Competitive Products/Services to any client or customer of WFIS with whom they had Material Contact or that were clients or customers of WFIS six (6) months prior to their date of termination.

50.     Rasmussen, a veteran insurance sales executive, began working for WFIS and its predecessors in Tampa in approximately 1999. According to public records, Rasmussen has been licensed to sell insurance products in Florida since 1989 under license # A215329.

51.     Trautewig, a veteran insurance sales executive, began working for WFIS and in Tampa in approximately 2011. According to public records, Trautewig has been licensed to sell insurance products in Florida since 1999 under license # A267725.

52.     Bonafede, an insurance sales executive, began working for WFIS and in Tampa in approximately 2015. According to public records, he has been licensed to sell insurance products in Florida since 2015 under license # A314535.

53.     The Individual Defendants were responsible for managing all aspects of client relationships at WFIS, including attracting and developing new clients, expanding current client relationships, and planning, marketing and developing future client opportunities.

---

[2] Each Agreement defines "Material Contact" as "interaction between me and the customer, client or prospective customer within one (1) year prior to [their] last day as a team member which takes place to manage, service or further the business relationship."
[3] Each Agreement defines "Competitive Products/Services" as "products or services that are in competition with [WFIS] products or services."

54.     During their employment, and at WFIS' expense, the Individual Defendants received training, sales and marketing experience, and expertise in obtaining, advising, servicing and retaining WFIS 's clients.  WFIS directly provided the Individual Defendants with client relationships, and provided them with the training and resources needed to establish and cultivate those relationships.  WFIS also provided the Individual Defendants with extensive confidential information and access to trade secrets belonging to WFIS, including customer lists, lists of potential customer targets, and operational and other proprietary business information regarding WFIS.

55.     On or about July 5, 2017, in consideration of her continuing at-will employment with WFIS, Rasmussen executed and agreed to abide by the Agreement, a true and correct copy of which is attached hereto as **Exhibit "A."**  The Agreement was executed by Rasmussen in the state of Florida.   On or about November 3, 1999, Rasmussen signed a Confidentiality, Nonsolicitation and Nonacceptance Agreement with WFIS' predecessor, Acordia Southeast, Inc., a true and correct copy of which is attached hereto as **Exhibit "B."**

56.     On or about December 5, 2011, in consideration of her continuing at-will employment with WFIS, Trautewig executed and agreed to abide by the  Agreement, a true and correct copy of which is attached hereto as **Exhibit "C."**   The Agreement was executed by Trautewig in the state of Florida.

57.     On or about January 5, 2015, in consideration of his continuing at-will employment with WFIS, Bonafede executed and agreed to abide by the Agreement, a true and correct copy of which is attached hereto as **Exhibit "D."**

58.     Each Agreement signed by the Individual Defendants contains various restrictive covenants necessary to protect numerous legitimate business interests of WFIS, including, without

12

limitation, WFIS' ongoing customer goodwill, substantial relationships with actual and prospective customers, investment in training for the Individual Defendants, and its need to protect the Confidential Information.

59.     In Section II of the Agreements, the Individual Defendants acknowledged and agreed that during the course of their employment with WFIS, they would acquire knowledge of certain WFIS trade secrets, as well as other confidential and proprietary information relating to WFIS' "business, business methods, personnel, and clients (collectively referenced as 'Confidential Information')." (Ex. A, C, D, § II) They agreed that such "information is, and shall always remain, the sole and exclusive property of" WFIS . (Ex. A, C, D §I).

60.     Section II of the Agreements defines "Trade Secrets" as including, but not limited to, the following information:

a.     "the names, address, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies and objectives;"

b.     "any information concerning the Company's operations, . . . its methods, services, pricing, costs, margins and mark ups, finances, practices, strategies, business plans, agreements, decision-making systems, technology, policies, procedures, marketing, sales, techniques, agent information, and processes;" [and]

c.     "any other proprietary and/or confidential information relating to the Company's customers, employees, products, services, sales, technologies, or business affairs." (*Id.*)

61.     Section II of the Agreements also defines certain categories of "records" as confidential, which include, without limitation, any "original, duplicated, computerized, memorized, handwritten or any other form of information, whether contained in materials provided to me by the Company, or by any institution acquired by the Company, or compiled by me in any form or manner . . . ." (*Id.*)

13

62.     By signing their respective Agreements, the Individual Defendants acknowledged and agreed that any "Confidential Information" would be used by them "solely and exclusively for the purpose of conducting business on behalf of [WFIS ]," and that they would not "divulge, use or disclose" such information except for that purpose. (*Id.*)

63.     Section III of the Agreements contains different bargained-for restrictive covenants. Here, the Individual Defendants agreed that for a period of two (2) years immediately following the termination of their employment for any reason, they would not "directly or indirectly or through associates, agents, or employees":

a.      solicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company . . . .;

b.      solicit, participate in or promote the solicitation of any of the Company's clients, customers, or prospective clients with whom [they] had Material Contact and/or regarding whom [they] received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ('Competitive Products/Services'). 'Material Contact' means interaction between me and the customer, client or prospective customer within one (1) year prior to [their] last day as a team member which takes place to manage, service or further the business relationship; or

c.      Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company with whom [they] had Material Contact.

64.     In Section VIII of the Rasmussen Agreement and Bonafede Agreement, they explicitly agreed that any violation of the restrictive covenants contained in the Agreement would cause irreparable injury to WFIS and that money damages would be inadequate compensation. (Ex. A, D § VIII.)

65.     In Section VIII of the Rasmussen Agreement and Bonafede Agreement, they agreed that "any violation of this Agreement [is a] proper subject for immediate injunctive relief, specific performance and other equitable relief to the Company." (*Id.*)

14

66.     Rasmussen and Bonafede also acknowledged and agreed in Section X of the Agreement that the Agreement would "survive my employment by [WFIS ] . . . ." and "inure to the benefit of successors and assigns of" WFIS . (Ex. A, D § X)

67.     In Section VII of the Trautewig Agreement, Trautewig explicitly agreed that should she violate any of the restrictive covenants contained in the Agreement, the injury to WFIS would be irreparable and that money damages would be inadequate compensation. (Ex. C § VII.)

68.     In Section VII of the Trautewig Agreement, Trautewig also agreed that "any violation of this Agreement [is a] proper subject for immediate injunctive relief, specific performance and other equitable relief to the Company." (*Id.*)

69.     Trautewig also acknowledged and agreed in Section IX of the Agreement that the Agreement would "survive my employment by [WFIS ] . . . ." and "inure to the benefit of successors and assigns of" WFIS . (Ex. C, § IX)

70.     Because of their long-term service and expertise, WFIS placed a great deal of trust and confidence in the Individual Defendants, and they were regularly given access to Confidential Information.

71.     More specifically, Rasmussen, Trautewig and Bonafede were given access to:

(a)     documents, records, and information regarding business methods and strategies of WFIS , including its sales and/or marketing strategies;

(b)     compiled lists of actual or prospective WFIS clients and/or contact persons and decision-makers for such clients;

(c)     documents, records, and information regarding the particular needs and specifications of particular WFIS clients, including the expiration dates of specific customer plans and policies;

15

(d)     documents, records, and information regarding prospective new clients that WFIS seeks or may seek to target in the future;

(e)     contracts or the terms of contracts that WFIS has or had with its clients;

(f)     documents, records, and information regarding WFIS 's pricing, compensation plans and related strategies;

(g)     the relative strengths and weaknesses of WFIS 's business model compared to other insurance brokerage firms; and/or

(h)     the cost structure of WFIS , its products and/or profitability, among other things.

72.     The Agreement's restrictions are consistent with Fla. Stat. § 542.335, and therefore are enforceable under Florida law. Other courts in Florida have also enforced this same WFIS Agreement against other breaching employees.

## Code of Ethics & Business Conduct

73.     WFIS takes numerous steps to protect its Confidential Information in addition to requiring employees to sign agreements like the Agreement quoted above. Such steps include, among other things, the policies set forth in Wells Fargo's Code of Ethics & Business Conduct ("Code"), which employees must agree to as a condition of their employment with WFIS. The "Confidential Information" section of the Code provides, in pertinent part, as follows:

> Your role in privacy protection is critical. As a team member, you will have access to confidential information about Wells Fargo, its customers, team members, and vendors that you are obligated to protect from unauthorized disclosure. Such information is intended solely for use within Wells Fargo and is limited to those with a business need to know. Confidential information acquired by a team member through his or her employment must be held in the strictest confidence and, except for a business reason, must never be discussed with anyone – not even family members. Such information is to be used solely for corporate purposes and never for personal gain and may not be used to compete with Wells Fargo.
>
> You may not access confidential information without a business purpose. You must not disclose confidential information that you have obtained in the course of your

employment to any other team member unless the other team member has a business need to know the information for the performance of his or her duties on behalf of Wells Fargo.

Wells Fargo protects the private, personal, and proprietary information of customers, vendors, and team members. Confidential customer information may not be disclosed to persons outside Wells Fargo except when its disclosure is required by law or in accordance with Wells Fargo's privacy policies and customer agreements. In addition, Wells Fargo may have entered into a confidentiality or nondisclosure agreement to protect a third party's confidential information and to prevent unauthorized disclosure or use of that information. You must be careful to honor those agreements.

\* \* \*

Improper release of or unauthorized access to confidential information damages our customers' trust in Wells Fargo and can result in loss of business and even legal action. It also reflects on your ability to do your job and is a violation of company policy and this Code.

74.     The "Proprietary Information" section of the Code provides that "[p]roprietary information is information that is the property of Wells Fargo." It prohibits employees, among other things, from:

•      Reveal[ing] any proprietary information about the company or its team members, customers, or vendors to anyone except properly designated team members.

\* \* \*

•      Disclos[ing] or us[ing] any proprietary information in a manner that is harmful to Wells Fargo, useful to competitors, or for your own or another's gain.

•      Keep[ing] any originals or copies (in electronic or other form) of manuals, notebooks, drawings, notes, reports, proposals, other documents, materials, tools, or equipment or property belonging to Wells Fargo.

•   Passwords and computer programs.

•   Business plans.

•   Marketing plans, strategies, and costs.

•   Potential acquisitions and divestitures.

75.     Proprietary Information under the Code includes but is not limited to information

regarding:

- Wells Fargo's business.

- The Company's financial performance, if it has not been publicly announced.

- Customers.

- Team members.

- Products, services, and pricing.

- Patents and other intellectual property Wells Fargo has not disclosed to the public, including inventions related to any of Wells Fargo's businesses.

- Systems plans and information.

- Data centers or other property information.

* Marketing plans, strategies, and costs.

* Potential acquisitions and divestitures.

* Any nonpublic information that would be harmful to Wells Fargo if disclosed.

**Rasmussen, Trautewig and Bonafede's Violations of Their Legal Obligations**

76. On November 28, 2017, the Individual Defendants and other Departing Employees abruptly and without notice resigned from WFIS to join Lockton.

77. On November 28, 2017 at 8:00 a.m., Rasmussen sent Tim Prichard of WFIS a letter of resignation in which she announced that she was resigning, effective immediately, her position from WFIS and that "I plan on accepting a position at Lockton." A true and correct copy of Rasmussen's resignation letter is attached hereto as **Exhibit "E."**

78. On November 28, 2017 at 9:00 a.m., Trautewig sent Patricia Myers of WFIS a letter of resignation in which she announced that she was resigning her employment with WFIS

18

"effective immediately", that she withdrew her execution/acceptance of the WFIS/USI employment agreement, and that "I plan on accepting a position at Lockton." A true and correct copy of Trautewig's resignation letter is attached hereto as **Exhibit "F."**

79. On November 29, 2017, Bonafede has announced on his Linked-In page that he is now and insurance sales executive with "Lockton Companies."

80. Upon information and belief, prior to their resignations from WFIS, the Individual Defendants provided Lockton with copies each Agreement which they signed.

81. Each Agreement requires the Individual Defendants to "communicate the contents of this section and the non-solicitation and non-disclosure sections of this Agreement to any prospective employer," such as Lockton. (Ex. A & D, § VIII; Ex. C §VII)

82. At some point prior to November 28, 2017, while still employed by WFIS, Rasmussen recruited, approached and/or provided contact information to a recruiter for Lockton at least five (5) other team members in the private lines group to misappropriate the Confidential Information, the clients and join Lockton.

83. Rasmussen either directly recruited or provided contact information to a recruiter for Lockton of other team member employees despite the knowledge that these employees had signed non-disclosure and non-solicitation agreements similar to the Agreement that Rasmussen signed.

84. The Individual Defendants joined Lockton-a direct competitor of WFIS.

85. Rasmussen is now a principal, or otherwise affiliated with Lockton, in a role that is substantially identical to her role at WFIS. Rasmussen's employer is, according to the declaration she has filed in this case, an employee of Northeast Series of Lockton, LLC. In particular, Rasmussen continues her specialty of representing and advising clients with their insurance and

risk management needs. She will do so by capitalizing on the relationships that Rasmussen gained and developed with WFIS 's customers while working for WFIS.

86.     Trautewig is now a principal, or otherwise affiliated with Lockton, in a role that is substantially identical to her role at WFIS. Trautewig's employer is, according to the declaration she has filed in this case, an employee of Northeast Series of Lockton, LLC. In particular, Trautewig continues her specialty of representing and advising clients with their insurance and risk management needs. She will do so by capitalizing on the relationships that Trautewig gained and developed with WFIS 's customers while working for WFIS.

87.     Bonafede's employer is, according to the declaration he has filed in this case, an employee of Northeast Series of Lockton, LLC. He will continue his specialty of representing and advising clients with their insurance and risk management needs. He will do so by capitalizing on the relationships that he gained and developed with WFIS 's customers while working for WFIS.

88.     On December 6, 2017, Trautewig, Bonafede and four other Departing Employees were recipients of an email from Departing Employee Gant with the subject heading "Proposal Template." The Proposal Template, which bears the brand name "Lockton Companies," was sent by Gant with the intention that it be used by the Departing Employees to make presentations to clients. The Proposal Template is an almost exact duplication of proposals that Gant and other Departing Employees created for specific WFIS clients.

89.     On December 13, 2017, a client of WFIS advised that he had been contacted by Trautewig who "informed me that Wells Fargo Insurance has been sold."

90.     Since November 28, 2017, WFIS has received broker of record letters from WFIS clients as a well as notifications from carriers regarding changes in the broker of record.

20

## COUNT I
## Temporary and Permanent Injunction
### (Against All Defendants)

91. WFIS restates here the allegations in paragraphs 1 through 90.

92. This is an action for a temporary and permanent injunction brought pursuant to Fla. Stat. § 542.335.

93. The Individual Defendants agreed to and signed the Agreements in consideration of their continuing at-will employment with WFIS. The Agreements' restrictive covenants are reasonable.

94. WFIS has a legitimate business interest in having, requiring, and enforcing each Agreement's restrictive covenants prohibiting the Individual Defendants, and anyone in active concert, participation or privity with them, from soliciting, participating in or promoting the solicitation of any of WFIS' clients, customers or prospective clients with whom they had Material Contact and/or with whom he received Confidential Information about. WFIS also has a legitimate business interest in having, requiring, and enforcing the Agreement's restrictive covenants prohibiting the Individual Defendants, and anyone in active concert, participation or privity with them, from accepting insurance business from or providing Competitive Products/Services to customers or clients of WFIS with whom they had Material Contact. This is because the Individual Defendants had a substantial relationship with WFIS' clients and knowledge about WFIS' prospective clients, and the Individual Defendants possess Confidential Information about WFIS trade secrets, as well as other confidential and proprietary information relating to WFIS, all of which enable WFIS to foster and maintain ongoing customer goodwill and substantial relationships with its actual and prospective customers.

95. The Individual Defendants, through their employment with Lockton, and Lockton have directly or indirectly solicited WFIS' clients, customers, or prospective clients with whom Rasmussen, Trautewig and Bonafede had Material Contact or regarding whom Rasmussen, Trautewig and Bonafede received Confidential Information about during her employment with WFIS. Further, the Individual Defendants, through their employment with Lockton, and Lockton have accepted insurance business from or provided Competitive Products/Services to customers or clients of WFIS with whom the Individual Defendants has had Material Contact, which provides the Individual Defendants with an unfair competitive advantage over WFIS, in violation of the Agreements.

96. The Individual Defendants have solicited their colleagues at WFIS to join Lockton.

97. The Individual Defendants and Lockton's conduct has and continues to cause irreparable harm to WFIS, for which it has no adequate remedy at law because the damages caused are difficult, if not impossible, to quantify.

98. Each Agreement, by its terms, survives the Individual Defendants' termination of employment from WFIS.

99. Each Agreement's restrictive covenants are reasonable in scope, time, and geographic area.

100. The Individual Defendants' breach of the Agreement, in concert with Lockton, was willful, malicious, and undertaken in bad faith.

101. WFIS has a substantial likelihood of success on the merits against the Individual Defendants and Lockton.

102. WFIS has a clear legal right to a temporary and permanent injunction against the Individual Defendants and Lockton.

22

70     Granting a temporary and permanent injunction will not harm the public interest. Further, the harm caused by the Individual Defendants and Lockton for which WFIS seeks relief outweighs any possible harm to the Individual Defendants and Lockton, as they and Lockton can compete for clients who are not WFIS's clients, customers or prospective clients, can accept insurance business from or provide Competitive Products/Services to those clients who are not current customers or clients of WFIS and can employ and train employees who are not employees of WFIS.

**WHEREFORE,** WFIS requests that this Court enter a temporary and permanent injunction against Rasmussen, Trautewig, Bonafede and Lockton as follows:

A.     an order enjoining and restraining Rasmussen, Trautewig, Bonafede and Lockton for a period of two years from the date of the Order from directly or indirectly soliciting or contacting any actual/existing and prospective WFIS customer and clients with whom Rasmussen, Trautewig and Bonafede had Material Contact, and/or received Confidential Information about during their employment with WFIS;

B.     an order enjoining and restraining Rasmussen, Trautewig, Bonafede and Lockton for a period of two years from the date of the Order from accepting insurance business from, or providing Competitive Products/Services to, customers and clients of WFIS with whom Rasmussen, Trautewig and Bonafede had Material Contact, and/or received Confidential Information about during their employment with WFIS;

C.     an order requiring Rasmussen, Trautewig, Bonafede and Lockton to immediately cease doing any business with any clients of WFIS in violation of Rasmussen's Trautewig's and Bonafede's restrictive covenants for a period of two years from the date of the Order;

D.     an order preventing Rasmussen, Trautewig and Bonafede to not solicit any WFIS employees to join them at Lockton;

E.     an order preventing Rasmussen, Trautewig, Bonafede and Lockton from sharing or discussing any of WFIS' Confidential Information and Trade Secrets with any third parties;

F.     an order requiring that Rasmussen, Trautewig and Bonafede and Lockton to immediately return all WFIS Confidential Information and Trade Secrets;

G.     an order requiring Rasmussen, Trautewig and Bonafede to reimburse WFIS for all attorney's fees and costs incurred in connection with this action pursuant to Fla. St. § 542.335 and all other applicable statutory and/or contractual grounds; and;

H.     any such other and further relief in law and/or equity that the Court deems just and proper.

## COUNT II
### Breach of Contract
### (Rasmussen, Trautewig, Bonafede)

103.     WFIS restates here the allegations in paragraphs 1 through 90.

104.     The restrictive covenants contained in the Agreement signed by Rasmussen, Trautewig, and Bonafede are enforceable under Fla. Stat. § 542.335 because they are reasonable in time, area, and line of business; and are supported by one or more legitimate business interests of WFIS, including among other things WFIS' substantial relationships with specific prospective and actual existing customers and clients; training provided by WFIS to Rasmussen, Trautewig, and Bonafede; WFIS goodwill; and valuable and confidential, professional and proprietary business information and trade secrets provided by WFIS to Rasmussen, Trautewig, and Bonafede.

24

105.   The Individual Defendants' solicitation of a WFIS' clients and employees is a direct violation of their Agreement and the restrictive covenants therein.

106.   Rasmussen's, Trautewig's and Bonafede's breach of Agreement and its restrictive covenants have caused WFIS to suffer damages.

WHEREFORE, WFIS demands judgment against Rasmussen, Trautewig and Bonafede for breach of contract and for all damages, interest, costs and attorney's fees and other relief deemed proper by this Court.

## COUNT III
### Declaratory Relief - the Agreements Are Governed By and Enforceable Under Florida Law

107.   WFIS restates here the allegations in paragraphs 1 through 90.

108.   Each Agreement is governed by "the law of the state where the incidents giving rise to the dispute or claim arose." (Ex. A & D, § X; Ex. C, § IX).

109.   The Individual Defendants have worked in Florida for most of their career, and they have WFIS client contacts located in Florida. The Individual Defendants also continue to maintain their Florida brokerage licenses.

110.   An immunity, power, privilege, and/or right of WFIS is dependent upon the facts and/or law applicable to the facts, including specifically WFIS 's right to invoke Florida law regarding contracts, the enforcement of reasonable restrictive covenants, and trade secret protection, among other things.

111.   The parties have an actual, present, adverse and antagonistic interest in the subject matter of this complaint, in fact and/or in law, and the parties are before the Court by proper process or representation.

112.   The judicial declaration sought by WFIS is not a mere advisory opinion, the giving of legal advice by the courts, or an answer to questions propounded from curiosity.

25

WHEREFORE, WFIS seeks a judicial declaration that:

A.      the restrictive covenants contained in the Rasmussen, Trautewig, and Bonafede Agreement are governed by Florida (Fla. Stat. § 542.335) and not the law of any other state;

B.      the facts and events giving rise to this dispute occurred in Florida;

C.      Florida is the only proper forum for this dispute; and

D.      the restrictive covenants set forth in Sections II and III(a), III(b), and III(c)(i) of the Agreement are reasonable in time, area, and line of business, and are supported by one or more legitimate business interests of WFIS ; Rasmussen, Trautewig, Bonafede and Lockton are properly precluded, for a period of two years from November 28, 2017, from directly or indirectly through agents, soliciting, participating in or promoting the solicitation of WFIS employees and any of the WFIS clients, customers, or prospective clients that Rasmussen, Trautewig and Bonafede had Material Contact during her employment.

## COUNT IV
### Tortious Interference With Contractual Relationships
### (Against Lockton)

113.    WFIS restates here the allegations in paragraphs 1 through 90.

114.    The Individual Defendants and the other Departing Employees had enforceable agreements with WFIS not to disclose Confidential Information and not to solicit WFIS employees and WFIS customers.

115.    Lockton had actual knowledge of the Rasmussen Agreement, the Trautewig Agreement, the Bonafede Agreement and the agreements WFIS had with the other departing employees.

116.    Having had knowledge of these contractual obligations, Lockton willfully engaged in wrongful conduct designed to have the Individual Defendants and the Departing Employees breach their respective contractual obligations to WFIS .

117. There is no justification for Lockton's wrongful interference with the Rasmussen Agreement, the Trautewig Agreement and the Bonafede Agreement.

118. As a consequence of the foregoing, WFIS has suffered and will continue to suffer irreparable harm and damages.

WHEREFORE, WFIS demands judgment against Lockton for tortious interference and for all damages, interest, costs and other relief deemed proper by this Court.

## COUNT V
### Violation of the Defend Trade Secrets Act, 18 U.S.C. §1831 et seq.
### (Against All Defendants)

119. WFIS restates here the allegations in paragraphs 1 through 90.

120. This is an action against all defendants for violations of the Defend Trade Secrets Act, 18 U.S.C. §1831 et seq. ("Defend Trade Secrets Act")

121. The Confidential Information that the Individual Defendants and Lockton misappropriated and are using to solicit WFIS' clients is business information in the form of a compilation and business data compilation. Such information includes the names, addresses, contact information, and insurance information and needs of WFIS customers, and of the company's methods, services, pricing, practices, techniques, sales, and marketing.

122. The Confidential Information is properly considered a trade secret under the Defend Trade Secrets Act. This information is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use, and it is not readily available to the public or to WFIS' competitors. WFIS spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

27

123. WFIS took reasonable efforts to maintain the secrecy of the Confidential Information including disseminating policies concerning Confidential Information and trade secrets, utilizing agreements such as the Agreements executed by the Individual Defendants and the other Departing Employees, requiring passwords to be used on computers, and through the promulgation of the Code of Conduct.

124. The Confidential Information contains business data from which WFIS derives independent economic value, actual or potential, from not being generally known to WFIS' competitors, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

125. As set forth herein, the Individual Defendants have violated the Act by taking the Confidential Information and providing it to Lockton.

126. At the time it received the Confidential Information, Lockton knew it was misappropriated because it was obvious from the nature of the information provided that it was acquired by improper means.

127. Lockton aided, abetted, and facilitated Individual Defendants' theft and misappropriation of WFIS trade secrets. Additionally, the Individual Defendants are currently in possession of WFIS' trade secrets and acquired them by improper means.

128. The foregoing conduct constitutes a misappropriation and misuse of WFIS' trade secret information in violation of the Defend Trade Secrets Act, 18 U.S.C. §1831 et seq.

129. The misappropriation of WFIS' Confidential Information, and Lockton's material assistance and facilitation of the same, have cause WFIS irreparable injury for which monetary damages alone are an inadequate remedy.

#54789807_v1

WHEREFORE, WFIS demands judgment against Rasmussen, Trautewig, Bonafede and Lockton for violations of the Defend Trade Secrets Act and for all damages, injunctive relief, interest, costs, attorney's fees and other relief deemed proper by this Court.

**COUNT VI**
**Violation of the Florida Uniform Trade Secrets Act**
**(Against all Defendants)**

130.    WFIS restates here the allegations in paragraphs 1 through 90.

131.    This is an action against all defendants for violations of the Florida Uniform Trade Secrets Act. §688.001, *et. seq.*, Fla. Stat.

132.    The Florida Uniform Trade Secrets Act (the "FTSA") defines a trade secret as information that "[d]erives independent economic value, actual or potential, from not being generally known to, and readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use." §688.002(4)(a), Fla. Stat. A trade secret may be compilation of such information, including a customer list. § 688.002(4); Fla. Stat.; *Kavanaugh v. Stump*, 592 So.2d 1231, 1232 (Fla. 5th DCA 1992).

133.    The FTSA further requires that the information is "subject of efforts that are reasonable under the circumstances to maintain its secrecy." § 688.002(4)(b), Fla. Stat.

134.    WFIS employed reasonable effort to maintain trade secret protection of the Confidential Information.

135.    As set forth herein, the Individual Defendants have violated the FTSA by taking the Confidential Information and providing it to Lockton.

136.    Lockton is liable for misappropriation because the FTSA defines misappropriation to include the acquisition or use of a trade secret by another person who "knows or has reason to know" that the trade secret was acquired by improper means to obtain it and/or was under a duty

to maintain its secrecy. §688.002(2), Fla. Stat. "Improper means" includes a breach of, or inducing any employee to breach, a duty to maintain secrecy. Fla. Stat. § 688.002(1).

137.     As consequence of the Defendants violation of the Act, WFIS has suffered and will continue to suffer irreparable harm and damages.

WHEREFORE, WFIS demands judgment against Rasmussen, Trautewig, Bonafede and Lockton for violations of the Florida Uniform Trade Secrets Act and for all damages, injunctive relief, interest, costs, attorney's fees and other relief deemed proper by this Court.

## COUNT VII
### Civil Conspiracy
### (Against All Defendants)

138.     WFIS restates here the allegations in paragraphs 1 through 90.

139.     The conduct of the Individual Defendants and Lockton, jointly and severally, constituted a civil conspiracy amongst them to engage in a concerted action for an illegal, unlawful and/or inappropriate purpose.

140.     Upon information and belief, Lockton acting in conjunction with and/or conspiracy with the Individual Defendants, pursued a common purpose to raid the WFIS employees, solicit employees to leave WFIS employ, breach or tortiously interfere with the WFIS non-disclosure and non-solicitation agreements in place, and intentionally damage WFIS's business interests.

141.     The Individual Defendants acting in conjunction with Lockton to purposely solicit and recruit specific employees to leave WFIS 's employ and join Lockton.

142.     As evidenced by the timing of the employee resignations, the Individual Defendants and Lockton acted with malice and intent to deprive WFIS of its lawful interest in its various agreements, and to significantly cause the personal lines business of WFIS of financial damage.

143.    WFIS 's business interests have been damaged by the civil conspiracy concocted by the Defendants, namely the instantaneous loss of 9 employees has resulted in an immediate and severe loss of business and employee talent.

144.    As a consequence of the foregoing, WFIS has suffered and will continue to suffer irreparable harm and damages.

WHEREFORE, WFIS demands judgment against Rasmussen, Trautewig, Bonafede and Lockton for civil conspiracy and for all damages, interest, costs and other relief deemed proper by this Court.

### COUNT VIII
**Unfair Competition**
**(Against All Defendants)**

114.    WFIS restates here the allegations in paragraphs 1 through 90.

115.    Unfairly competing with WFIS, Defendants have engaged in a conspiracy to unlawfully divert, and have succeeded in unlawfully diverting, business away from WFIS for the benefit of Lockton using WFIS 's Customer relationships, good will, and confidential information and by, among other things set forth above and incorporated herein, breaching, aiding or encouraging breaches of, and tortiously interfering with the Individual Defendants' fiduciary and contractual obligations to WFIS , in order to compete unfairly with WFIS in the highly competitive insurance industry and secure, and continue to benefit from, an unfair competitive advantage not available to legitimate, unlawful competitors in the industry.

116.    Upon information and belief, Lockton acting in conjunction with and/or conspiracy with the Individual Defendants, pursued a common purpose to raid the WFIS employees, solicit employees to leave WFIS 's employ, breach or tortiously interfere with the non-disclosure and non-solicitation in place, and intentionally damage WFIS 's business interests.

31

117. As evidenced by the timing of the employee resignations, the Individual Defendants and Lockton acted with malice and intent to deprive WFIS of its lawful interest in its various agreements, and to significantly cause the personal lines brokerage business of WFIS damage.

118. WFIS's business interests have been damaged by the unfairly competitive scheme concocted by the Defendants.

WHEREFORE, WFIS demands judgment against all Defendants for unfair competition and for all damages, injunctive relief, interest, costs, attorney's fees and other relief deemed proper by this Court.

## COUNT IX
### Breach of Fiduciary Duty/Duty of Loyalty
### (Against Rasmussen, Trautewig, Bonafede)

119. WFIS restates here the allegations in paragraphs 1 through 90.

120. As employees of WFIS, the Individual Defendants each agreed to be, and was in fact, bound by WFIS's policies, including its Code.

121. By the acts and omissions described above, the Individual Defendants have breached the fiduciary duties they owed to WFIS as its employees, including the duties of loyalty, confidence and non-competition – all of which required Rasmussen, Trautewig, and Bonafede to protect WFIS's interests.

122. The Individual Defendants were prohibited from actively competing with WFIS during the tenure of their employment.

123. Upon information and belief, Rasmussen, Trautewig, and Bonafede, while still employed by WFIS, sought to compete with and to divert employees away from WFIS to themselves, and to Lockton.

124. WFIS has been damaged by the breaches of fiduciary duty of the Individual

Defendants, and by the loss of business revenue occasioned thereby, in an amount to be proven

at trial.

125. As a consequence of the foregoing, WFIS has suffered and will continue to suffer

irreparable harm and damages.

WHEREFORE, WFIS demands judgment against Rasmussen, Trautewig and Bonafede

for breach of their fiduciary duty and duty of loyalty and for all damages, injunctive relief, interest,

costs and other relief deemed proper by this Court.

Respectfully submitted,

Date: December 27, 2017

/s David E. Cannella
David E. Cannella
Florida Bar No. 983837
Luis Gonzalez
Florida Bar No. 55881
Holland & Knight LLP
200 South Orange Avenue, Suite 2600
Orlando, Florida 32801
(p) 407-244-5127; (f) 407-244-5288
Primary E-mail: david.cannella@hklaw.com
Secondary E-mail: migdalia.petrovich@hklaw.com
Primary E-mail: luis.gonzalez@hklaw.com
Secondary E-mail: dawn.spurlock@hklaw.com
*Counsel for USI Insurance Services, LLC as
assignee and successor in interest to WFIS
Insurance Services USA, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 27, 2017, the foregoing was filed with the Clerk

of the Court via CM/ECF, which will electronically serve all counsel of record.

s/ David E. Cannella
David E. Cannella

#54789807_v1